FILED

2011 Jun-06  AM 11:35
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

FILED

2011 JUN -6  A 9 08

U.S. DISTRICT COURT
N.D. OF ALABAMA

| | | |
|---|---|---|
| NELL C. DYSART, *Pro Se* | ) | |
| | ) | |
| PLAINTIFF, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| | ) | |
| BANKTRUST, F/K/A, THE PEOPLES | ) | |
| BANK AND TRUST OF SELMA, AL, | ) | |
| SUCCESSORS AND/OR ASSIGNS OF | ) | |
| THE PEOPLES BANK AND TRUST OF | ) | |
| SELMA, AL., | ) | |
| W. BIBB LAMAR, JR., | ) | |
| EDWARD T. LIVINGSTON, | ) | DEMAND TRIAL BY JURY |
| ELAM P. HOLLEY, JR., | ) | |
| MAC MARTIN, | ) | |
| ELAINE DELLINGER, | ) | |
| ANDERSON & WEIDNER, F/K/A | ) | |
| ANDERSON & ASSOCIATES, DAVID B. | ) | CV-11-RRA-1917-S |
| ANDERSON, DEANNA L. WEIDNER, | ) | |
| RYAN K. COCHRAN, | ) | |
| K. EDWARD SEXTON, II, | ) | |
| STAR PROPERTIES, LLC, STEPHEN | ) | |
| CUMMINGS, III, UNKNOWN PERSONS | ) | |
| A,B,C,D,E,F,G. | ) | |
| | ) | |
| | ) | |
| DEFENDANTS. | ) | |

## VERIFIED COMPLAINT

## I.  INTRODUCTION AND NATURE OF THIS ACTION

1.      On December 17, 2007, The Peoples Bank & Trust Company, Selma, Alabama ("Peoples") became BankTrust ("BankTrust").  (See exhibit 1, attached hereto and fully incorporated herein by reference).  At most times relevant to this Complaint, the change in ownership had not taken place.  Though for the purpose of this case – hereinafter, The Peoples Bank & Trust Company will be referred to as BankTrust.

2.      This action arises from the systematic and intentional concealment – by Defendants, acting as The Peoples BankTrust Enterprise (hereinafter "TPBE"), (together) BankTrust ("BankTrust"), W. Bibb Lamar, Jr. ("Lamar"), Edward T. Livingston ("Livingston"), Mac Martin ("Martin"), Elam P. Holley, Jr. ("Holley"), Elaine Dellinger ("Dellinger"), Anderson & Associates, LLC. ("Anderson & Associates"), Anderson & Weidner, ("Anderson & Associates"), David B. Anderson ("Anderson"), Deanna D.  Weidner ("Weidner"), Ryan K. Cochran ("Cochran"), K. Edward Sexton, II ("Sexton"), Star Properties, LLC., ("Star Properties"), and Stephen Cummings, III ("Trey Cummings") – of certain material facts, that if known by Dysart, would have allowed her an opportunity to keep her home from being foreclosed.

3.      The above named Defendants jointly and severally devised and/or participated in a scheme of racketeering activity and other related violations which were designed to – and which did – inflict extreme physical and emotional harm and severe economic hardship upon Dysart.   Furthermore, Defendants did deceive the United States Bankruptcy Court contemporaneously while engaging in a pattern of racketeering activity – to achieve the intended goal of foreclosing on her home.  Defendants' activity involves numerous predicate acts; the

2

result of which upon information and belief is ongoing and continue to the present. (See exhibit 2, attached hereto and fully incorporated herein by reference).

4.    On September 8, 2009, Dysart – represented by counsel filed a lawsuit in The Circuit Court of Jefferson County, Alabama.   Dysart will present to a jury proof of the Defendant's malicious, tortuous, and intentional interference with her right to file the action for recovery of damages to her.

5.    On October 15, 2007 – after the foreclosure sale of Dysart's home, Defendant Weidner informed Dysart that she (Weidner) had advertised Dysart's home for foreclosure sale in the Alabama Messenger on September 22, 29, and October 6, 2007.  Dysart was not notified of the advertisements and suffered a real injury as a result of the scheme of the Defendants.  The advertisements constituted mail fraud, as defined by 18 USC §1341.  Dysart, a direct victim of Defendants' scheme lost the chance to keep or to "purchase" her home because she had no knowledge of the ads in the Alabama Messenger, a local legal newspaper circulated from Birmingham, Alabama. The advertisements were mailed to a large number of subscribers.

6.    Dysart will present facts to a reasonable jury giving evidence of the Defendants' determination, perseverance, skill and precision used under the guise of legal procedure to defraud the Court and others, misrepresent material facts and ultimately, breach the mortgage contract on her home.

7.    The actions of the Defendants have caused Dysart to suffer economically and has caused her to suffer mental anguish, high blood pressure, depression, emotional distress, stress, frequent anxiety attacks, Graves Disease/hyperthyroidism, and physical discomfort, i.e., arrhythmia, weight loss, and tremors, as well. (See exhibit 3, attached hereto and fully

incorporated herein by reference). Plaintiff believes all of these illnesses were directly caused by injuries she has received as a result of the egregious conduct of the Defendants.

8.      As a direct and proximate cause of the willful and malicious conduct alleged herein, Defendants directly and proximately injured Dysart by, but not limited to: (a) Misrepresentation of a material fact in a Trial Brief filed in the United States Bankruptcy Court. The misrepresentation: that Dysart would be made aware of the amount that she owed in order to cure her tax default, "THE      PARTIES HAVE STIPULATED THAT THE TAX SALES ARE VOID, BUT AN ACCOUNTING IS NECESSARY … Peoples Bank intends to … establish the amounts due by Dysart after the tax sales are set aside"; (See exhibit 4, attached hereto and fully incorporated herein by reference) (b) conspiring and willfully concealing conversations and/or negotiations regarding a material fact – the accounting or an amount necessary to bring Dysart's property taxes current; (c)      withholding a material fact that a foreclosure was in process, in violation of the clauses contained in Dysart's note and mortgage; (d) mailing or causing to be mailed foreclosure sale advertisements of Dysart's home for which Defendants had no legal authority to advertise for such; (e)   illegally putting Dysart's home in the stream of commerce; thereby effectuating a cloud on the title. (See exhibit 2, attached hereto and fully  incorporated herein by reference) (f) using improper and illegal tactics to breach the mortgage contract on Dysart's home; (g) invasion of Dysart's privacy and trespassing on her property; (h)causing Dysart to lose the quiet enjoyment of her home; (i) tortuously hindering Dysart from presenting her case; (k)   causing Dysart to lose all equity and past, present, and future monies relating to her home.

9.      Dysart, on behalf of herself, brings this action to recover for these damages, and others caused by these Defendants, which attribute directly to the Defendant's egregious

4

conduct and fraudulent scheme(s). Dysart's claims are asserted under the federal Racketeer Influenced and Corrupt Organizations Act ("RICO") (18 U.S.C. § 1961, et.seq.) and related federal and state law statutory and common law claims.

10.     Dysart was injured on or around October 15, 2007, the date that she discovered the predicate acts of the named Defendants herein.

## II.     PARTIES

11.     Plaintiff Nell C. Dysart ("Dysart" or "Plaintiff") is an adult individual and is domiciled in Jefferson County and a resident in the State of Alabama in this judicial district.

12.     Defendant BankTrust of Alabama ("BankTrust") (f/k/a) The Peoples Bank and Trust Company of Selma, Alabama is an Alabama banking corporation with its principal place of business in Mobile, Mobile County, Alabama, with branch offices in the state of Florida. At all times pertinent to this Complaint, BankTrust (f/k/a The Peoples Bank & Trust Company) materially participated, conducted, conspired, directed, assisted, encouraged and/or otherwise aided and abetted, and/or associated with the conduct of the Enterprise, in this judicial district.

13.     Defendant W. Bibb Lamar, Jr. ("Lamar") is an adult individual and is a resident in the State of Alabama. At times relative to this Complaint, Lamar was Chairman and CEO of Defendant BankTrust, and as such controlled and associated with the conduct of TPBE.

14.     Defendant Edward T. Livingston ("Livingston") is an adult individual and is a resident in the State of Alabama. At times relative to this Complaint, Livingston was President and CEO of The Peoples Bank & Trust Company, and as such controlled and associated with the conduct of TPBE.

5

15.     Defendant Mac Martin ("Martin") is an adult individual and is domiciled in Dallas County and a resident in the State of Alabama. At all times relevant to this Complaint, Martin was an employee of Defendant BankTrust, and as such associated with the conduct of TPBE.

16.     Defendant Elam P. Holley, Jr. ("Holley") is an adult individual and is domiciled in Jefferson County and a resident of the State of Alabama. At times relevant to this Complaint, Holley was President and CEO of The Peoples Bank & Trust Company, and as such controlled and associated with the conduct of TPBE.

17.     Defendant Elaine Dellinger ("Dellinger") is an adult individual and is domiciled in Dallas County and a resident of the State of Alabama. At times relevant to this Complaint, Martin was an employee of Defendant BankTrust, and as such associated with the conduct of TPBE.

18.     David B. Anderson & Associates, LLC,  now known as Anderson & Weidner, LLC ("Anderson & Associates") is an Alabama law firm with its principal place of business in Birmingham, Jefferson County, Alabama. At all times relevant to this Complaint, Anderson & Associates materially participated, conspired, directed, assisted, encouraged and/or otherwise aided and abetted Defendants, individually, collectively, and/or associated with the conduct of the TPBE, in this judicial district.

19.     David B. Anderson ("Anderson") is an adult individual and is domiciled in Jefferson County and a resident of the State of Alabama. At all times relevant to this Complaint, Anderson was a principal in Anderson & Associates, and as such associated with the conduct of TPBE.

6

20.     Ryan K. Cochran ("Cochran") is an adult individual and is domiciled in the State of Tennessee. At times relevant to this Complaint, Cochran was an employee of Defendant David B. Anderson, and as such associated with the conduct of TPBE.

21.     Deanna L. Weidner ("Weidner") is an adult individual and is domiciled in Jefferson County and a resident of the State of Alabama. At all times relevant to this Complaint, Weidner was an employee of Defendant David B. Anderson, and as such associated with the conduct of TPBE.

22.     K. Edward Sexton II ("Sexton") is an adult individual and is domiciled in Jefferson County and a resident in the State of Alabama. At all times relevant to this Complaint, Sexton was a principal and/or employee of Evans & Sexton, and as such associated with the conduct of TPBE.

23.     Star Properties LLC  ("Star Properties") is an Alabama real estate investment company with its principal place of business in Birmingham, Jefferson County, Alabama. At times relevant to this Complaint, Star Properties materially participated, facilitated, conspired, assisted, encouraged, aided or abetted, and/or otherwise associated with the conduct of TPBE, in this judicial district.

24.     Defendant Stephen Cummings III ("Cummings") is an adult individual and is domiciled in Jefferson County and a resident in the State of Alabama. At all times relevant to this Complaint, Cummings was an agent, employee or principal of Star Properties, and as such associated with the conduct of TBPE.

## III.     JURISDICTION AND VENUE

7

25.    Pursuant to 28 U.S.C. § 1331, this Court has original jurisdiction over Plaintiff's Complaint in that claims arise under a federal statute, namely the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 et seq., or federal common law. This Court has supplemental jurisdiction over Plaintiff's other claims pursuant to 28 U.S.C. § 1367, as such claims are related to these claims which this Court has jurisdiction under 28 U.S.C. § 1331 and that such claims form a part of this same case.

26.    Venue is proper in the United States District Court of the Northern District of Alabama, Southern Division, pursuant to 28 U.S.C. § 1391(a)(b)(c). All Defendants are subject to personal jurisdiction in this district. Defendants BankTrust f/k/a/ The Peoples Bank and Trust Company, Anderson & Associates LLC, Star Properties LLC are corporations that are subject to personal jurisdiction in this judicial district; therefore, are deemed to reside in this judicial district. Defendants also advertised in this judicial district, and received revenue and profits from the sale of Dysart's home in this judicial district. Defendants made material misrepresentations and omissions in this judicial district. Therefore, a substantial part of the acts and omissions giving rise to Dysart's claims occurred in this judicial district.

## IV.    FACTS

27.    On August 30, 2002, Dysart entered into an unambiguous contractual note and mortgage agreement with BankTrust (See exhibit 5, attached hereto and fully incorporated herein by reference), for a residence located at 2637 Manchester Ct. Vestavia Hills, AL. Dysart took possession, and shortly thereafter moved into her home with her mother, who at the time was eighty-four (84) years of age.

8

28.     The note and mortgage entered into on August 30, 2002 by the parties was foreclosed on October 15, 2007, by BankTrust's breach of the contract. BankTrust failed to give Dysart notice of the foreclosure, as agreed upon in paragraphs numbers 15 & 22. (See exhibit 6, attached hereto and fully incorporated herein by reference).

29.     BankTrust also violated the Code of Alabama 1975 § 35-10-8, which states: Notice of said sale shall be given in the manner provided in such mortgage or deed of trust … . BankTrust did not give Dysart notice as required.

30.     On April 27, 2004, Dysart filed for protection under Chapter 7 Bankruptcy, under the advice of counsel, Eddie Sexton – who is now a Defendant in this case. BankTrust's note was listed as a secured debt on the Bankruptcy schedule, but was always paid outside of the schedule. IRS taxes and property taxes were listed as unsecured priority claims.

31.     Dysart's property taxes were included as unsecured priority claims, yet on May 24, 2004, in violation of the automatic stay, the Jefferson County Tax Collector sold Dysart's home for taxes.

32.     On August 3, 2004, Dysart's Chapter 7 was discharged.

33.     On October 26, 2004, Dysart's attorney, Eddie Sexton, filed a Chapter 13 Bankruptcy proceeding on her behalf, primarily to schedule outstanding payments for the unsecured priority claims for IRS and property taxes owed by Dysart. BankTrust's mortgage payments never were paid out of the bankruptcy court.

34.     In or about April, 2006, upon pre-approval, then approval – Dysart was to refinance her home in order to completely pay all debts out of her Chapter 13 plan. Dysart was

9

scheduled to close the refinance on Friday April 6, 2007 at 2:00pm, at Attorney Eddie Sexton's office, but "clear to close" documents never arrived for the closing. (See exhibit 6, attached hereto and fully incorporated herein by reference). The refinance would have included BankTrust's balance, the taxes, as well as the first overbid due to investors.

35.     In the next month, on May 23, 2006, the Jefferson County Tax Collector, once again violated the automatic stay and sold Dysart's home for taxes.

36.     On August 8, 2007, Defendant Deanna Weidner filed a Trial Brief in The United States Bankruptcy Court Northern District of Alabama Southern Division. The brief stipulated that Defendants would perform an accounting for monies that were delinquent and owed by Dysart. (See exhibit 4, attached hereto and fully incorporated herein by reference). Dysart relied on the misrepresentation(s) made in the brief, "Peoples Bank intends to examine witnesses and present evidence to establish the amounts due by Dysart after the tax sales are set aside". Defendants never intended to follow through as stipulated – and never did. Defendants did not make Dysart aware any amount that she owed. Her home was subsequently foreclosed on. Dysart was injured by that action.

37.     On September 4, 2007, an Agreed Order was entered (See exhibit 8, attached hereto and fully incorporated herein by reference) voiding the tax sales on the residence, setting them aside, and vesting the property in Dysart's name. Dysart relied on the Order. Dysart's delinquent taxes had been in the control of the courts and under a Court Order "Not to Allow Redemption" since some time before March 1, 2006 (See exhibit 9, attached hereto and fully incorporated herein by reference). Defendants violated the Agreed Order. Dysart was injured by that action, as well.

38.     In violation of the Agreed Order, in violation of her contract, and unknown to Dysart, Defendants advertised her home for foreclosure sale in the Alabama Messenger on September 22, September 29, and October 6, 2007.

39.     The Tax Collector's Letter stating the amount that Dysart owed was not entered in the tax collector's computer system until November 28, 2007.  In violation of the Agreed Order, Defendants had already foreclosed on Dysart's home on October 15, 2007.

40.     Dysart's taxes were not paid until December 27, 2007; the total amount due was $12,903.97; the Bankruptcy Court paid $6,100.00, on Dysart's behalf; Star Properties paid $5,800.00; BankTrust paid $950.00.    (See exhibit 10, attached hereto and fully incorporated herein by reference).

41.     In order to take care of her tax default, Dysart only needed to pay a balance of $6,803.97. Dysart was not informed of that amount.  Dysart could not have been informed of that amount prior to the foreclosing, due to the fact that the "accounting" was not available until November 28, 2007.  However, the $6, 803.97, owed by Dysart  was paid by Star Properties and BankTrust on December 27, 2007, approximately   two and one-half (2 ½ months) after BankTrust foreclosed on Dysart's home.

42.     On October 15, 2007, Defendants illegally foreclosed on Dysart's home.  Upon information and belief, the foreclosure took place before 11:00am, which was the advertised time of the sale. Illegally selling the residence prior to the scheduled time kept Dysart – if she had known of it – or any other interested party from bidding on the property.

43.     Dysart contracted with Attorneys John Watts and Stan Herring, who filed a lawsuit against BankTrust on September 8, 2009.

11

44.     On or about October 27, 2009, instead of filing an Answer to Dysart's Complaint, Defendants Anderson and Weidner, did email a tortuous and threatening letter and draft to Dysart's attorneys.   The Defendants threatened to file a frivolous lawsuit action against her attorneys, if they did not withdraw her lawsuit. They also threatened to file a Motion that was filled with falsities, if her lawsuit was not withdrawn.   (See exhibit 11, attached hereto and fully incorporated herein by reference).   The Defendants' email was among other things, libelous, misleading, and fraudulent.  Dysart's attorneys relied on the information, then withdrew Dysart's claim, resulting in injury to Dysart.

## V.      PATTERN OF RACKETEERING

### 18 U.S.C. § 1962(c) The Enterprise

45.     Each Defendant in this Complaint is a "Person" under 1 U.S.C. § 1. Each Defendant is this Complaint is a "Person" under 18 U.S.C. § 1961(3).  Defendant BankTrust f/k/a The Peoples Bank & Trust Company of Selma, Alabama formed an association-in-fact enterprise with Defendants, (together) BankTrust, W. Bibb Lamar, Jr., Edward T. Livingston, Mac Martin, Elam P. Holley, Jr., Elaine Dellinger, Anderson & Associates, LLC., Anderson & Weidner, David B. Anderson, Deanna D. Weidner, Ryan C. Cochran, K. Edward Sexton, Star Properties, LLC., and Stephen Cummings, III, namely The Peoples BankTrust Enterprise, (hereinafter "TPBE").  The Defendants (together, "TPBE") are an enterprise associated-in-fact and operated together for the common purpose of conspiring to divest Dysart of her home and equity therein.

46.     BankTrust and its employees role in TPBE was to conduct, oversee and direct the conduct of the affairs of the enterprise.  Anderson & Associates, LLC, Anderson & Weidner, and

David Anderson's role in TBPE was to actively participate in, manage, conduct, oversee and direct the conduct of the affairs of the enterprise. Deanna Weidner and Ryan Cochran's role in TPBE was to actively participate in the conduct of the affairs of the enterprise by carrying out orders of BankTrust and David Anderson.   Eddie Sexton's role in TPBE was to actively participate in the conduct of the affairs of the enterprise, directly or indirectly by conspiring with David Anderson and Deanna Weidner to intentionally conceal or suppress vital information that Dysart relied on.   Such was information that Sexton had a fiduciary duty to disclose to Dysart. But that he failed to do, causing Dysart to be injured by his suppression of information.   Star Properties, LLC. and Stephen Cummings, III's role in TPBE was to conspire with David Anderson and Deanna Weidner to actively participate in the conduct of its affairs indirectly by fraudulently purchasing Dysart's home.

47.   The Defendants individually and/or collectively, knowingly and willfully associated with TPBE, and directed, managed, conducted and participated in the conduct of TPBE's affairs, directly and indirectly, by playing significant roles in the predicate acts used for the facilitation of the unauthorized and unlawful foreclosure of Dysart's home by among other things, failing to disclose pertinent information to Dysart, and failing to give Dysart the required notice due to her under clause #22 of her mortgage.   The Defendant's conduct was also in violation of the Fannie Mae/Freddie Mac uniform mortgage instrument and in violation of the Code of Alabama 1975 § 35-10-8. It is of understanding and belief that certain predicate acts of The Peoples Bank Enterprise still continue to this day, as the residence has a cloud on the title and is still in the stream of commerce, as a direct result of the Defendants' illegal scheme.

VI.    **PREDICATE ACTS BY DEFENDANTS ASSOCIATED-IN-FACT WITH THE PEOPLES BANKTRUST ENTERPRISE ("TPBE")**

### 18 U.S.C. § 1341 (Mail Fraud)

48.    On or about December 6, 2007, in the Birmingham News, in the Northern District of Alabama and elsewhere, Star Properties and Trey Cummings,  Defendants herein, devised a scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute … for the purpose of executing such scheme or artifice or attempting so to do, placed in a post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service … those being illegal advertisements of Dysart's home for sale, for the purpose of "furthering the scheme to defraud", as an essential part the scheme to sell Dysart's home for obtaining money, as defined in 18 U.S.C. § 1341.

49.    On or about October 18, 2007, in the Northern District of Alabama, Anderson, Defendant herein, devised a scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmitted or caused to be transmitted by means of wire/email, communication in interstate or foreign commerce, a writing for the purpose of "furthering a scheme to defraud" Dysart of her home and the equity contained therein, as defined in 18 U.S.C. § 1343. In Defendant's email, he tried to "lull" Dysart into a "false sense of security" or acceptance that  she/Dysart was aware of Defendants' actions to foreclose; that the foreclosure was valid; that Defendants' actions were justified; that Defendant Sexton was a willing participant in the discussions relating to the foreclosure.  Defendant's wire/email communication was a material part of the illegal scheme.  Defendants also sent this same correspondence via U.S.P.S.  Defendants herein, devised a scheme or artifice to defraud, or

for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute … for the purpose of executing such scheme or artifice or attempting so to do, placed in a post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service … that being Defendant's "lulling letter", as an essential part the scheme to dispose of Dysart's home, as defined in 18 U.S.C. § 1341.

50.     On or about September 22, September 29, and October 6, 2007, in the Alabama Messenger, in the Northern District of Alabama and elsewhere, BankTrust, Weidner, and Anderson, Defendants herein, devised a scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute … for the purpose of executing such scheme or artifice or attempting so to do, placed in a post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service … those being illegal advertisements of Dysart's home for sale, as an essential part the scheme to dispose of Dysart's home for obtaining money, as defined in 18 U.S.C. § 1341.

51.     On or about July 31, August 7, and August 14, 2004, in the Alabama Messenger, in the Northern District of Alabama and elsewhere, BankTrust and Cochran, Defendants herein, devised a scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute … for the purpose of executing such scheme or artifice or attempting so to do, placed in a post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service … those being illegal advertisements of Dysart's

home for sale, as an essential part the scheme to dispose of Dysart's home for obtaining money, as defined in 18 U.S.C. § 1341.

### 18 U.S.C. § 1343 (Wire Fraud)

52.     On or about July 6, 2004 and on or about July 19, 2004, in the Northern District of Alabama, Cochran, Defendant herein, devised a scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmitted or caused to be transmitted by means of wire/facsimile, communication in interstate or foreign commerce, a facsimile, threatening Dysart to secure – with her home – an unrelated business debt approximating $114,000.00, for the purpose of "furthering a scheme to defraud", as defined in 18 U.S.C. § 1343. Defendant Cochran threatened to foreclose on Dysart's home if sufficient collateral was not offered for the existing unsecured business debt, which was included in Dysart's Chapter 7 proceeding. Collateral was not offered. BankTrust did foreclose.

53.     On October 15, 2007, in the Northern District of Alabama, Weidner and Cummings, Defendants herein, devised a scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmitted or caused to be transmitted by means of wire/telephone, communications in interstate or foreign commerce, a telephone conversation "for the purpose of executing the fraudulent scheme" to divest Dysart of her home and profit from such scheme, as defined in 18 U.S.C. § 1343. Star Properties/Cummings purchased Dysart's foreclosed home.

54.     On or about October 18, 2007, in the Northern District of Alabama, Anderson, Defendant herein, devised a scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmitted or caused to be transmitted by means of wire/email, communication in interstate or foreign commerce, a writing

16

for the purpose of "furthering a scheme to defraud" Dysart of her home and the equity contained therein, as defined in 18 U.S.C. § 1343. In Defendant's email, he tried to convince Dysart into a "false sense of security" or acceptance that she/Dysart was aware of Defendants' actions to foreclose; that the foreclosure was valid; that Defendants' actions were justified; that Defendant Sexton was a willing participant in the discussions relating to the foreclosure. Defendant's wire communication was a material part of the illegal scheme.

55.     From on or about December 6, 2007, and continuing through until or about August 19, 2008, in the Northern District of Alabama and elsewhere, Star Properties and Trey Cummings, Defendants herein, devised a scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmitted or caused to be transmitted by means of wire/internet, communication in interstate or foreign commerce, a writing for the purpose of illegally advertising for sale and profiting from the sale of Dysart's home, as defined in 18 U.S.C. § 1343. Star Properties fraudulently acquired title to Dysart's home on October 15, 2007 as a party to an illegal foreclosure of her home by Defendant, BankTrust. As a Realtor for Keller Williams Hoover, Al, Cummings advertised on Keller Williams Realty's internet website.

56.     From on or about December 6, 2007, and continuing through until or about August 19, 2008, in the Northern District of Alabama and elsewhere, Star Properties and Trey Cummings, Defendants herein, devised a scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmitted or caused to be transmitted by means of wire/internet, communication in interstate or foreign commerce, a writing for the purpose of illegally advertising for sale and profiting from the sale of Dysart's home, as defined in 18 U.S.C. § 1343. Star Properties fraudulently acquired title to

Dysart's home on October 15, 2007 as a party to an illegal foreclosure of her home by Defendant, BankTrust. As a Realtor for Keller Williams Hoover, Al, Cummings listed Dysart's home in the Birmingham Multiple Listing Service.

57. On or about October 27, 2009, in the Northern District of Alabama, BankTrust, Weidner, and Anderson, Defendants herein, devised a scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmitted or caused to be transmitted by means of wire/email, communication in interstate or foreign commerce, a writing for the purposes of "avoidance of detection, prevention of recovery of money, and to conceal an otherwise completed fraud" that divested Dysart of her home, as defined in 18 U.S.C. § 1343. On September 8, 2009, Dysart filed an action in The Circuit Court of Jefferson County, Alabama against Defendant BankTrust. On October 27, 2009, Defendants sent a threatening and malicious email, with defaming content to Dysart's attorneys. Defendants' email, which was comprised of a letter filled with falsities and a fraudulent draft, which was intended to be filed, demanded that Dysart withdraw her lawsuit against BankTrust or Dysart's attorneys would face a legal malpractice lawsuit. Dysart did withdraw her lawsuit.

## 18 U.S.C. § 1344 (Bank Fraud)

58. On or about August 19, 2008, in the Northern District of Alabama, Star Properties and Cummings, Defendants herein, with a false deed and fraudulent title to Dysart's home, sold the home to an unsuspecting buyer, as Defendants knowingly executed, or attempted to execute, a scheme or artifice to defraud a financial institution; or obtain the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution,

by means of false or fraudulent pretense, representations, or promises as defined in 18 U.S.C. 18 § 1344.

59.     On or about December 26, 2007, in the Northern District of Alabama and elsewhere, Dellinger, Defendant herein, issued an "excess funds" check to Dysart in the amount of $3,606.13, supposedly and overage from the illegal foreclosure sale of Dysart's home; as Defendant knew the sale was unlawful and that the dispensed funds were tainted, Defendant knowingly executed, or attempted to execute, a scheme or artifice to defraud a financial institution; or to obtain the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control or, a financial institution, by means of false or fraudulent pretenses, representations, or promises, as defined in 18 U.S.C § 1344.

60.     On October 15, 2007, in the Northern District of Alabama, Star Properties and Cummings, Defendants herein, illegally and fraudulently purchased Dysart's home from Defendant, BankTrust;   the purchase being made before the legal hour for sale, and with Defendant, BankTrust having no legal authority to sell, put bank customers at risk of loss; Defendants knowingly executed, or attempted to execute, a scheme or artifice to defraud a financial institution; or to obtain the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises, as defined by 18 U.S.C. § 1344.

61.     On October 15, 2007, in the Northern District of Alabama, BankTrust, Weidner, and Anderson, Defendants herein, illegally and improperly foreclosed on Dysart's home;   by violating terms and conditions of the contract regarding proper procedure for foreclosure; and by holding state statutory law in disregard;   Defendants knowingly executed, or attempted to execute, a scheme or artifice to defraud a financial institution; or to obtain the moneys, funds,

credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises, as defined by 18 U.S.C. § 1344.

**18 U.S.C. § 1509 (Obstruction of Court Orders)**

62.    On or about September 22, 2007, and other times subsequent – relative to this action, in the Northern District of Alabama, BankTrust, Weidner, and Anderson, Defendants herein, by threat or force, willfully prevented, obstructed, impeded, or interfered with, or willfully attempted to prevent, obstruct, impede, or interfere with, the due exercise of rights or the performance of duties under an order, judgment, or decree of a court of the United States, for the purpose of intentionally violating an Agreed Order entered on September 4, 2007, in The United States Bankruptcy Court For The Northern District Of Alabama Southern Division; such order imposed a duty on Defendants to perform an accounting of delinquent monies owed by Dysart; Order also gave Dysart an opportunity to cure a property tax default by voiding the 2004 and the 2006 tax sales at issue; Order restored Dysart's legal right to her residence by vesting property in her name; Defendants withheld material facts, and intentionally and fraudulently denied Dysart the due exercise of rights as defined in 18 U.S.C. § 1509.

**VII.    CONTINUITY**

63.    As set forth in paragraphs 48 to 62 Defendants acts are not isolated incidents, but are consistent with an ongoing pattern of racketeering activity. Defendants' conduct is likely to continue. However, the common purpose of the enterprise might have been accomplished when Dysart's home was foreclosed on and "further profit from the scheme to defraud, as such, may be over, yet the scheme" itself is still on-going; monies derived from the predicate acts of the Defendants still affect interstate commerce by virtue of the fraudulent deed and fraudulent title

20

that the Defendants produced.   Defendants' Anderson and Weidner's attempt to prevent detection of The Peoples BankTrust Enterprises' scheme is an ongoing material part of the scheme, itself. It is of understanding and belief that Star Properties, LLC's pattern and regular way of doing business has been in the fraudulent acquisition of real property.   Because of alleged fraud and conversion, i.e., Phillips v Star Properties, Hovies v. Star Properties, Wallace v. Star Properties; Star Properties, LLC's fraudulent activity is likely to continue.

## VIII.   DYSART'S INJURY

64.   The actions of the Defendants have caused the Plaintiff to suffer economically and has caused her to suffer mental anguish, emotional distress, stress, physical discomfort and associated illnesses, as well.   As a result of Defendant's behavior, Plaintiff is now suffering from hypertension and is being medicated to control her blood pressure.   The level of stress that Plaintiff now suffers from has caused her to be treated for hyperthyroidism.   (See exhibit 3, attached hereto and fully incorporated herein by reference).   Plaintiff believes all of these illnesses are related to the injuries she has received as a result of the Defendants control and participation in TPBE.

65.   Dysart has lost all monies that she paid for her home.   She has lost the equity that was acquired, as well as any future profits from the sale of her home. She has lost the quiet enjoyment, solitude, tranquility, and any other homeowner benefits that were attributed to her residence.

## IX.   CAUSES OF ACTION AND RELIEF REQUESTED

### COUNT ONE

### Fraud on the Court
### Defendants Weidner, Anderson, BankTrust/Officers/Employees

21

66.     Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

67.     On or about August 8, 2007, in The United States Bankruptcy Court for the Northern District of Alabama Southern Division, Weidner, Anderson, and BankTrust, Defendants herein, filed a Trial Brief for an evidentiary hearing scheduled for later that month.

68.     Such Trial Brief stated, *inter alia* … "THE PARTIES HAVE SITPULTAED THAT THE TAX SALES ARE VOID, BUT AN ACCOUNTING IS NECESSARY … Peoples Bank intends to examine witnesses and present evidence to establish the amount due by Dysart after the tax sales are set aside".

69.     Defendants misrepresented that material fact; they willfully made it to deceive Dysart into believing that she would be given the amounts that she needed to pay in order to cure her default; Dysart relied on that misrepresentation; such misrepresentation proximately caused damage to Dysart. Defendants made the misrepresentation without ever intending to honor it.

70.     Defendants previously filed a Motion for Relief From Automatic Stay in order to foreclose Dysart's mortgage. Defendants then filed a fraudulent trial brief in support of that motion to influence the court's decision to lift the Automatic Stay. The Attorney Defendants' egregious misconduct and fabrication of evidence to which they were a party to, constitute a fraud on the court. *Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238, 64 S.Ct. 997,88 L.Ed. 1250 (1944). See Rozier v. Ford Motor Company, 573 F.2d 1332. A saving clause in Rule 60(b) provides: "This rule does not limit the power of a court to entertain an independent action … for fraud upon the court." *Dausuel v. Dausuel*, 90 U.S.App.D.C. 275, 195 F.2d 774 (1952). See Rozier v. Ford Motor Company, 573 F.2d 1332.

71.     Dysart had no way of knowing the intention of the Defendants was to deceive. Under the *Throckmorton Doctrine*, for fraud to lay a foundation for an independent action, it must be such that it was not in issue in the former action; nor could it have been put in issue by the reasonable diligence of the opposing party. *Toledo Scale Co. v. Computing Scale Co.*, 261 U.S. 399, 425, 43 S.Ct. 458, 465, 67 L.Ed. 719 (1923). See Hall v. Hall, 587 So.2d 1198.

72.     As a direct and proximate result of Defendant's fraud on the court, Dysart was injured.

73.     As a consequence of Defendants' wrongdoing, Plaintiff is entitled to seek all equitable and legal remedies and damages provided by state and federal statutes, including general damages, compensatory damages, punitive damages, mental anguish damages, consequential damages, penalties, and attorneys' fees, as available.

**COUNT TWO**

**Violation of RICO, 18 U.S.C. § 1962(c)**
**All Defendants**

74.     Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

75.     Each of the Defendants if a person under 18 U.S.C. § 1961(3).

76.     BankTrust a/k/a Peoples, Anderson & Associates LLC, Anderson & Weidner LLC, David B. Anderson, Deanna D. Weidner, Ryan K. Cochran, K. Edward Sexton, Star Properties LLC, Stephen G. Cummings III, are associated-in-fact in The Peoples BankTrust Enterprise ("TPBE"), and their association-in-fact constitutes an enterprise under 18 U.S.C. § 1961(4).

77. In violation of 18 U.S.C. § 1962(c), Defendants managed, conducted, operated, and/or participated in the conduct of the affairs of TPBE, including, but not limited to, participation in such activities that furthered the Defendants' fraudulent scheme, through a pattern of racketeering activity involving multiple predicate acts of mail fraud, wire fraud, bank fraud, and all other predicate acts, as detailed within this Complaint.

78. The common purpose of this pattern of racketeering activity had been to fraudulently divest Plaintiff of her primary residence.

79. Since at least 2004, Defendants knowingly and intentionally threatened, harassed, oppressed, suppressed information, and misled Dysart. With reckless disregard for the truth, Defendants falsely represented a material fact and advertised Plaintiff's home for sale, by way of newspaper and the Internet. False advertisements were the Defendants' way of soliciting to the world for customers to purchase Dysart's home before and after the wrongful foreclosure.

80. Two years after the illegal scheme to divest Dysart of her home, Dysart filed a lawsuit to recover damages for the egregious acts of the Defendants. Defendants Anderson and Weidner tortuously interfered with the proceeding in order to conceal the Defendants' fraud.

81. Defendants' use of the Alabama Messenger constitutes mail fraud under 18 U.S.C. § 1341. As this legal news publication is generally mailed to subscribers. Defendants' use of the Birmingham News constitutes both mail fraud under 18 U.S.C. § 1341, as well as wire fraud under 18 U.S.C. § 1343. The Birmingham News is available online, therefore; giving it not only a domestic but, a real time foreign effect on interstate commerce as well.

82. As a direct and proximate result of Defendant's violation of 18 U.S.C. § 1962(c), Dysart was injured physically, economically, and emotionally because she was forced out her home, a home where she was also primary caregiver for her elderly mother. She was forced to

accept a financial loss associated with the equity that she accumulated in her home;  she lost all the payments that she had made on her home;  she lost the equity that she had accrued;  she lost the possibility of any profits that she would have made from a sale of her home.

83.    As a direct and proximate result of Defendant's violation of 18 U.S.C. § 1962(c), Dysart was injured.  The extreme mental anguish, and tremendous emotional distress that Dysart was/is under caused her illnesses of Graves disease/hyperthyroidism, high blood pressure, and related conditions that she attributes to the egregious conduct of the Defendants.

84.    Under 18 U.S.C. § 1964(c), Plaintiff is entitled to treble her general and compensatory damages, plus interest, costs and attorneys' fees.

## COUNT THREE

### Violation of RICO, 18 U.S.C. § 1962(d)
### All Defendants

85.    Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

86.    Defendants conspired to violate 18 U.S.C. § 1962(c) in violation of 18 U.S.C. § 1962(d), in order to conceal the truth from Dysart, as it related to the foreclosure of her mortgage.

87.    As a direct and proximate result of Defendants' violation of 18 U.S.C. § 1962(d), Dysart was injured because the Defendants withheld information that Dysart should have been made aware of.

88.    Under 18 U.S.C. § 1964(c), Plaintiff is entitled to treble her general and compensatory damages, plus interest, costs and attorneys' fees.

## COUNT FOUR

### Breach of Contract
### Defendant BankTrust

89.     Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

90.     On August 30, 2002, Plaintiff and Defendant BankTrust entered into a valid mortgage contract – which was not ambiguous.  That contract contained specific rights and obligations for both parties.  "If a written contract exists, the rights of the parties are controlled by that contract, … . *Alabama Fram Bureau Mutual Casualty Insurance Company v. Adams,* 289 Ala. 304, 267 So.2d 151 (1972)".  See Ramsay Health Care, Inc. v. Follmer, 560 So.2d 746.

91.     Defendants breached that contract as it relates to Clause #22, which states remedies of notice to be given to borrower in the event of default.

Notice shall specify:  (a) the default; (b) action required to cure default;   (c)  a  date  to  cure default, not less than 30 days from date notice given to borrower;   (d) that failure to cure default on or before 30 day date specified in notice may result in acceleration;  (e) notice that borrower has reinstatement rights after acceleration;   **(f) notice that borrower has right to bring court action … as defense of borrower to acceleration and sale.**

92.     Defendants did not send notice to Dysart as to acceleration of her debt, thus changing the terms and conditions of the contract.  " … Although a contract can be discharged or modified by subsequent agreement of the parties, no contract can be varied, contradicted, or discharged by an antecedent agreement.   Today may control the effect of what happened

yesterday, but what happened yesterday cannot change the effect of what happens today."
*Hibbett Sporting Goods, Inc. v. Biernbaum*, 375 So.2d 431, at 435 (Ala.1979).

93.     Even though Dysart was in default of her mortgage, Dysart relied on the
conditions of the mortgage contract which would have allowed her the opportunity to cure the
default.

94.     As a direct and proximate cause of Defendant's breach of contract, Dysart was
economically and severely injured.  Dysart's home was appraised on February 18, 2006 for
$442,000.00.  On October 15, 2007 Defendants illegally took Dysart's home from her and sold
it for $229,700.00.  Based on the 2006 appraisal, at least $212,300.00 in equity was taken away
from her.  On or about June 22, 2007, a home, three houses down from Dysart's residence sold
for $329,900.00.  That house had the exact footprint as Dysart's home, except that it did not have
a finished basement, and Dysart's did, yet a foreclosure sale significantly diminished the value of
her home.

95.     As a direct and proximate result of Defendant's breach of contract, Dysart was
injured.

96.     As a consequence of Defendants' wrongdoing, Plaintiff is entitled to seek all
equitable and legal remedies and damages provided by state and federal statutes, including
general damages, compensatory damages, punitive damages, mental anguish damages,
consequential damages, penalties, and attorneys' fees, as available.


### COUNT FIVE


**Extrinsic Fraud**
**Defendants Anderson, Weidner, BankTrust**

27

97. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

98. On September 8, 2009, Dysart being represented by Counsel filed a lawsuit in The Circuit Court of Jefferson County, Alabama against BankTrust, alleging Breach of Contract, as well as other causes of action.

99. On or about October 28, 2009, Dysart's attorneys received an email – derogatory in nature, from the law office of Defendants Anderson and Weidner. In the email, Defendant Anderson made several false statements regarding Dysart's handling of her financial obligations to BankTrust. It was those misrepresentations that challenged the integrity of any information that Dysart had given to her new attorneys.

100. Defendant Anderson did not file an answer; rather he emailed a libelous letter to avoid being detected. He made up numerous falsities that attacked Dysart and her character, in order to block her "ultimate complaint to the authorities; thereby making the apprehension of himself and the other Defendants less likely". To keep the truth from being found out, Defendant Anderson intentionally misrepresented facts.

101. Defendant Anderson also threatened to file a frivolous lawsuit action against Dysart's attorneys, if they did not "voluntarily dismiss" her lawsuit. (See exhibit 11, attached hereto and fully incorporated herein by reference). Defendant Anderson was well aware of the fact that the mortgage contract signed by Defendant BankTrust and Dysart states at paragraph number 22:

**(f) notice that borrower has right to bring court action … as defense of borrower to acceleration and sale.**

102.    Defendant Weidner – by emailed draft, (See exhibit 11, attached hereto and fully incorporated herein by reference) threatened to file a Motion to Dismiss or In the Alternative Motion for Summary Judgment if the lawsuit went forward.  Defendant Weidner's Motion also included numerous falsities.  Likewise, Defendant Weidner did not want the truth to be known; therefore, she too intentionally misrepresented facts.

103.    Defendants Anderson and Weidner, by email communication made several intentional false representations concerning, but limited to Dysart's Chapter 7 and Chapter 13 bankruptcy filings; about Dysart's non-payment of property taxes; and about Dysart's knowledge of Defendants' illegal scheme to foreclose on her mortgage.

104.    The false representations caused Dysart's attorneys to question the integrity of her claims.  Dysart withdrew her case against Defendants in reliance on the false representations.

105.    The Defendants caused Dysart not to present her case, which deprived Dysart of an opportunity to be heard, and caused damage to her.

106.    On some time shortly after October 28, 2009, Dysart met with her attorneys regarding her lawsuit, and the allegations made by Defendants, Anderson and Weidner.  It was decided in the meeting that Dysart would withdraw her lawsuit.  Dysart became overwhelmed and could not contain her hurt and disappointment.  She broke down and cried during the meeting.

107.    As a direct and proximate result of Defendant's fraudulent actions, Dysart was injured.

108.    As a consequence of Defendants' wrongdoing, Plaintiff is entitled to seek all equitable and legal remedies and damages provided by state and federal statutes, including

general damages, compensatory damages, punitive damages, mental anguish damages, consequential damages, penalties, and attorneys' fees, as available.

## COUNT SEVEN

### Trespass
### All Defendants

109.    Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

110.    On October 15, 2007, Dysart had a possessory right to her residence located at 2637 Manchester Ct., Vestavia Hills, AL   36226, as vested in her name by Agreed Court Order, entered on September 4, 2007, in The United States Bankruptcy Court of the Northern District of Alabama Southern Division.

111.    On October 15, 2007, without Dysart's consent – BankTrust, together with other Defendants herein, in violation of Dysart's legal right to her property, did consciously intend to unlawfully divest Dysart of the legal interest in her property.

112.    On October 15, 2007, BankTrust, together with other named Defendants herein, illegally foreclosed on Dysart's home; filed a false deed and transferred a fraudulent title, both in favor of the Defendants that – which to this day affects the stream of commerce.  (See exhibit 2, attached hereto and fully incorporated herein by reference)

113.    As a direct and proximate result of Defendant's violation, Dysart was injured.

114.    As a consequence of Defendants' wrongdoing, Plaintiff is entitled to seek all equitable and legal remedies and damages provided by state and federal statutes, including general damages, compensatory damages, punitive damages, mental anguish damages, emotional distress damages, consequential damages, penalties, and attorneys' fees, as available.

## COUNT SIX

### Intentional Infliction of Emotional Distress
### All Defendants

115.    Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

116.    Since October 15, 2007 and times thereafter, Defendants herein, have caused Dysart much disappointment, hurt, humiliation, embarrassment, physical discomfort, mental anguish, stress, emotional distress, and sadness.

117.    Defendants have acted: (1) intentionally and recklessly to cause Dysart undue pain, including but not limited to filing fraudulent misrepresentations in a court proceeding; (2) Defendants' conduct has been excessively extreme and outrageous, including, but not limited to conspiring and unlawfully selling Dysart's home; (3) Defendants' extreme conduct has caused Dysart to lose her home; (4) and the loss of Dysart's home has caused her severe medical injury. As a result of the egregious conduct of the Defendants, Dysart has a medical diagnosis of, and is being treated for: hypertension, stress, anxiety, depression, and Graves Disease, and related illnesses, which were not onset until the Defendant's conduct affected Dysart.

118.    As a direct and proximate result of Defendant's violation, Dysart was injured.

119.    As a consequence of Defendants' wrongdoing, Plaintiff is entitled to seek all equitable and legal remedies and damages provided by state and federal statutes, including general damages, compensatory damages, mental anguish damages, emotional distress damages, consequential damages, punitive damages, penalties, and attorneys' fees, as available.

As a result of the intentional misconduct of the defendants as described in the preceding paragraphs, Plaintiff, Nell C. Dysart, prays this Honorable Court will grant relief as hereinafter set forth.

WHEREFORE, Plaintiff, Nell C. Dysart, prays for relief as follows:

a.   For general damages in an amount according to proof at trial;

b.   For punitive damage and all treble damages based on compensatory damages per RICO statute as allowed by law according to proof;

c.   For prejudgment interest as allowed by law;

d.   For all compensatory damages;

e.   For consequential damages;

f.   For discretionary damages;

g.   For all costs of suit, including attorney fees, investigators and other related legal fees;

h.   For all special damages according to proof;

i.   Granting such other and further relief as the Court deems just and proper.

Respectfully submitted,

Dated:  June 3, 2011

Nell C. Dysart, Pro Se, Plaintiff
2509 Tempest Drive SW
Birmingham, AL  35211
P.O. Box 10042
Birmingham, AL  35202
(205) 369-4074 CL
(866) 388-8949 FX
ncdysart@msn.com

## VERICATION OF COMPLAINT

I, Nell C. Dysart, hereby take oath and state that:

1.      I have personal knowledge of the facts and circumstances underlying this suit and I have carefully read each of the allegations contained in the Complaint; and

2.      Each of the allegations contained in this Complaint are true and accurate to the best of my knowledge and belief.

Signed under the pains and penalties of perjury this ____3____ day of June, 2011.

_____
Nell C. Dysart


STATE OF ALABAMA        )
COUNTY OF JEFFERSON  )

I, the undersigned, a Notary Public in and for said County in said State, hereby certify that Nell C. Dysart, whose name is signed to the foregoing instrument, and who is known to me, took oath and stated that the foregoing statements were true and accurate to the best of the affiant's knowledge and belief.

Given under my hand and seal of office this __3__ day of June, 2011.


_____
Notary Public

My commission expires:_____ **MY COMMISSION EXPIRES FEBRUARY 13, 2012**

33

**SERVE DEFENDANTS VIA CERTIFIED MAIL AT THE FOLLOWING ADDRESSES:**

BankTrust
Corporate Headquarters
100 St. Joseph Street
Mobile, AL   36602

W. Bibb Lamar, Jr.
c/o BankTrust
100 St. Joseph Street
Mobile, AL   36602

Edward T. Livingston
c/o BankTrust
310 Broad Street
Selma, AL   36701

Mac Martin
c/o BankTrust
310 Broad Street
Selma, AL 36701

Elaine Dellinger
c/o BankTrust
310 Broad Street
Selma, AL 36701

Elam P. Holley, Jr.
c/o Southcity Bank
1360 Montgomery Highway Ste: 100
Vestavia Hills, AL   35216

Anderson & Associates, LLC,
AKA Anderson & Weidner, LLC
Financial Center
505 20th Street North Ste:  1450
Birmingham, AL 35203

David B. Anderson

c/o Anderson & Associates, LLC,
AKA Anderson & Weidner, LLC
Financial Center
505 20th Street North Ste: 1450
Birmingham, AL 35203

Deanna L. Weidner
c/o David B. Anderson & Associates, LLC,
AKA Anderson & Weidner, LLC
Financial Center
505 20th Street North Ste: 1450
Birmingham, AL 35203

Ryan K. Cochran
c/o Waller, Lansden, Dortch & Davis, LLP
511 Union Street Ste: 2100
Nashville, TN 37219

K. Edward Sexton, II
c/o Gentle, Turner & Sexton
2  20th Street North Ste: 1200
Birmingham, AL 35203

Star Properties LLC
2201 Hidden Ridge Cir
Birmingham, Alabama 35243

Stephen Cummings III
2201 Hidden Ridge Cir.
Birmingham, Alabama 35243

**Exhibits 1 thru 11 attached thereto and fully incorporated therein.**

 

*EXHIBIT 1*

November 14, 2007

`··············AUTO··ALL FOR AADC 350`

` իվիկիկոսիկիկիկ ||ոսկլկիկոսկիկոսիկ ||`

Nell C Dysart       **29  5525**
2637 Manchester Ct
Vestavia Hills AL 35226-3573

As a valued Peoples Bank & Trust customer, we are pleased to announce some exciting news about your banking relationship. On December 17, 2007, The Peoples Bank & Trust Company will become **BankTrust**.

**Your existing account features, benefits and account number will remain the same.** And now, you will enjoy access to a much larger network of banking offices and ATM locations.

As always, our first priority is you, our customer. If you have any questions, simply stop by any of our convenient locations, or give us a call at 1-877-484-3728. Also, be sure to review the "Frequently Asked Questions" section on the back of this letter.

Thank you for your relationship with The Peoples Bank & Trust Company. As we welcome you into the BankTrust family, we remain committed to providing the same great customer service to which you are accustomed.

Sincerely,

W. Bibb Lamar, Jr.
Chairman and CEO
BankTrust

Edward T. Livingston
President and CEO
The Peoples Bank & Trust Company

Enclosure

Member FDIC



*EXHIBIT 2*

## Match Found.

Based on the property information entered, it appears Fannie Mae owns a loan at this address.

A "Match Found" status does not guarantee or imply that you will qualify for a Making Home Affordable refinance or modification.

If you're interested in a refinance, please contact your mortgage lender or servicer (the organization to whom you make your monthly mortgage payments) to confirm these results and ask about the Home Affordable Refinance Plus program.

*SEARCHED ON*
*JUNE 2, 2011.*



HEALTH
SYSTEM

*The Kirklin Clinic*

November 3, 2010

EXHIBIT
3

**RE:  Nell Dysart (D.O.B. 12-20-51)**

To Whom It May Concern:

I have been treating Ms. Nell Dysart for hyperthyroidism secondary to Graves disease
since March, 2010. She also underwent an ultrasound guided fine needle biopsy of a right
thyroid nodule on May 5, 2010. These medical problems have caused severe physical and
emotional stress to her. Fortunately, she is responding to treatment and is doing much
better.  Please take her medical issues into consideration

Please contact me if you have any question regarding Ms. Dysart's endocrine problems.

Sincerely,

Carlos R. Arguello, M.D., F.A.C.E.
Assistant Professor of Medicine
Division of Endocrinology, Diabetes and Metabolism
Phone: 205-801-8490

CA/ag

**Department of Medicine** | The University of
*Division of Endocrinology* | Alabama at Birmingham
4FL The Kirklin Clinic | Mailing Address:
2000 6th Avenue South | TKC 4FL
205.801.8490 | 2000 6TH AVE S
Fax 205.801.8798 | BIRMINGHAM AL 35233-0271

 **UNIVERSITY OF ALABAMA**
**HEALTH SERVICES FOUNDATION, P.C.**

THE KIRKLIN CLINIC

10/14/2010

Ref Phy
Address

Re:  NELL DYSART
     UAB #:  000001424967

To Whom It May Concern,

Ms. Nell Dysart has been my patient since February of 2001.  Over the last 6 months, she has
had a difficult time medically.  She had a period of weight loss starting before February that
she felt was secondary to stress.  She was subsequently diagnosed with Graves' disease and
has been undergoing treatment for this.  She, in addition, has had problems with carpal tunnel
syndrome, hypertension, ulnar neuropathy, back pain, muscle cramps, osteopenia, vitamin D
deficiency, and possible early glaucoma.  Please take these conditions into consideration.

Sincerely,

*Laurie Hall*

Laurie Hall, M.D.

Laurie Hall, M.D.

LH/vha/2740
lmlete6

*send copy to patient*

University of Alabama Health Services Foundation, P.C.
The University of Alabama at Birmingham
2000 Sixth Avenue South    Birmingham, Alabama
(205) 801-8000

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

*EXHIBIT 4*

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| NELL C. DYSART, | ) | BANKRUPTCY CASE NO. |
| | ) | |
| DEBTOR. | ) | 04-09416-TBB 13 |
| | ) | |

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| THE PEOPLES BANK AND TRUST | ) | |
| COMPANY, | ) | |
| Plaintiff, | ) | |
| v. | ) | ADVERSARY PROCEEDING NO. |
| | ) | |
| PLYMOUTH PARK TAX SERVICES, | ) | 07-00040-TBB |
| LLC; HEARTWOOD '88, LLC; J.T. | ) | |
| SMALLWOOD, in his capacity as | ) | |
| Tax Collector of Jefferson | ) | |
| County, Alabama; and NELL C. | ) | |
| DYSART. | ) | |
| Defendants. | ) | |

## TRIAL BRIEF

The captioned Adversary Proceeding and Peoples Bank's Motion for relief from automatic stay is set for an evidentiary hearing on August 22. 2007. The Peoples Bank and Trust Company ("Peoples Bank") submits the following Trial Brief in support of its complaint and Motion.

## BACKGROUND FACTS

1. On August 30, 2002, Dysart entered into the Adjustable Rate Note in the amount of $210,000.00 with Peoples Bank. Also

7705.6

on August 30, 2002, Dysart, a single woman, granted Peoples Bank a mortgage on the above-described property, known as 2637 Manchester Court, Vestavia Hills, Alabama 35226 (the "Mortgage"). The Mortgage is recorded at Instrument No. 200212/3739, in the Probate Office of Jefferson County, Alabama.

2. On April 27, 2004, Nell C. Dysart (the "Debtor") filed for Chapter 7 Bankruptcy relief, Case No. 04-03798-TBB-7. The Debtor scheduled her residence located at 2637 Manchester Court, Vestavia Hills, Alabama 35226 (the "Residence") and scheduled her debt to People's Bank, which is secured by the Residence.

3. In violation of the automatic stay, on May 24, 2004, J.T. Smallwood, in his capacity as the Jefferson County Tax Collector (the "Jefferson County Tax Collector") purported to sell the Debtor's Residence to Plymouth Park Tax Services, LLC ("Plymouth") for pre-petition taxes owed and an excess bid of approximately $38,000 (the "Plymouth Overbid").

4. On October 26, 2004, the Debtor filed for Chapter 13 bankruptcy relief. The Debtor scheduled the Residence and, consistent with the tax sale being void, she indicated that she owned the Residence in fee simple. Dysart also scheduled her debt to Peoples Bank as undisputed.

5. On December 13, 2005, the Debtor's Chapter 13 Plan was confirmed. Dysart did not address the treatment of Peoples Bank

in her plan, but elected to continue to make payments on her debt directly to Peoples Bank.

6.    The Confirmation Order requires the Debtor to pay Plymouth $605 per month for 60 months on a void obligation, or $36,300 in addition to the return of the $38,000 overbid which has been paid by the Trustee to Plymouth.

7.    Plymouth filed a priority claim for $7,341.24 and an amended claim alleging it was secured for $13,221.25 plus 12% interest from January 6, 2006 until paid in full.  These claims are null and void and have burdened the Chapter 13 estate to the extent that the Debtor ceased paying current taxes and insurance on the property so that the Debtor could pay a void obligation.

8.    On May 23, 2006, the Jefferson County Tax Collector, with knowledge of the Chapter 13 bankruptcy case and again in violation of the automatic stay, purported to sell the Residence, this time to Heartwood 88' LLC ("Heartwood") for $64,000, resulting in an overbid of approximately $50,000 (the "Heartwood Overbid").

9.    Neither the Jefferson County Tax Collector nor Heartwood received relief from the Chapter 13 automatic stay in order to sell and purchase the Residence in 2006.

10.   Pursuant to the Mortgage, Dysart is required to maintain insurance on the Residence in an amount sufficient to adequately protect Peoples Bank.  The Mortgage also permits the

lender to obtain insurance coverage on the Residence at Dysart's expense if Dysart fails to maintain the required coverage.   Any funds Peoples Bank pays for insurance is immediately due and payable by Dysart.   A failure to immediately reimburse Peoples Bank is a default under the Mortgage and entitles Peoples Bank to accelerate all sums due and foreclose upon the property.

11.   Prior to July 20, 2006, Peoples Bank was notified that Dysart failed to maintain insurance on the Residence.   Peoples Bank demanded that the debtor cure her default, but the debtor failed to do so.

12.   On or about July 20, 2006, Peoples Bank temporarily forced placed insurance on the Residence at the cost of $4,790.00.   Peoples Bank demanded that the debtor renew the insurance on the property and reimburse Peoples Bank for the premiums which Peoples Bank has paid, plus costs and interest. Several months later, the Debtor obtained insurance on the property, but has not reimbursed Peoples Bank for the cost of the forced placed insurance.   Peoples Bank received a refund of the used premium, which resulted in the total payment of $2060 for the forced placed insurance.

13.   The Debtor is also required to pay all property taxes assessed to the Residence.

14.   Pursuant to the Jefferson County Tax Collector, the Debtor has failed to pay taxes since 2002.

15.  The Debtor's failure to pay insurance and taxes each constitute a default on her mortgage.

16.  Dysart has defaulted on her Mortgage to Peoples Bank and the current amount of the indebtedness due is $197,654.59 ($195,637.12 principal; $2,017.47 interest) as of January 16, 2007; plus forced placed insurance costs of $2060.00 as of July 20, 2006; exclusive of costs of collection and reasonable attorneys' fees.  Interest continues to accrue on the principal sum at the rate of $44.83 for each day after January 16, 2007. Interest also continues to accrue upon the insurance premiums paid. Dysart also owes attorney's fees for the efforts of Peoples to protect its mortgage and collect its debt which is in default.

17.  Despite notice of default, no payment has been made on this indebtedness.

18.  Peoples Bank filed its Motion to Terminate the Automatic Stay in Case No. 04-09416-TBB-13 on February 13, 2007.

19.  Peoples Bank filed its complaint against Plymouth, Heartwood, the Jefferson County Tax Collector and the Debtor to void the tax sales on March 13, 2007.

20.  Counsel for Plymouth and Heartwood and Counsel for the Jefferson County Tax Collector have stipulated that the tax sales are void.

21. The trial of this adversary proceeding and the evidentiary hearing regarding Peoples Bank's Motion to Terminate the Automatic Stay are scheduled to occur on August 22, 2007.

## I. THE PARTIES HAVE STIPULATED THAT THE TAX SALES ARE VOID, BUT AN ACCOUNTING IS NECESSARY

All parties have stipulated that the tax sales of the Residence occurred in violation of the automatic stay and are, therefore, void. The only issues remaining in the Adversary Proceeding are the amount necessary to cure defaults under the Mortgage which are the insurance premiums, the attorney's fees and the amount of taxes owed by Dysart after the tax sales are set aside. Peoples Bank intends to examine witnesses and present evidence to establish the amounts due by Dysart after the tax sales are set aside.

## II. CAUSE EXISTS FOR RELIEF FROM THE AUTOMATIC STAY

Dysart's failure to pay taxes and maintain insurance on the Residence constitutes "cause" under 11 U.S.C. § 362(d)(1) for granting Peoples Bank relief from the stay in this Chapter 13 bankruptcy action. See In re: Elmira Litho, Inc., 174 B.R. 892, 902 (Bankr. S.D.N.Y. 1994) (holding that a secured creditor lacks adequate protection if there is a threat of a decline in the value of the property); In re: Delaney-Marin, 304 B.R. 365, 370, n. 3 (9th Cir. 2003) (holding that a threat to decline

includes failure to maintain property insurance)(reversed on other grounds). Debtor's refusal to pay taxes and provide and maintain insurance upon the property is cause to grant relief from the automatic stay pursuant to 11 U.S.C. § 362(d)(1).

Peoples Bank lacks adequate protection and is otherwise entitled to relief from the automatic stay pursuant to 11 U.S.C. § 362(d)(1). Pursuant to the terms of her mortgage, Dysart was given notice that she was in default and payment was demanded. No such payment was made and many months have expired since Dysart was provided notice. Therefore, the indebtedness secured by the mortgage is due to be accelerated and upon the termination of the automatic stay, Peoples Bank is entitled to immediately proceed with advertising the foreclosure sale of the mortgaged property.

Respectfully Submitted,

/s/ Deanna L. Weidner
David B. Anderson
Deanna L. Weidner
Attorneys for The Peoples Bank and
Trust Company

OF COUNSEL
Anderson & Associates, LLC
Financial Center
505 20th Street North, Suite 1450
Birmingham, Alabama, 35203
Telephone (205) 324-1230
Facsimile  (205) 322-3890

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the above and foregoing **Trial Brief** has been duly served upon counsel of record electronically and/or by mailing same by United States mail, properly addressed and postage prepaid, to the following:

K. Edward Sexton II
Evans & Sexton
1736 Oxmoor Road, Ste. 101
Birmingham, AL  35209

Nell C. Dysart
2637 Manchester Ct.
Vestavia Hills, AL  35226

Willie Nell Dysart
1652 8th Avenue West
Birmingham, AL  35208

D. Sims Crawford
P. O. Drawer 10848
Birmingham, AL  35202

Educational Credit Management Corporation
c/o W. McCollum Halcomb
Halcomb & Wertheim
P. O. Box 12005
Birmingham, AL  35202-2005

Internal Revenue Service, Insolvency
801 Tom Martin Drive, Stop 126
Birmingham, AL  35023

Diane C. Murray
Sirote & Permutt, P.C.
P. O. Box 55887
Birmingham, AL  35255-5887

Plymouth Park Tax Services, LLC
c/o Heather A. Lee
Burr & Forman LLP
420 North 20th Street, Suite 3100
Birmingham, AL  35203

Plymouth Park Tax Services, LLC
c/o Plymouth Financial Company
35 Airport Road, Suite 150
Morristown, NJ 07960

Plymouth Park Tax Services, LLC
Douglas Badaszewski
c/o Plymouth Financial Company
35 Airport Road, Suite 150
Morristown, NJ 07960

New South Federal Savings Bank
P. O. Box 830180
Birmingham, AL  35210

HomEq Servicing
1100 Corporate Center Drive
Raleigh, NC 27607

Great Lakes Educational Loan Services/ECMC
P. O. Box 8973
Madison, WI  53708-8973

ECMC
Lockbox 8682
P. O. Box 75848
St. Paul, MN 55175-0848

U.S. Bankruptcy Court
1800 5th Avenue North, Room 120
Birmingham, AL  35203

J. T. Smallwood, Tax Collector
716 Richard Arrington Jr Blvd N, Room 160
Birmingham, AL  35203

This the 8th day of August, 2007.


       /s/ Deanna L. Weidner
       Of Counsel

*EXHIBIT*
*5*

After Recording Return To:
**THE PEOPLES BANK AND TRUST COMPANY**

**835 MAIN STREET, P.O. BOX 240**
**MONTEVALLO, AL 35115**

_____

[Space Above This Line For Recording Data]

# MORTGAGE

**DYSART**
**LOAN NUMBER:**    **4464877117**
**PARCEL NUMBER:**

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11,
13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A) **"Security Instrument"** means this document, which is dated    **AUGUST 30, 2002**
together with all Riders to this document.

(B) **"Borrower"** is    **NELL C. DYSART, A SINGLE WOMAN**

Borrower is the mortgagor under this Security Instrument.

(C) **"Lender"** is    **THE PEOPLES BANK AND TRUST COMPANY**

Lender is a    **ALABAMA BANKING CORPORATION**                     organized and existing under the laws of
**ALABAMA**                                . Lender's address is    **835 MAIN STREET**
**MONTEVALLO, AL 35115**

Lender is the mortgagee under this Security Instrument.

(D) **"Note"** means the promissory note signed by Borrower and dated    **AUGUST 30, 2002**
The Note states that Borrower owes Lender

**TWO HUNDRED TEN THOUSAND AND 00/100**

Dollars (U.S. $  **210,000.00**                ) plus interest. Borrower has promised to pay this debt in
regular Periodic Payments and to pay the debt in full not later than    **SEPTEMBER 1, 2032**

(E) **"Property"** means the property that is described below under the heading "Transfer of Rights in the Property."

(F) **"Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due
under the Note, and all sums due under this Security Instrument, plus interest.

(G) **"Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following Riders are
to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| [X] Adjustable Rate Rider | [ ] Condominium Rider | [ ] Second Home Rider |
| [ ] Balloon Rider | [ ] Planned Unit Development Rider | [ ] Biweekly Payment Rider |
| [ ] 4 Family Rider | [ ] Other(s) [specify] | |

*Nell*

**(H) "Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

**(I) "Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

**(J) "Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

**(K) "Escrow Items"** means those items that are described in Section 3.

**(L) "Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

**(M) "Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the Loan.

**(N) "Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

**(O) "RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

**(P) "Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably mortgages, grants and conveys to Lender, with power of sale, the following described property located in the **COUNTY**
(Type of Recording Jurisdiction)

of   **JEFFERSON**                                :
   (Name of Recording Jurisdiction)

```
Lot 3, according to the map and survey of Manchester Subdivision
as recorded in Map Book 201, Page 50, in the Probate Office of
Jefferson County, Alabama.
```

which currently has the address of   **2637 MANCHESTER COURT**
                                              [Street]

**VESTAVIA HILLS**              , Alabama   **35226**      ("Property Address").
   [City]                                [Zip Code]

   TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

ALABAMA – Single Family – Fannie Mae/Freddie Mac UNIFORM INSTRUMENT                    Form 3001 1/01
DOCU1AL2
DOCU1AL2.VTX  11/04/20000                    *(Page 2 of 13 pages)*

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1.      Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower,

and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6. Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as

Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. Borrower shall not surrender the leasehold estate and interests herein conveyed or terminate or cancel the ground lease. Borrower shall not, without the express written consent of Lender, alter or amend the ground lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss

ALABAMA – Single Family – **Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**                                      Form 3001 1/01
DOCU1AL6
DOCU1AL6.VTX  11/04/2000                         *(Page 6 of 13 pages)*



reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) **Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**

(b) **Any such agreements will not affect the rights Borrower has – if any – with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.**

**11. Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of

the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted

limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security

Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is

ALABAMA – Single Family – Fannie Mae/Freddie Mac UNIFORM INSTRUMENT                  Form 3001 1/01
DOCU1AL10
DOCU1ALA.VTX  11/04/2000                       *(Page 10 of 13 pages)*

necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.**

**If Lender invokes the power of sale, Lender shall give a copy of a notice to Borrower in the manner provided in Section 15. Lender shall publish the notice of sale once a week for three consecutive weeks in a newspaper published in   JEFFERSON                County, Alabama, and thereupon shall sell the Property to the highest bidder at public auction at the front door of the County Courthouse of this County. Lender shall deliver to the purchaser Lender's deed conveying the Property. Lender or its designee may purchase the Property at any sale. Borrower covenants and agrees that the proceeds of the sale shall be applied in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.**

**23. Release. Upon payment of all sums secured by this Security Instrument, Lender shall release this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.**

**24. Waivers.** Borrower waives all rights of homestead exemption in the Property and relinquishes all rights of curtesy and dower in the Property.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

- BORROWER - NELL C. DYSART - DATE

ALABAMA – Single Family – Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
DOCU1AL12
DOCU1ALC.VTX   05/28/2002
*(Page 12 of 13 pages)*

Form 3001 1/01

[Space Below This Line For Acknowledgment]

STATE OF ALABAMA
COUNTY OF JEFFERSON

I, Chris Smitherman (Notary Public) (name and style of officer), hereby certify that

NELL C. DYSART

whose name is signed to the foregoing conveyance, and who is known to me, acknowledged before me on this date that, being informed of the contents of the conveyance, she executed the same voluntarily on the day the same bears date.

Given under my hand this 30th day of August, 2002

_____
Notary Public
My Commission Expires: 5/13/04

THIS INSTRUMENT WAS PREPARED BY:
CHristopher R. Smitherman
Attorney at Law
P.O. Box 261
Montevallo, AL 35115
(205) 665-4357

ALABAMA – Single Family – Fannie Mae/Freddie Mac UNIFORM INSTRUMENT                    Form 3001 1/01
DOCU1AL13
DOCU1ALD.VTX   05/28/2002                            *(Page 13 of 13 pages)*

*EXHIBIT 6*

limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to limit; and (b) any sums already collected from Borrower which exceeded permitted limits will b Borrower. Lender may choose to make this refund by reducing the principal owed under the Note o direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partiai prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security

ALABAMA – Single Family – Fannie Mae/Freddie Mac **UNIFORM INSTRUMENT**                                      Form 3001 1/01
DOCU1AL9                                             *(Page 9 of 13 pages)*
DOCU1AL9.VTX  11/04/2000

Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is

necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.**

**If Lender invokes the power of sale, Lender shall give a copy of a notice to Borrower in the manner provided in Section 15. Lender shall publish the notice of sale once a week for three consecutive weeks in a newspaper published in      JEFFERSON                County, Alabama, and thereupon shall sell the Property to the highest bidder at public auction at the front door of the County Courthouse of this County. Lender shall deliver to the purchaser Lender's deed conveying the Property. Lender or its designee may purchase the Property at any sale. Borrower covenants and agrees that the proceeds of the sale shall be applied in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.**

**23. Release. Upon payment of all sums secured by this Security Instrument, Lender shall release this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.**

**24. Waivers.** Borrower waives all rights of homestead exemption in the Property and relinquishes all rights of curtesy and dower in the Property.

## Fwd: RE: Dysart

From: **Arlene Kirby** (akirby@evanslawpc.com)
Sent: Mon 4/10/06 8:58 AM
To:    nelldysart@hotmail.com
Cc:    Eddie Sexton (Eddie@evanslawpc.com)

*EXHIBIT 7*

```
>>> "Kawana Walker" <Kawana.Walker@AltaHELP.com> 4/10/06 8:50:00 AM
>>>
Please place on Hold, I will update you in a few

-----Original Message-----
From: Arlene Kirby [mailto:akirby@evanslawpc.com]
Sent: Monday, April 10, 2006 9:22 AM
To: Kawana Walker
Subject: Dysart
```

Kawana,

We still do not have anything on Ms. Dysart's refinance. Do you have
any idea when I can expect it?

Thank you,

```
Arlene J. Kirby
Secretary to K. Edward Sexton, II
Evans & Sexton, P.C.
1736 Oxmoor Road, Suite 101
Birmingham, Alabama 35209
(205) 870-1970
```

# Closing

From: **Arlene Kirby** (akirby@evanslawpc.com)
Sent: Wed 4/05/06 4:52 PM
To:    nelldysart@hotmail.com

Hey,

Kawana Walker just called asking that I email her your entire petition.
Please let me know if this is okay – I might have misunderstood you
when you said that you were having to get funding from another
institution? She has a tentative closing scheduled for 2:00 this
Friday.

Thanks,

Arlene

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

*EXHIBIT 8*

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | **BANKRUPTCY CASE NO.** |
| NELL C. DYSART | ) | **04-09416-TBB 13** |
| | ) | **Chapter 13** |
| Debtor. | ) | |

## ORDER GRANTING RELIEF FROM AUTOMATIC STAY

This matter has come before the Court on the Motion of Peoples Bank & Trust of Selma ("Peoples Bank") seeking relief from the automatic stay and permission to foreclose its mortgage against the residence of Nell Dysart, the Debtor herein (the "Debtor"). This Court has considered the schedules and proof of claim that establish an undisputed secured debt due Peoples Bank, the failure of the Debtor to pay for insurance and ad valorem taxes related to the property and the lack of any opposition to the Motion; and, this Court is of the opinion that this Order should be entered for cause under 11 USC § 362(d)(1).

Accordingly, it is hereby ORDERED, ADJUDGED AND DECREED the automatic stay in this Bankruptcy Case shall be and hereby is terminated with respect to the secured claim of Peoples Bank and Peoples Bank is hereby authorized to foreclose its mortgage against the Debtor's residence.

DONE this ____ day of September, 2007.

_____
THOMAS B. BENNETT
UNITED STATES BANKRUPTCY JUDGE

317580

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | **BANKRUPTCY CASE NO.** |
| **NELL C. DYSART** | ) | **04-09416-TBB 13** |
| | ) | **Chapter 13** |
| Debtor. | ) | |
| | ) | |

| | | |
|---|---|---|
| | ) | |
| **THE PEOPLES BANK AND TRUST** | ) | |
| **COMPANY,** | ) | |
| | ) | |
| Plaintiff, | ) | **ADVERSARY PROCEEDING** |
| | ) | |
| vs. | ) | **CASE NO. 07-0040-TBB** |
| | ) | |
| **PLYMOUTH PARK TAX SERVICES,** | ) | |
| **LLC; HEARTWOOD '88, LLC; J.T.** | ) | |
| **SMALLWOOD, in his capacity as Tax** | ) | |
| **Collector of Jefferson County, Alabama;** | ) | |
| **and NELL C. DYSART,** | ) | |
| | ) | |
| Defendants. | ) | |

## AGREED ORDER

This cause having come before this Court upon stipulation of the parties and this Court having considered the same, the Court enters the following findings, conclusions and orders thereon:

1.     On May 25, 2004 the Jefferson County Tax Collector conducted a tax sale of Lot 3, according to the Map and Survey of Manchester Subdivision, as recorded in Map Book 201, Page 50, in the Probate Office of Jefferson County, Alabama, commonly known as 2637 Manchester Court, Vestavia Hills, Alabama 35226 (the "Residence").  On that date the debtor in this case Nell C. Dysart ("Dysart"), was a Chapter 7 debtor.

1

2.      Plymouth Park Tax Services, LLC ("Plymouth") was the purchaser of the Residence at the May 25, 2004 tax sale. Plymouth's purchase amount consisted of $2,468.60 for taxes and a $38,000.00 excess bid (the "Plymouth Excess Bid").

3.      Plymouth paid subsequent ad valorem taxes on the Residence on or about October 5, 2004 in the amount of $2,484.63.

4.      On May 23, 2006 the Jefferson County Tax Collector conducted another tax sale of the Residence.  On that date, Dysart was a Chapter 13 debtor in the bankruptcy case underlying this Adversary Proceeding.

5.      Heartwood '88, LLC ("Heartwood") was the purchaser of the Residence at the May 23, 2006 tax sale.  Heartwood's purchase amount consisted of $5,170.64 for taxes and a $64,000.00 excess bid (the "Heartwood Excess Bid").

6.      Heartwood paid subsequent ad valorem taxes on the Residence on or about December 5, 2006 in the amount of $5,330.24.

7.      In May 2005, Dysart filed an adversary proceeding (No. 05-00113-TBB) in this bankruptcy case against Plymouth and the Jefferson County Tax Collector ("Tax Collector") demanding that the Tax Collector release the Plymouth Excess Bid.  As a result of that adversary proceeding, the Tax Collector released the Plymouth Excess Bid and said funds were paid to Plymouth on or about January 1, 2006.

8.      In addition to the recovery of the Plymouth Excess Bid, Plymouth has received payments pursuant to Dysart's Chapter 13 totaling $6,161.50.

9.      Heartwood has not received any payments from Dysart's Chapter 13 case toward the amount it paid at the May 23, 2006 tax sale or that it paid in subsequent taxes on December 18, 2006.

017580      34907017616015

10.     The Plaintiff, the Tax Collector, Plymouth, Heartwood, and Dysart agree and stipulate to this Order.

It is therefore **ORDERED, ADJUDGED AND DECREED** as follows:

1.     The May 25, 2004 tax sale and the May 23, 2006 tax sale are null and void and title to the Residence is vested in Nell Dysart.

2.     By November 15, 2007, the Tax Collector shall return to Plymouth and Heartwood (collectively referred to as the "Purchasers") all ad valorem taxes Purchasers have paid for the Residence with interest on the taxes and the excess bid amounts no later than November 15, 2007.  The amount the Tax Collector is to return to Plymouth pursuant to this paragraph is $14,132.96.  The amount the Tax Collector is to return to Heartwood pursuant to this paragraph is $19,338.90.  The refund of taxes is to be paid from current year collections via the normal refund petition process.

3.     By November 15, 2007, the Jefferson County Treasurer shall return to Heartwood the Heartwood Excess Bid from the Treasurer's Redemption Account.

4.     Plymouth shall return all non-excess bid funds totaling $6,161.50 received from Dysart or the Chapter 13 Trustee on Dysart's behalf to the Chapter 13 Trustee within twelve days of the entry of this Order, and said funds shall be paid to the Jefferson County Tax Collector for payment of taxes due on the Residence.

5.     Interest and penalties shall not accrue upon the taxes due until November 15, 2007.

6.     Plymouth and Heartwood are dismissed from the Adversary Proceeding with prejudice.

017580

7.    This Order may be recorded in the Jefferson County Probate Office.

**DONE** and **ORDERED** this the _____ day of _____ September _____ , 2007.

_____

THOMAS B. BENNETT, JUDGE
NORTHERN DISTRICT OF ALABAMA
BANKRUPTCY COURT



CLRQTAX

| | YR | TT | SS | Q | BLK | PPP.PPP | RT | RN | | | |
|---|----|----|----|----|-----|---------|----|----|----|----|----|
| PARCEL | 03 | 29 | 36 | 2 | 006 | 001.003 | RR | 00 | C/S 00 | 00 0000 | |

EXHIBIT 9

| | | | | | | YEAR | TAX | INTEREST | TOTAL TAX |
|---|---|---|---|---|---|---|---|---|---|
| DATE INQUIRE: | 030106 | BR | N | CN | N | 03 | 2468.60 | 8579.34 | 11047.94 |
| RECEIPT DATE: | 000000 | SP | N | BA | N | 04 | 2484.63 | 419.07 | 2903.70 |
| DYSART NELL C | | | | | | 05 | 4909.84 | .00 | 4909.84 |

537 MANCHESTER CT
VESTAVIA AL          352263573
2637    MANCHESTER          CT
SITE          35226
LEGAL: LOT 3 MANCHESTER SUBDIVISION
       PB 201 PG 50
UNIT NBR:  20-86503
MARKET VALUE
ASSESSED VALUE        25560
EXCESS BID          38000.00          ---------------------------------------
EXCESS BID INTEREST    8056.00          REDEMPTION FEES:                15.00
CLASS          3                    TOTAL:              8998.41      18876.48
DATE SOLD:      052504               REMARKS:          I/S PLYMOUTH PARK I
PER DIEM      15.94    RECEIPT NBR              DO NOT ALLOW REDEMPTION!!
REDEEMED                                        SEE GARY- CASE# AP-05-00113
BY:                                             * LIEN/FEE *
                                                PRESS RECEIVE

**ANDERSON & ASSOCIATES, LLC**
SUITE 1450, FINANCIAL CENTER
505 20TH STREET NORTH
BIRMINGHAM, AL 35203-4635
PHONE: (205) 324-1230
FACSIMILE: (205) 322-3890

*EXHIBIT 10*

Deanna L. Weidner
dlweidner@davidbandersonlaw.com

January 11, 2008

*IF PEOPLES SOLD THE PROPERTY, WHY DID THEY PAY ANY TAXES?*

Edward K. Sexton
1736 Oxmoor Road
Suite 101
Birmingham, AL 35209

Dear Eddie,

*✱ SEE TAB #35*

Re:     ***Plymouth/Dysart Property Taxes***

Enclosed is check from BankTrust, formerly Peoples Bank & Trust, for Ms. Dysart. Pursuant to our settlement agreement in the AP, Plymouth refunded and the Trustee paid approximately $6,100 of the past due property taxes, leaving about $6,750 to be paid.  Star Properties (the purchaser at foreclosure) paid $5,800 and BankTrust paid the remaining amounts owed to the Tax Collector (around $950.00).  Because Star Properties paid a significant portion of the taxes, BankTrust had funds remaining from the foreclosure sale above the amount Ms. Dysart owed.  The enclosed draft is for the excess funds.  Please forward the draft to Ms. Dysart.

If you have any questions regarding the above, please do not hesitate to contact me.

Best Regards,

Deanna L. Weidner

DLW:nb
Cc:     Peoples Bank
          Enclosure: (check

Ltr-to Sexton-dated-011108.doc

```
CLPAID        P  N  P  J.T.SMALLWOOD TAX COLLECTOR    29 36 2 6 1.003
                              PHONE 325-5500
                  ROOM 160, 716 RICHARD ARRINGTON JR. BLVD. N.
                         BIRMINGHAM, ALABAMA 35203
             TAX INQUIRY FOR TAX YEAR 2007   MARKET VALUE:        1398700
DATE:                          01/10/08      ASSESSED VALUE:       139870
UNJ   IBR:  20-86503                         TOTAL H/E:             53.00
PAR   _:    29-36-2-6-1.003-RR               TOTAL NET TAX:      12898.97
FILE NBR:                       167802       FOREST/LIENS:           .00
CLASS:  M                                    STORM WATER FEE:       5.00
                                             FIRE DUES:             .00
                                             FEES/INTEREST:         .00
DYSART NELL C                                TOT AMT DUE:       12903.97
2637 MANCHESTER COURT                        AMOUNT PAID:       12903.97
BIRMINGHAM AL        352263573               DATE PAID:         12/27/07

LOT 3 MANCHESTER SUBDIVISION     PAID BY: DSIMS CRAWFORD/STAR PROPE
PB 201 PG 50                     PROCESS DATE:        12/27/07
                                 BATCH NBR: 1251  TELLER:    2
SITE:  2637 MANCHESTER CT        BALANCE DUE:             .00
 ORIG:
 AMM:  PU/TAL 2625, PER COURT
                                    * PRIOR YR IND SALE *
MORTGAGE NBR            COMPANY                       000000
```

# ANDERSON & ASSOCIATES, LLC
## FINANCIAL CENTER
### 505 20TH STREET NORTH, SUITE 1450
### BIRMINGHAM, AL 35203-4635
### PHONE: (205) 324-1230
### FACSIMILE: (205) 322-3890

*EXHIBIT*
*11*

**David B. Anderson**
dbanderson@davidbandersonlaw.com

October 27, 2009

**VIA E-MAIL: john@wattslawgroup.com**
John G. Watts, Esq.
Watts Law Group, PC
The Kress Building
301 19th Street North
Birmingham, AL  35203

**VIA E-MAIL: msh@mstanherringlaw.com**
M. Stan Herring, Esq.
M. Stan Herring, P.C.
The Kress Building
301 19th Street North
Birmingham, AL 35203

      **Re:** *Nell Dysart vs. BankTrust, et al.*
           *Civil Action No. CV-2009-902905*

Dear Messrs. Watts and Herring:

I have read your complaint in the captioned action and believe you are misinformed about several material facts and the law. Ms. Dysart commenced a Chapter 7 bankruptcy case in order to stay a foreclosure of the Mortgage. Subsequently, she filed a Chapter 13 bankruptcy case for the purpose of restructuring her secured debts. Ultimately, she acknowledged that she was unable to afford her house and it was sold at a foreclosure sale of which she was aware.

Unknown to BankTrust, Dysart failed to pay taxes for years and the house was sold twice in overbid situations. We commenced an action and were successful in setting aside the sales, but at significant expense to the bank. Although we were able to avoid the penalties, five years of taxes, interest and fees needed to be paid. We had extensive negotiations with Eddie Sexton concerning the reinstatement and restructuring of the secured obligation. We even tried to formulate a repayment plan based upon our understanding of her income and obligations. Ms. Dysart failed to pay her property insurance and Eddie Sexton advised that she could not afford the house. We filed a motion for relief so that the mortgage could be foreclosed. Ms. Dysart was served with all pleadings, each of which notified Ms. Dysart of the default, the acceleration and the bank's intention to foreclose. We had more conversations with Eddie Sexton concerning

John G. Watts, Esq.
M. Stan Herring, Esq.
October 27, 2009
Page 2

Ms. Dysart's inability to pay the mortgage on any basis. Mr. Sexton represented that Ms. Dysart could only pay $300 per month.

Ms. Dysart did not oppose relief from the automatic stay. We had additional conversations with Mr. Sexton in which we advised him of the foreclosure sale, its date and time and a request for a proposal from Ms. Dysart greater than $300 per month. Mr. Sexton advised us that Ms. Dysart could only pay $300 and that she understood the mortgage on her house would be foreclosed. The mortgage was foreclosed and a third party purchased the house.

Ms. Dysart was well aware of the foreclosure sale as she was negotiating for repayment terms up until the sale. After the sale, Ms. Dysart wrote us and advised, not that she was unaware of the sale, but rather she had been told by a potential third party purchaser that the foreclosure sale had been continued.

After the foreclosure, we obtained the reimbursement of extra tax payments and paid $3,600 to Ms. Dysart as her interest in the house. She accepted that amount and thanked us. Ms. Dysart had a year to redeem the property for the foreclosure bid. She was unable to do this, which is additional evidence of the fact that she could not have avoided the foreclosure and has suffered no damages.

Having thanked us for trying to help her, two years later we receive your lawsuit. Your factual allegations are false. We have endeavored to compile a detailed history of this case with exhibits. Attached is a draft Motion to Dismiss or In the Alternative Motion for Summary Judgment that we are almost ready to file. Your allegation that a creditor failed to provide written notice of the foreclosure sale as provided in a mortgage does not create a cause of action. Dysart's mortgage confirms this and contractually provides that compliance with statutory notice requirements satisfies any notice requirement in the mortgage.

Please review the Motion and the exhibits that will be delivered to you, and we hope that you will voluntarily dismiss your suit. Please consider this a notice that under the Alabama Attorney Liability Act you have filed a frivolous lawsuit without a basis in fact or law. If you do not dismiss this action immediately and we prevail, we will pursue you and your firm for the cost of defense. Once you read this, please give me a call to discuss how you want to proceed.

Very truly yours,

David B. Anderson

David B. Anderson

DBA/rmd

**IN THE CIRCUIT COURT OF JEFFERSON COUNTY, ALABAMA**

| | | |
|---|---|---|
| **NELL DYSART, an individual** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | |
| | ) | |
| **BANKTRUST, a Corporation; FICTITIOUS** | ) | **CASE NO.:  CV-09-902905** |
| **DEFENDANTS A, B and C being that legal** | ) | |
| **entity which was responsible for or conducted** | ) | |
| **the wrongful acts alleged in the complaint;** | ) | |
| **whose identity is unknown but will be** | ) | |
| **substituted by amendment when ascertained** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MOTION TO DISMISS OR IN THE ALTERNATIVE MOTION FOR SUMMARY JUDGMENT

COMES NOW BankTrust, Defendant herein and moves this Court to dismiss Plaintiff's claims for failure to state a claim pursuant to Ala. R. Civ. P. 12 (b)(6) or in the alternative for summary judgment pursuant to Ala. R. Civ. P. 56.  In support of its motion, BankTrust asserts the following:

### NATURE OF THE CASE

Nell Dysart, who filed two bankruptcy cases to stay the foreclosure of the Mortgage, complains that BankTrust failed to give Dysart proper contractual notice before BankTrust foreclosed its Mortgage upon Dysart's property.  Dysart had been in default with BankTrust for approximately four years prior to BankTrust foreclosing its Mortgage.  Between 2003 and the foreclosure sale that finally occurred on October 15, 2007, (1) Dysart defaulted in payment; (2) Dysart failed to secure property insurance on the mortgaged premises; (3) Dysart failed to pay ad valorem taxes for four consecutive years, resulting in the sale of the property by the Jefferson County Tax Collector at two separate tax sales; and (4) Dysart filed bankruptcy twice.

1

BankTrust had to expend tens of thousands of dollars in Dysart's bankruptcy to avoid the tax sales because Dysart concealed from BankTrust that she had failed to pay her taxes and that she no longer owned the property. Without succeeding in the adversary proceeding, BankTrust would have had to pay over $70,000 to the purchasers of the property to redeem the house upon which BankTrust had a first priority lien. The bankruptcy court twice ordered that BankTrust was authorized to foreclose the property. Both Dysart and her lawyer were served with the orders. Dysart and her lawyer had each been given notice on multiple occasions and were well aware that BankTrust was going to foreclose. After being given numerous chances, Dysart refused to fulfill her obligations to BankTrust. Instead, Dysart wanted BankTrust to pay her insurance, pay her taxes, pay her debt to BankTrust, yet keep the property and earn a profit.

Dysart does not allege that BankTrust failed to comply with the statutory notice requirements contained in Ala. Code 35-10-13 (1975) or 6-8-62 (1975). Rather, Dysart alleges that BankTrust failed to comply with more stringent requirements contained in the Mortgage. Pursuant to binding precedent, however, this claim fails as a matter of law. See Bullock v. Bishop, 435 So.2d 24 (Ala. 1993); Redman v. Federal Home Mortgage Corp., 765 So.2d 630 (Ala. 2000). As the Alabama Supreme Court has explained, even if the contractual notice requirements are more stringent than the statutory notice requirements, the statutory requirements control. Id. So long as the statutory notice requirements are satisfied, there is no claim for which relief can be granted for allegedly failing to comply with the contractual notice requirements. Dysart's complaint is due to be dismissed pursuant to Ala. R. Civ. P. 12(b)(6).

Even if the Court were to construe documents outside of the complaint, Dysart's claims are still required to be dismissed as a matter of law pursuant to Ala. R. Civ. P. 56. First, paragraph 15 expressly provides that if the statutory notice provisions are less stringent or

2

different than the contractual notice requirements, the statutory notice requirements will suffice for compliance. The Mortgage in this case expressly confirms the ruling that the Alabama Supreme Court held applies as a matter of law. Second, even if the statutory notice provision did not control, BankTrust complied with the contractual requirements by, among other things, providing for notice of acceleration 30 days prior to foreclosure as required by paragraph 18 of the Mortgage. Ownership of the property was transferred to another and pursuant to paragraph 18, BankTrust was merely required to notify Dysart that it had accelerated the debt thirty days before BankTrust foreclosed, which BankTrust did. No other notice was contractually required. Third, pursuant to paragraph 20 of the Mortgage, Dysart is prohibited from bringing this suit prior to giving BankTrust notice of her intent to sue. Dysart has been given more than sufficient notice, was well aware of the foreclosure, had a year to redeem and has no damages.

## FACTUAL BACKGROUND

1.  In August 2002, Nell Dysart executed a promissory note to People's Bank & Trust Company, n/k/a BankTrust, which note was secured by a Mortgage on the property located at 2637 Manchester Court, Vestavia Hills, Alabama. (App. 1, Martin Aff., Exhs. A and B). Dysart had also guaranteed payment of commercial debt to BankTrust.

2.  In early 2004, Dysart defaulted in payment on the note. (App. 2, Anderson Aff., Exh. 1). Dysart also defaulted in payment on the guaranty.

3.  On March 8, 2004 BankTrust notified Dysart that she was in default, provided the amount necessary to cure the default, the date required to cure the default, and provided notice that if the default was not cured within 30 days, BankTrust would accelerate the note and begin foreclosure proceedings. Id.

4.  Dysart did not cure the default within the 30 day period.

3

5.     Instead, on April 27, 2004 Dysart filed for Chapter 7 relief in the United States Bankruptcy Court for the Northern District of Alabama, Case No. 04-03798.

6.     Unknown to BankTrust, Dysart was also in default under the Mortgage because she had failed to pay the 2003 ad valorem taxes on the Property. On May 25, 2004, the Jefferson County Tax collector sold the Property to Plymouth Park Tax Services, LLC ("Plymouth") at a tax sale for $40,468.60 ($2,468.60 for taxes and a $38,000.00 excess bid). (See App. 2, Anderson Aff., Exh. 2. Dysart failed to notify BankTrust that the property upon which BankTrust had a first priority lien had been sold.

7.     Unaware of the tax sale, on June 4, 2004, BankTrust moved the bankruptcy court to lift the automatic stay to authorize BankTrust to foreclose on Dysart's property. (App. 2, Anderson Aff., Exh. ____). This notice was served upon both Dysart and her attorney. Id.

8.     On July 19, 2004, the Bankruptcy Court granted BankTrust's motion and ruled that BankTrust was authorized to foreclose its Mortgage upon the Property. (App. 2, Anderson Aff., Exh. 3). The Order was served upon both Dysart and her attorney.

9.     Dysart made a few payments to BankTrust and BankTrust, without knowledge of the tax sale, agreed to discuss a long-term restructuring. (App. 2, Anderson Aff., Exh. ____).

10.    Unknown to BankTrust, Plymouth, as owner of the property paid the taxes owed in October 2004. (App. 2, Anderson Aff., Exh. ____).

11.    On October 26, 2004, Dysart filed for Chapter 13 relief in the United States Bankruptcy Court for the Northern District of Alabama, Case No. 04-09416-TBB-13. Dysart made payments for several months.

12.    On March 1, 2006, Dysart moved the Bankruptcy Court to permit her to refinance her debt to BankTrust. (App. 2, Anderson Aff., Exh. ____). Dysart's motion was originally

4

denied, but was later granted after Dysart cured certain defects in her Motion. (App. 2, Anderson Aff., Exhs. ____, ____ and ____). Apparently, another creditor of Dysart reported Dysart to a credit bureau. As a result, the bank that had originally agreed to re-finance Dysart's debt to BankTrust decided Dysart was not a satisfactory credit risk. (App. 2, Anderson Aff., Exh. ___.

13.     Unknown to BankTrust, Dysart did not pay the 2005 ad valorem taxes on the Property. On May 23, 2006, the Jefferson County Tax Collector sold the Property to Heartwood `88, LLC for $69,170.64 at a tax sale ($5,170.64 for taxes and a $64,000.00 excess bid). (App. 2, Anderson Aff., Exh. 2). Dysart failed to notify BankTrust that the Property had been sold again.

14.     In July 2006, Dysart failed to pay the property insurance as required by the Mortgage. The insurance company notified BankTrust and BankTrust notified Dysart that it had force placed insurance, that Dysart's failure to protect the Property was a default under the terms of the Mortgage and that if not cured, BankTrust would move the Bankruptcy Court to lift the stay so that BankTrust could foreclose. (App. 1, Martin Aff., ¶ 5). Dysart failed to cure the default within 30 days.

15.     In October 2006, Heartwood paid the ad valorem taxes on the Property. (App. 2, Anderson Aff., Exh. _____).

16.     Without serving or notifying BankTrust, on May 11, 2005, Dysart filed an adversary proceeding in bankruptcy court against the Jefferson County Tax Collector and Plymouth, the first purchaser of the Property at the May 2004 tax sale, demanding that the Jefferson County Tax Collector pay the Overbids to Dysart's Chapter 13 Trustee. (App. 2, Anderson Aff., Exh. _____). In order to conceal the tax sales, Dysart used a different property

5

address in the complaint and did not include BankTrust, a necessary party, in the suit (or Heartwood).  (Id., ¶ 3).

17.    Dysart settled with Plymouth and with the Jefferson County Tax Collector, whereby the Jefferson County Tax Collector would pay the overbid to the Chapter 13 Trustee, the Trustee would pay the funds to Plymouth and Dysart agreed that if she were to redeem her interest in the Property, she would pay the taxes and the excess funds in exchange for a quit claim deed from Plymouth to Dysart. (App. 2, Anderson Aff., Exh. ____).

18.    The Bankruptcy Court ordered the Overbids to be paid to the Chapter 13 Trustee. (App. 2, Anderson Aff., Exh. __). Although the suit was over a different property, the Order signed by the Bankruptcy Court contained the address of the Property under the Mortgage. (Id.)

19.    Unaware of the tax sales, on January 23, 2007 BankTrust moved for relief from the automatic stay to foreclose the Mortgage due to Dysart's failure to procure insurance. (App. 2, Anderson Aff., Exh. ____). BankTrust specifically described the default, provided notice of acceleration and BankTrust's intent to foreclose the Mortgage. Id. at pp. 6-7. Both Dysart and her attorney were served with a copy of the Motion for Relief From Stay. Id. at p. 7.

20.    BankTrust then learned of the tax sales and of the Bankruptcy Court's Order resulting from Dysart's adversary proceeding. (App. 2, Anderson Aff., Exh. __). The Jefferson County Tax Collector notified BankTrust that liens in excess of $71,000 for taxes and overbids were allegedly superior to BankTrust's first priority lien upon the Property. (App. 2, Anderson Aff., Exh. 2).

21.    On February 7, 2007, Plymouth notified BankTrust that if BankTrust did not redeem its interest in the Property by paying the $71,000 by February 8, 2008, BankTrust would lose its lien upon the Property. (App. 2, Anderson Aff., Exh. __). Dysart's purported plan was

6

to pay the taxes and the overbids through her Chapter 13 plan, which would not be completed by February 8, 2008, thereby resulting in BankTrust having to pay Dysart's debt to Plymouth and Heartwood or lose its lien upon the Property.

22.     On February 13, 2007, BankTrust amended its Motion for Relief From Stay to include the defaults and lack of adequate protection due to the tax sales and Overbid Payments. (App. 2, Anderson Aff., Exh. __).  Again, BankTrust specifically described the defaults and provided notice of acceleration BankTrust's intention to foreclose.  BankTrust specifically requested authority to foreclose its Mortgage. Id., ¶¶ 26-27. Both Dysart and her counsel were served with a copy of the Amended Motion for Relief From Stay. Id. at p. 9.

23.     On February 13, 2007, BankTrust sued Dysart, the Jefferson County Tax Collector, Plymouth and Hartwood in the Bankruptcy Court to void the tax sales that resulted in breach of the terms of the Mortgage and were in violation of the automatic stays in order to reinstate BankTrust's first priority lien upon the Property so that BankTrust could foreclose its Mortgage and sell the Property. (App. 2, Anderson Aff., Exh. __, A.P. No. 07-00040, ND Ala. Bankr.) Dysart was served with the Complaint. Id. at p. 9; App. 2, Anderson Aff. Exh. ____. Dysart never answered the complaint and neither Dysart, nor her counsel, appeared at the trial.

24.     On August 7, 2007, BankTrust's counsel wrote to Dysart's counsel notifying Dysart that if an agreement could not be reached by August 22, 2009, BankTrust would foreclose the mortgage. BankTrust attached to this letter the amount of taxes due from 2002 to the present. (App. 2, Anderson Aff., Exh. __).

25.     On August 8, 2007, BankTrust filed a trial brief in the adversary proceeding. The trial brief listed the specific defaults, provided another notice of acceleration and BankTrust's

7

intention to foreclose if the automatic stay was lifted. (App. 2, Anderson Aff., Exh. __ ). Both Dysart and her counsel were served with a copy of the trial brief. Id. at p. 8.

26.     BankTrust's Motion for Relief From Stay was heard by the Bankruptcy Court on August 22, 2007 and was continued until September 4, 2007. Both Dysart and her counsel were served with notice of the hearing. Neither Dysart, nor her counsel, appeared at the August 22, 2007 hearing. (App. 2, Anderson Aff., Exh. _____). Dysart's counsel attended the hearing on September 4, 2007 and represented that there was nothing Dysart could do to cure the defaults and reinstate the note. (App. 2, Anderson Aff., ¶__, Exh. ___). Dysart did not oppose the motion for relief to foreclose BankTrust's Mortgage. (App. 2, Anderson Aff., Exh. _____).

27.     On September 4, 2007, the parties entered into a settlement agreement whereby the tax sales were voided and Plymouth was required to return all funds received. Heartwood's purchase was also voided and BankTrust's lien was restored. (App. 2, Anderson Aff., Exh. ___).

28.     The Court granted BankTrust's motion and authorized BankTrust to foreclose its Mortgage. (App. 2, Anderson Aff., Exh. _____). Both Dysart and her counsel were served with a copy of the order. (App. 2, Anderson Aff., Exh._____).

29.     BankTrust's counsel discussed with Dysart's counsel the date and time of the foreclosure sale. (App. 2, Anderson Aff., ¶¶ _____).

30.     Pursuant to the statutory notice requirements, BankTrust advertised the foreclosure sale on September 22, 2007, September 29, 2007 and October 6, 2007 in the Alabama Messenger. (App 2, Anderson Aff., Exh. _____).

31.     Dysart offered to pay a fraction of the past due indebtedness in order to avoid foreclosure, but BankTrust rejected the offer. (App. 2, Anderson Aff., Exh. _____).

8

32.     Dysart's counsel notified BankTrust's counsel that Dysart could not bring her indebtedness current or pay an amount satisfactory to BankTrust and that Dysart was aware of the foreclosure sale. (See App. 2, Anderson Aff., Exh. ____).

33.     On October 15, 2007 a third party purchased the Property at the foreclosure sale in an arms length transaction. (See App. 2, Anderson Aff., Exh. ___). Dysart did not bid at the foreclosure sale.

34.     The purchaser bid more than the debt to BankTrust.  The excess funds received from the purchaser were paid to Dysart and Dysart accepted these funds.

35.     Dysart had one year to redeem the property, but failed to do so.

## ARGUMENT

## I.     DYSART'S CLAIMS ARE DUE TO BE DISMISSED PURSUANT TO ALA. R. CIV. P. 12(b)(6)

### A.     Motion to Dismiss Standard

If after viewing the complaint in a light most favorable to the pleader it appears that the pleader could not prove any set of circumstances that would entitle the pleader to relief, a motion to dismiss is due to be granted. Nance v. Matthews, 622 So.2d 297, 299 (Ala.1993); Raley v. Citibanc of Alabama/Andalusia, 474 So.2d 640, 641 (Ala.1985). This Court must consider whether the plaintiff may possibly prevail. Nance, 622 So.2d at 299. A dismissal is proper when it appears beyond doubt that the plaintiff can prove no set of facts in support of the claim that would entitle the plaintiff to relief. Nance, 622 So.2d at 299; Garrett v. Hadden, 495 So.2d 616, 617 (Ala.1986); Hill v. Kraft, Inc., 496 So.2d 768, 769 (Ala.1986).

9

**B.     Dysart's Claim that BankTrust Allegedly Failed to Satisfy Contractual Notice Requirements That Are More Stringent Than the Statutory Notice Requirements Fails As a Matter of Law**

Dysart can prove no facts that would support her claim that BankTrust failed to provide contractual notice because binding precedent holds that BankTrust was only required to comply with the statutory notice requirements. See e.g. Bullock v. Bishop, 435 So.2d 24 (Ala. 1993); Redman v. Federal Home Mortgage Corp., 765 So.2d 630 (Ala. 2000). Dysart has not alleged that BankTrust failed to comply with the statutory notice requirements. Dysart's claims are due to be dismissed as a matter of law.

In Bullock, the mortgage agreement provided that the lender was contractually required to give 21 days notice to the borrower prior to conducting a foreclosure sale of the property. 435 So.2d at 26. The lender only provided 19 days notice of the sale and the borrower sued claiming the sale was void and conducted in bad faith. Id. at 26. The Alabama Supreme Court disagreed, holding that Ala. Code § 35-10-8 and Ala. Code § 6-8-62 clearly prescribe the time and manner of noticing a foreclosure sale and that the statutory notice requirements are controlling over the terms of the mortgage. Bullock, 435 So.2d at 26. The debtor's claims were dismissed as a matter of law.

Similarly, in Redman, the debtor sued the bank for fraud, wrongful foreclosure and breach of contract alleging that the bank failed to send the debtor a copy of the notice of foreclosure as required by the Mortgage. 765 So.2d at 630. The bank argued that when notice is given to borrowers according to Alabama statutory requirements, that notice is sufficient even if a more stringent form of notice is called for in the mortgage instrument. Id. at 633. The Alabama Supreme Court agreed with the bank. In fact, Judge Lyons concurred specially to point out that although other jurisdictions require compliance with contractual and statutory

10

foreclosure notice requirements, "Alabama law is to the contrary," explaining that "in <u>Bullock v.</u>

<u>Bishop</u>, 435 So.2d 24 (Ala.1983), [the Alabama Supreme Court] held that less stringent statutory

standards prevail over more stringent contractual requirements." <u>Id.</u> at 637.

Dysart has not alleged that BankTrust failed to comply with the statutory requirements,

which are controlling.  Dysart has failed to state a claim for which relief can be granted and her

complaint is due to be dismissed

## II.    THERE ARE NO GENUINE ISSUES OF MATERIAL FACT AND BANKTRUST IS ENTITLED TO SUMMARY JUDGMENT AS A MATTER OF LAW

### A.    <u>Summary Judgment Standard</u>

The summary judgment standard is stated as follows in <u>Roberts v. Nasco Equipment Co.,</u>

<u>Inc.</u>, 986 So.2d 379, 382 (Ala. 2007):

> A summary judgment is proper if there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law. Rule 56(c)(3), Ala. R. Civ. P.  If the movant meets this initial burden, then the burden shifts to the nonmovant to present "substantial evidence" creating a genuine issue of material fact.  <u>Ex parte Alfa Mut. Gen. Ins. Co.</u>, 742 So.2d 182, 184 (Ala. 1999). Substantial evidence is 'evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.' <u>West v. Founders Life Assurance Co. of Florida</u>, 547 So.2d 870, 871 (Ala. 1989).

### B.    <u>BankTrust Complied With The Statutory Notice Requirements And Dysart Had Actual and Constructive Notice</u>

In <u>Redman</u>, the Supreme Court affirmed the trial court's summary judgment entered

against borrowers that sued a lender for failure to provide the borrower with a copy of the notice

of foreclosure as required under the mortgage.  765 So.2d at 636.  The borrower claimed that the

lender failed to notify the debtor of the default before accelerating payment and before

foreclosing the property in violation of the mortgage.  <u>Id.</u> at 633.  The mortgage provisions were

nearly identical to the provisions in Dysart's Mortgage, except that unlike Dysart's Mortgage,

the <u>Redman</u> mortgage did not expressly state that compliance with the statutory notice

requirements shall satisfy any notice requirements in the mortgage. Cf. Id. at ___ with App. 1, Martin Aff., Exh. B, Mortgage, ¶¶ ___. The borrowers argued that the borrower's testimony that she did not receive actual notice of default, foreclosure, or demand for possession created a factual conflict as to the issue of the validity of the foreclosure that should have gone to a jury. The trial court and the Supreme Court disagreed. Summary judgment in the bank's favor was affirmed.

It was undisputed that the lender did not mail notice of the foreclosure sale to the borrower. 765 So. 2d at p. 637. The Court did not consider the failure to send documentary notification to be an issue. Id. at 637. Instead, the Court analyzed whether the borrower had constructive notice of the default, acceleration and foreclosure.

> These holdings illustrate this Court's consistent disposition of issues involving parties' deliberately being uninformed in an effort to avoid liability. Thus, our inquiry here is whether Mrs. Redman and Burns, as reasonable persons, had notice of facts sufficient to cause them to make further inquiry as to the status of Mrs. Redman's mortgage account with SouthTrust. We conclude that they did. It is clear from the record that the defendants closed their eyes to avoid "discovery" of the truth that was reasonably apparent: that the Mortgage was seriously in arrears and that SouthTrust was ready to legally foreclose on the property in Vincent.

Id. at 635. The Court explained that the issue is not whether the lender sent written documentation of default, acceleration or foreclosure, but rather whether the borrower had sufficient information to cause the borrower to make further inquiry.

> A monthly mortgage payment and a monthly bank statement were obligations of which Mrs. Redman was aware, and whether she received documentary information about either did not lessen her responsibility to know the status of each account. To argue ignorance of the status of the Mortgage or of her checking account was to close her eyes in an effort to avoid discovering the truth. Mrs. Redman had sufficient notice of the default and the foreclosure sale, and the summary judgment in favor of SouthTrust and Federal on the claims of fraud and wrongful foreclosure was proper.

Id at 633.

.      .

BankTrust has submitted evidence of Dysart's actual knowledge and of the notification of the default, acceleration and foreclosure to Dysart.  Taxes and insurance were obligations of which Dysart was aware.  BankTrust served several pleadings filed in Dysart's bankruptcy upon Dysart that clearly notified Dysart of the default, the acceleration and the impending foreclosure. BankTrust's motion for relief from stay was pending for over six months before it was granted. Dysart did not oppose the motion requesting authority to foreclose.  The bankruptcy court expressly ruled that BankTrust was authorized to foreclose its Mortgage and this order was served upon Dysart and her lawyer.  BankTrust discussed the foreclosure with Dysart's counsel on numerous occasions and Dysart attempted to renegotiate a restructuring.  For Dysart to claim ignorance of the foreclosure sale is to "close her eyes in an effort to avoid discovering the truth." Dysart's claims are due to be dismissed as a matter of law.

## C.      **BankTrust Complied With the Notice Requirements in the Mortgage**

Even if constructive knowledge of acceleration and foreclosure were insufficient (which it is not), BankTrust complied with the provisions of the Mortgage.  Specifically, the Mortgage expressly provides that publishing the foreclosure notice as required by Alabama statute shall satisfy any requirement in the Mortgage to provide notice of foreclosure:

> If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

(App. 1, Martin Aff., Exh. B, Mortgage, ¶ 15).  The corresponding provision in the Redman mortgage is identical to the mortgage provision here, except that the Redman notice provision did not contain the above quoted term.  Nonetheless, as a matter of law, the Supreme Court determined that statutory notice combined with constructive notice was sufficient and that the

13

borrowers' claims were due to be dismissed. Dysart's Mortgage simply reiterated the law of

Alabama.

The Note also provides that if applicable law provides for notice by another method,

compliance with applicable law is all that is required:

> Unless applicable law requires another method, any notice that must be
> given to me under this Note will be given by delivering it or mailing it by
> first class mail to me at the Property address or at a different address if I
> give the Note Holder a notice of a different address.

(App. 1, Martin Aff., Exh. A, Note).

Moreover, BankTrust was not required to give Dysart a copy of the notice of foreclosure.

Due to the tax sales, BankTrust was only contractually required to provide Dysart notice of

acceleration pursuant to paragraph 18 of the Mortgage:

> If all or any part of the Property or any interest in the Property is sold or
> transferred... without Lender's prior written consent, Lender may require
> immediate payment in full of all sums secured by this Security
> Instrument.... If Lender exercises this option, Lender shall give Borrower
> notice of acceleration. The notice shall provide a period of not less than
> 30 days from the date the notice is given in accordance with Section 15
> within which Borrower must pay all sums secured by this Security
> Agreement. If Borrower fails to pay these sums prior to the expiration of
> this period, Lender may invoke any remedies permitted by this Security
> Instrument without further notice or demand on borrower.

(App. 1, Martin Aff., Exh. B, Mortgage, ¶ 18). BankTrust moved the Court for relief from stay

on January 23, 2007, amended the Motion for Relief on February 13, 2007, sued Dysart for the

transfer of her interest to Plymouth and Heartwood on February 13, 2007, and filed a trial brief

on August 8, 2007. Each of these writings were served on Dysart at the address identified in the

Mortgage and provided Dysart with notice of acceleration and the amount of the debt secured by

the Mortgage that had to be paid in order to avoid foreclosure. Each also notified Dysart that if

the debt was not paid before the Court lifted the automatic stay, BankTrust would foreclose its

Mortgage.    Dysart did not oppose BankTrust's request for authority to foreclose.    The

14

Bankruptcy Court granted BankTrust's Motion and expressly authorized BankTrust to foreclose its Mortgage. Dysart's counsel attended the hearing on the motion for relief and Dysart was served with a copy of the Order. Each of these notices were served more than 30 days prior to foreclosure. Pursuant to paragraph 18, no other notice was required to be provided before BankTrust foreclosed. BankTrust complied with the provisions of the Mortgage.

## D. Dysart Has Failed to Comply With the Notice Provisions of the Mortgage

The Mortgage provides that Dysart was required to give BankTrust reasonable notice of her intent to sue prior to filing any lawsuit:

> Neither Borrower nor Lender may commence, join or be joined to any judicial action (as either an individual litigant or member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action.

(App. 1, Martin Aff., Exh. B, § 20).

Dysart's complaint is due to be dismissed as a matter of law under this provision alone. After the foreclosure sale, Dysart thanked BankTrust and claimed she planned to pursue claims against her counsel for failing to successfully negotiate a restructuring of her debt to BankTrust. Two years later, without any notice, BankTrust received service of the summons and complaint. Notice of her intent to sue was a condition precedent to bringing this lawsuit.

## E. Dysart Has No Damages

Dysart claims she did not have notice of the foreclosure sale, but Dysart cannot articulate any damages that resulted from any alleged failure to provide contractual notice. Dysart can point to no difference in result if she received a copy of the Notice of Foreclosure or if she did not. Dysart knew of the impending foreclosure and had no ability to pay the debt due to

15

BankTrust. If Dysart did have funds sufficient to pay the accelerated debt to BankTrust, she could have redeemed her interest in the property pursuant to Alabama law. Dysart had one year to redeem, but she failed to do so.

Dysart claims that if BankTrust would have given Dysart a copy of the Notice of Foreclosure, Dysart would have been able to sell the house. Dysart can submit no evidence that she would have sold the house before the foreclosure sale and Dysart still had the option to sell her redemption rights in the house for an entire year after the sale. Dysart's claim of damages result from Dysart failing to pay insurance and taxes and BankTrust foreclosing its Mortgage, not from any alleged failure to provide notice of the sale. As a matter of law, Dysart did not suffer any damages as a proximate result of any alleged failure to mail her a copy of the foreclosure notice.

WHEREFORE, premises considered, BankTrust requests this Court dismiss Dysart's complaint as a matter of law.

Respectfully submitted,

/s/ Deanna L. Weidner
David B. Anderson (AND006)
Deanna L. Weidner (WEI038)
COUNSEL FOR BANKTRUST

**OF COUNSEL:**
ANDERSON & ASSOCIATES, LLC
Financial Center
505 20th Street North, Suite 1450
Birmingham, AL 35203
Telephone: (205) 324-1230
Telecopier: (205) 322-3890
dbanderson@davidbandersonlaw.com
dlweidner@davidbandersonlaw.com

16

## **CERTIFICATE OF SERVICE**

I hereby certify that a copy of the above and foregoing Motion to Dismiss has been served upon the following through the Court's electronic filing system and/or by United States mail, first class and postage prepaid, on this the _____ day of October, 2009:

John G. Watts, Esq.
M. Stan Herring, Esq.\
Watts Law Group, PC
The Kress Building
301 19th Street North
Birmingham, AL 35203

/s/ Deanna L. Weidner _____

OF COUNSEL