FILED

Case 2:11-cv-01917-LSC   Document 72   Filed 07/10/12   Page 1 of 65
Case: 12-13653   Date Filed: 07/12/2012   Page: 1 of 2

2012 Jul-10 PM 09:55
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| NELL C. DYSART, *Pro Se* | ) | |
| | ) | |
| PLAINTIFF, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| BANKTRUST, F/K/A, THE PEOPLES | ) | |
| BANK AND TRUST OF SELMA, AL, | ) | |
| SUCCESSORS AND/OR ASSIGNS OF | ) | |
| THE PEOPLES BANK AND TRUST OF | ) | CASE NO. 2:11-cv-01917-LSC |
| SELMA, AL., | ) | |
| W. BIBB LAMAR, JR., | ) | |
| EDWARD T. LIVINGSTON, | ) | |
| ELAM P. HOLLEY, JR., | ) | |
| MAC MARTIN, | ) | |
| ELAINE DELLINGER, | ) | |
| ANDERSON & WEIDNER, F/K/A | ) | |
| ANDERSON & ASSOCIATES, DAVID B. | ) | |
| ANDERSON, DEANNA L. WEIDNER, | ) | |
| RYAN K. COCHRAN, | ) | |
| K. EDWARD SEXTON, II, | ) | |
| STAR PROPERTIES, LLC, STEPHEN | ) | |
| CUMMINGS, III, UNKNOWN PERSONS | ) | |
| A,B,C,D,E,F,G. | ) | |
| | ) | |
| DEFENDANTS. | ) | |

---

## PLAINTIFF NELL C. DYSART'S NOTICE OF APPEAL

---

Notice is hereby given that Nell C. Dysart, plaintiff in the above named case, hereby

appeals to the United States Court of Appeals for the Eleventh Circuit of this Court's July 3,

2012 Memorandum of Opinion and Order dismissing her claim under the Racketeer Influenced

and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, *et seq*., without prejudice, for failure to state a claim. (Docs. 69 & 70). Plaintiff appeals dismissal of her state law claims in entirety, without prejudice, under 28 U.S.C. § 1367(c) (3). (Docs. 69 & 70). Plaintiff appeals costs that were taxed to her. (Doc. 70).

Respectfully Submitted,

DATED:  July 10, 2012

Nell C. Dysart, *Pro Se*
P.O. Box 10042
Birmingham, AL   35202-0042
(205) 369-4074
ncdysart@msn.com

FILED

2011 Sep-23  AM 09:42
U.S. DISTRICT COURT
N.D. OF ALABAMA

Case 2:11-cv-01917-LSC   Document 46   Filed 09/23/11   Page 3 of 65

Case: 12-13653     Date Filed: 09/12/2012     Page: 1 of 11

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| NELL DYSART, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | CV-11-RRA-1917-S |
| BANKTRUST, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**REPORT AND RECOMMENDATION**

This is a civil action filed by Nell Dysart, *pro se*, against BankTrust, W. Bibb Lamar,

Jr., Edward T. Livingston, Elam P. Holley, Jr., Mac Martin, Elaine Dellinger, Anderson &

Weidner, David Anderson, Deanna L. Weidner, Ryan K. Cochran, K. Edward Sexton, II, Star

Properties, LLC, and Stephen Cummings, III. The following claims stated in the complaint

arise directly out of the foreclosure of the plaintiff's home, and are alleged against all

defendants. They are fraud on the court (Count One), violation of the Racketeer Influenced

and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962© (Count Two), violation of

RICO, 18 U.S.C. § 1962(d) (Count Three), breach of contract (Count Four), intentional

infliction of emotional distress (Count Six),[1] and trespass (Count Seven). Another count,

Count Five, is directed at defendants Anderson, Weidner, and BankTrust only, and it

concerns written statements made by or on behalf of these defendants, in response to a prior

lawsuit filed against them relating to the same foreclosure.

The case is before the court on the various motions to dismiss (docs. 27, 30, 31) filed

---

[1]This count appears out of order, on page 31 of the complaint.

by defendants BankTrust, W. Bibb Lamar, Jr., Edward T. Livingston, Elam P. Holley, Jr., Mac

Martin, Elaine Dellinger, Anderson & Weidner, David Anderson, Deanna L. Weidner, and

Ryan K. Cochran.  All of the motions are brought pursuant to Rule 12(b)(6) of the Federal

Rules of Civil Procedure.


## APPLICABLE STANDARD

The Eleventh Circuit has stated:

> Fed.R.Civ.P. 8(a)(2) requires that a pleading contain "a short and plain statement of the claim showing that the pleader is entitled to relief" in order to "give the defendant fair notice of what the ... claim is and the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47, 78 S.Ct. 99, 103, 2 L.Ed.2d 80 (1957). In *Twombly*, the Supreme Court expressly "retired" the "no set of facts" pleading standard under Rule 8(a)(2) that the Court had previously established in *Conley v. Gibson*. *Twombly*, 550 U.S. at 563, 127 S.Ct. at 1969. Justice Black wrote for the Court in Conley of "the accepted rule that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." 355 U.S. at 45-46, 78 S.Ct. at 102. In rejecting that language, the Court in Twombly noted that courts had read the rule so narrowly and literally that "a wholly conclusory statement of claim would survive a motion to dismiss whenever the pleadings left open the possibility that a plaintiff might later establish some set of undisclosed facts to support recovery." 550 U.S. at 561, 127 S.Ct. at 1968 (internal quotation marks and alterations omitted).

> In *Twombly*, the plaintiffs alleged an antitrust conspiracy among certain regional telecommunications providers in violation of the Sherman Act, 15 U.S.C. § 1 (2006). *Id.* at 550, 127 S.Ct. at 1962. Their complaint relied on allegations of the defendants' parallel behavior to allege the conspiracy. *Id.* The Supreme Court granted certiorari to address the proper standard for pleading an antitrust conspiracy through allegations of parallel conduct. *Id.* at 553, 127 S.Ct. at 1963. Justice Souter, writing for a substantial majority, first noted:

> > While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.

*Id.* at 555, 127 S.Ct. at 1964-65 (internal quotation marks, citations, and alterations omitted). The Court explained that "[f]actual allegations must be enough to raise a right to relief above the speculative level ... on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id.* at 555, 127 S.Ct. at 1965. The Court ultimately held that to survive a motion to dismiss, a complaint must now contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Id.* at 570, 127 S.Ct. at 1974. Cautioning that its new plausibility standard is not akin to a "probability requirement" at the pleading stage, the Court nonetheless held that the standard "calls for enough fact to raise a reasonable expectation that discovery will reveal evidence" of the claim. *Id.* at 556, 127 S.Ct. at 1965. The Court was careful to note that "we do not require heightened fact pleading of specifics," but concluded that when plaintiffs "have not nudged their claims across the line from conceivable to plausible, their complaint must be dismissed." *Id.* at 570, 127 S.Ct. at 1974. Finding that the plaintiffs' complaint did not plausibly suggest an illegal conspiracy by merely alleging parallel conduct-because such parallel conduct was more likely explained by lawful, independent market behavior-the Court held that the district court properly dismissed the complaint. *Id.* at 567-70, 127 S.Ct. at 1972-74.

The Supreme Court has since applied the *Twombly* plausibility standard to another civil action, *Ashcroft v. Iqbal*, --- U.S. ----, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). *Iqbal* involved a *Bivens* action brought by a Muslim Pakistani who had been arrested and detained following the September 11, 2001, terrorist attacks. *Id.* at 1943. He sued current and former federal officials, including John Ashcroft, former Attorney General of the United States, and Robert Mueller, the Director of the FBI. *Id.* at 1942. Iqbal alleged that Ashcroft and Mueller adopted and implemented a detention policy for persons of high interest after September 11, and that they designated him a person of high interest on account of his race, religion, or national origin, in violation of the First and Fifth Amendments to the Constitution. *Id.* at 1944. Iqbal's complaint alleged that Ashcroft was the "principal architect" of the policy and identified Mueller as "instrumental in [its] adoption, promulgation, and implementation," but also stated that both men "knew of, condoned, and willfully and maliciously agreed to subject" Iqbal to harsh conditions of confinement "as a matter of policy ... for no legitimate penological interest." *Id.* at 1944 (alteration in original).

In evaluating the sufficiency of Iqbal's complaint in light of *Twombly*'s construction of Rule 8, the Court explained the "working principles" underlying its decision in that case. *Id.* at 1949. First, the Court held that "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Id.* Second, restating the plausibility standard, the Court held that "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged-but it has not 'show[n]'-'that the pleader is entitled to relief.' " *Id.* at 1950 (quoting Fed.R.Civ.P. 8(a)(2)). The Court suggested that courts considering motions to dismiss adopt a "two-pronged approach" in applying these principles: 1) eliminate any allegations in the complaint that are merely legal conclusions; and 2) where there are well-pleaded factual allegations,

3

"assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* Importantly, the Court held in *Iqbal*, as it had in *Twombly*, that courts may infer from the factual allegations in the complaint "obvious alternative explanation[s]," which suggest lawful conduct rather than the unlawful conduct the plaintiff would ask the court to infer. *Id.* at 1951-52 (quoting *Twombly*, 550 U.S. at 567, 127 S.Ct. at 1972). Finally, the Court in *Iqbal* explicitly held that the *Twombly* plausibility standard applies to all civil actions, not merely antitrust actions, because it is an interpretation of Rule 8. *Id.* at 1953.

Applying these principles to Iqbal's complaint, the Court began by disregarding as wholly conclusory Iqbal's allegations that Mueller was "instrumental" in adopting the detention policy and Ashcroft was the "principal architect" of the policy, and that they willfully agreed to subject Iqbal to harsh treatment for a discriminatory purpose. *Id.* at 1951. The Court then determined that the remaining factual allegations-that Mueller and Ashcroft approved the FBI's policy of arresting and detaining thousands of Arab Muslim men as part of its investigation into the events of September 11-did not plausibly establish the purposeful, invidious discrimination that Iqbal asked the Court to infer. *Id.* at 1951-52. The alternative inferences that could be drawn from the facts-namely, that the arrests were likely lawful and justified by a nondiscriminatory intent to detain aliens who were illegally present in the United States and who had potential connections to those who committed terrorist acts-were at least equally compelling. *Id.* Accordingly, the Court ruled that Iqbal's complaint must be dismissed. *Id.* at 1954.

*American Dental Ass'n v. Cigna Corp.*, No. 09-12033, 2010 WL 1930128, *3 -5 (11th Cir.

May 14, 2010).

ALLEGATIONS

On August 30, 2002, the plaintiff took out a mortgage on her home with defendant

BankTrust.[2]  On April 27, 2004, the plaintiff filed for Chapter 7 bankruptcy pursuant to the

advice of her bankruptcy attorney, defendant Sexton. The BankTrust debt was listed as a

secured debt on the bankruptcy schedule, and was always paid outside the schedule. The

---

[2]The mortgage was with People's Bank & Trust Company, which has become BankTrust. For ease of reference, the court will refer to this defendant only as BankTrust, the name it is known by now.

4

plaintiff's property taxes were included as unsecured priority claims.

On May 24, 2004, the Jefferson County Tax Collector caused the residence to be sold to pay unpaid taxes on the property.  On August 3, 2004, the plaintiff's Chapter 7 case was discharged.  On October 26, 2004, defendant Sexton filed a Chapter 13 case in bankruptcy on behalf of the plaintiff.  The primary purpose of this filing was to schedule outstanding payments for the unsecured priority claims for IRS and property taxes owed by the plaintiff. Mortgage payments owed to BankTrust were never paid through the bankruptcy court.

The plaintiff was supposed to refinance her home in order to pay completely all of her debts as part of her Chapter 13 plan. The refinancing was supposed to be closed by defendant Sexton on April 6, 2007, but "clear to close" documents never arrived for the closing and it did not take place.

On May 23, 2006, the Jefferson County Tax Collector again sold the plaintiff's home for payment of the unpaid taxes.

On August 8, 2007, defendant Weidner, one of the attorneys for BankTrust, filed a trial brief in the bankruptcy court stating that "[d]efendants would perform an accounting for monies that were delinquent and owed by [the plaintiff]." (Doc. 1, p. 10.)  The brief also stated that BankTrust "intends to examine witnesses and present evidence to establish the amounts due by [the plaintiff] after the tax sales are set aside." *Id.* The plaintiff states that she relied on these representations, and that the defendants never made her aware of any amounts that she owed.

The tax sales were set aside by the bankruptcy court on September 4, 2007, which also "vest[ed] the property in [the plaintiff's] name." *Id.*  The complaint also states that a <u>different</u>

5

court order, entered some time before March 1, 2006, prevented her from redeeming the property. The complaint states that the defendants violated the September 4, 2007 order by advertising the property for foreclosure sale in the Alabama Messenger on September 22, September 29, and October 6, 2007. The home was foreclosed on October 15, 2007, before 11:00 a.m., the advertised time of the sale. The plaintiff claims that this sale was illegal.

The Jefferson County Tax Collector's letter stating that the amount the plaintiff owed in taxes was not entered in the tax collector's computer system until November 28, 2007. The total amount due was $12, 903.97. The plaintiff's taxes were paid on December 27, 2007, with the bankruptcy court paying $6,100.00, Star Properties paying $5,800.00, and BankTrust paying $950.00. The complaint alleges that "[i]n order to take care of her tax default, [the plaintiff] only needed to pay a balance of $6,803.97." *Id.* at 11. This amount apparently represents an approximation of the amounts paid by BankTrust and Star Properties. The plaintiff was not informed of that amount.

On September 8, 2009, the plaintiff, through Attorneys John Watts and Stan Herring, not parties to this action, filed a lawsuit against BankTrust. In response, defendants Anderson and Weidner "email[ed] a tortuous and threatening letter and draft to [the plaintiff's] attorneys. The [d]efendants threatened to file a frivolous lawsuit action against her attorneys, if they did not withdraw her lawsuit. The also threatened to file a motion that was filled with falsities, if her lawsuit was not withdrawn." *Id.* at 12.

ANALYSIS

This is the third time the plaintiff has filed a lawsuit concerning the events surrounding

6

her foreclosure.  The first was filed in Jefferson County Circuit Court on September 8, 2009.
The plaintiff's attorneys at that time voluntarily dismissed that action.  (Doc. 1, pp. 3, 12.)

Her second lawsuit was filed in this United States District Court last year.  *See Dysart v. BankTrust, et al.*, CV-10-J-3521-S.  In that case she sued the exact same defendants as she has in the instant case.  Further, she attempted to set out various RICO and state law claims.
Judge Inge Johnson, in a January 7, 2011, order wrote:

> Taking the allegations of the complaint as true, the court finds that the plaintiff alleges a variety of wrongdoings and conspiracies by a variety of people, all somehow connected to the plaintiff discovering "on October 15, 2007 ... that she had just been injured by an unauthorized and wrongful foreclosure on her home. This foreclosure presumably resulted from a property tax default, which [plaintiff] will prove was not the truth." Complaint, ¶ 3. The plaintiff alleges that defendant BankTrust violated a Court Order in breaching her mortgage contract and that she has been injured by defendants' "racketeering enterprise." Complaint ¶¶ 5-6. Much of the conspiracy she alleges occurred was orchestrated by defendant Sexton, plaintiff's attorney at the time. Id., ¶ 8 and plaintiff's exhibit 5.

> The plaintiff continues that defendant Anderson and defendant Peoples knew the plaintiff's 2003 property taxes were delinquent in March of 2004, because defendant Cochran filed a motion to Lift the Automatic Stay in plaintiff's bankruptcy case. However, the plaintiff also asserts that this was prior to plaintiff's filing of a Chapter 7 bankruptcy petition in 2004, and all of these actions were done to prepare to foreclose on plaintiff's home. Complaint, ¶¶ 46-4 7. This was also all in retaliation against plaintiff because she owed an unsecured loan to People's Bank and hence they wrongfully foreclosed on her property. Id., ¶¶ 31, 33, 47-48. She learned about the tax sale and that she was not allowed to redeem the property on March 1, 2006. See plaintiff exhibit 22.

> Sometime after the 2004 bankruptcy filing, there were two separate tax sales on the plaintiff's house, which were declared void by the bankruptcy court in September 2007. Complaint, ¶ 49. Her home was foreclosed in October 2007. Id., ¶¶ 50-51. The plaintiff asserts said foreclosure somehow constituted wire fraud, mail fraud, and violated Alabama Code sections as well. Id., ¶ 52. The plaintiff further alleges that the purchaser of her property did so illegally, that the foreclosure sale was not properly held, and that her attorney failed to keep her informed. Complaint, ¶¶ 57-60. This is also related to a subdivision plaintiff was developing with her son, for which her attorney wanted to handle the closings and also purchase some lots. Id., ¶ 59. She further states the foreclosure was illegally done and that defendants "failed to comply with the law." Id., ¶¶ 60-64. The plaintiff also claims that as a "direct and

proximate result of Defendant's violation of 18 U.S.C. § 1962©, [the plaintiff] is injured by the fact that she is now forced to take care of her mother on a 24/7 basis." Complaint, ¶ 87.

*Dysart v. BankTrust, et al.*, CV-10-J-3521-S, doc. 10, pp. 3-5.[3]

Judge Johnson dismissed the case, holding:

Foreclosure actions are not appealable to this court. The Rooker-Feldman doctrine prohibits federal courts from reviewing state court proceedings. *See e.g., Siegel v. LePore*, 234 F.3d 1163, 1172 (11th Cir.2000). If the plaintiff believes her mortgage was wrongfully foreclosed, couching that foreclosure in RICO language does not make it into a federal claim. If plaintiff believes she was subjected to legal malpractice, she should sue her attorney directly for legal malpractice, and not couch the same in RICO language.

The vast majority of the acts about which plaintiff complains occurred between three and seven years prior to the filing of this lawsuit. Even if the court could discern from the plaintiff's complaint what actions she contends formed the criminal enterprise, the statute of limitations for civil RICO actions is four years. A civil RICO action begins to accrue as soon as the plaintiff discovers, or reasonably should have discovered, both the existence and source of her injury and that the injury is part of a pattern. This requirement is in accordance with the four year statute of limitations established by the United States Supreme Court because it requires plaintiffs to pursue the civil RICO remedy within four years of the time when they discovered, or reasonably should have discovered, that they are entitled to civil RICO damages for their injury. *McCaleb v. A.O. Smith Corp.*, 200 F.3d 747, 751 (11th Cir.2000). In her complaint, the plaintiff alleges her troubles first arose in 2003 or 2004. She states that in March 2004, defendant Peoples knew plaintiff was delinquent in her 2003 property taxes. Complaint, ¶ 47. She also asserts that her March 2004 mortgage payment was not accepted. Plaintiff exhibit 6. In the RICO context, "inquiry notice" controls. *Prudential Ins. Co. of America v. United States Gypsum Co.*, 359 F.3d 226, 236-37 (3rd Cir.2004) (rejecting the argument that the statute of limitations for civil RICO claims is triggered only when the injury becomes "actual"); *Takeuchi v. Sakhai*, 227 Fed.Appx. 106, 107 (2nd Cir.2007) (rejecting plaintiffs' "actual injury" argument and holding that the statute of limitations ran from the time plaintiffs were on inquiry notice as to their injuries).

Given the allegations of the plaintiff's complaint, the court finds the foreclosure itself was not the point at which the plaintiff should have learned of the alleged fraudulent scheme, but rather before then, such as March 2004 when plaintiff

---

[3]The court also referred to the complaint as a "shotgun" pleading, lacking clarity and precision, which failed to meet the requirements of Rule 8(a) of the Federal Rules of Civil Procedure. *Id.* p. 3.

had the bank refuse a mortgage payment, or March 2006 when plaintiff learned she was not allowed to redeem her property. See plaintiff exhibit 22. Similarly plaintiff's state law claims pursuant to § 35-4-153, Alabama Code 1975, as amended, and other Alabama Code sections, while couched in terms of foreclosure, seem more accurately to state claims for various types of fraud. In Alabama, the statute of limitations for fraud is two years, starting from the time a plaintiff should have or did discover facts indicating the existence of fraud. *McGowan v. Chrysler Corp.*, 631 So.2d 842, 845 (Ala.1993); *Henson v. Celtic Life Ins. Co.*, 621 So.2d 1268, 1274 (Ala.1993).

The plaintiff states violations of the Fair Debt Collection Practices Act occurred, although there is no specific action alleged to have violated this Act. In any event, claims under that Act are subject to a one year statute of limitations. See e .g., 15 U.S.C. § 1692k(d); *Maloy v. Phillips*, 64 F.3d 607, 608 (11th Cir.1995). As this suit was filed December 20, 2010, and no allegation of the complaint occurred within the one year prior to this date, all claims under the Fair Debt Collection Practices Act are barred.

To the extent the plaintiff's claims are not barred by the statute of limitations or otherwise, the court is of the opinion they are due to be dismissed for failing to state a claim upon which relief may be granted.

*Id.*

The plaintiff has now filed the instant action which, for the most part, arises out of the same facts as were at issue in the case before Judge Johnson. The only thing new is Count Five, which arises out of the communications sent by defendants Anderson and Weidner in response to the September 8, 2009 action. As to the counts based on the foreclosure, this magistrate judge agrees with Judge Johnson's analysis regarding the statutes of limitations concerning the plaintiff's various claims, and, based on that analysis, determines that related counts in this case should be dismissed. Moreover, the claims are also bared because of the doctrine of *res judicata*.[4]

The doctrine of claim preclusion (or *res judicata*) bars the parties to an action from relitigating matters that were or could have been litigated in an earlier suit. The

---

[4]To the extent this ground has not been raised by the movants, or the non-moving defendants, the court raises it *sua sponte*.

> doctrine facilitates "the conclusive resolution of disputes" by reducing "the expense
> and vexation attending multiple lawsuits, conserv[ing] judicial resources, and
> foster[ing] reliance on judicial action by minimizing the possibility of inconsistent
> decisions." *Montana v. United States,* 440 U.S. 147, 153-54, 99 S.Ct. 970, 59 L.Ed.2d
> 210 (1979). In accordance with those values, the doctrine bars a claim whenever (1)
> a court of competent jurisdiction has (2) rendered a final judgment on the merits in
> another case involving (3) the same parties and (4) the same cause of action.
> *Rubbermaid,* 193 F.3d at 1238.

*Shurick v. Boeing Co.*, 623 F.3d 1114, 1116-17 (11th Cir. 2010). "[R]es judicata applies not

only to claims which were actually brought before the previous court, but also to those claims

'which could have been raised in that action.'" *In re Atlanta Retail, Inc.*, 456 F.3d 1277,

1288 (11th Cir. 2006) quoting *In re Piper Aircraft Corp.*, 244 F.3d 1289, 1296 (11th Cir.

2001)).

The first three requirements are clearly satisfied. There can be no dispute that Judge

Johnson rendered a final judgment on the merits in the preceding action. That judgment was

rendered by a court of competent jurisdiction. Further, the parties are identical in both cases.

The fourth element of *res judicata*, whether both cases concern "the same cause of action,"

is determined by whether both cases concern "the same nucleus of operative fact." *Shurick*,

623 F.3d at 1117. In the instant case, Count Two is nearly identical to Count One in Judge

Johnson's case.[5] Count Four in the instant case makes the same breach of contract claim as

Count Three in Judge Johnson's case. All of the remaining claims in the instant case, except

the "extrinsic fraud" claim in Count Five, grow directly out of the foreclosure and the

procedures and conduct engaged in by the defendants related to the foreclosure. Clearly the

same nucleus of operative fact, the events and procedures surrounding the foreclosure, is

---

[5]Notably, in the instant case the plaintiff adds paragraph 80, which alleges that
"[d]efendant Anderson and Weidner tortuously interfered with the [2009] proceeding in order to
conceal the [d]efendants' fraud." (Doc. 1, p. 24.) However, that statement is the basis for, and
can support only Count Four, not the RICO count.

present here. *Res judicata* bars all of the plaintiff's claims except Count Five. Count Five, claims state law fraud. This court, in its discretion pursuant to 28 U.S.C. § 1367, should decline to exercise supplemental jurisdiction over the state claim.

## RECOMMENDATION

Based on the foregoing, it is RECOMMENDED that the motions to dismiss be GRANTED, and that the court *sua sponte* dismiss all remaining claims except Count Four, as against all defendants, based on the doctrine of *res judicata*. As to Count Five, it is RECOMMENDED that the court, in its discretion pursuant to 28 U.S.C. § 1367, decline to exercise supplemental jurisdiction over the claim.

Any party may file specific written objections to this report and recommendation within fourteen (14) days from the date it is filed in the office of the Clerk. Failure to file written objections to the proposed findings and recommendations contained in this report and recommendation within fourteen (14) days from the date it is filed shall bar an aggrieved party from attacking the factual findings on appeal. Written objections shall specifically identify the portions of the proposed findings and recommendation to which objection is made and the specific basis for objection. A copy of the objections must be served upon all other parties to the action.

DONE this 23rd day of September, 2011.

Robert R. Armstrong, Jr.
United States Magistrate Judge

FILED
2012 Apr-12  AM 10:10
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| NELL DYSART, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | CV-11-RRA-1917-S |
| BANKTRUST, W. BIBB LAMAR, JR., | ) | |
| EDWARD T. LIVINGSTON, | ) | |
| ELAM P. HOLLEY, JR., | ) | |
| MAC MARTIN, ELAINE DELLINGER, | ) | |
| ANDERSON & WEIDNER, | ) | |
| DAVID ANDERSON, DEANNA | ) | |
| L. WEIDNER, and | ) | |
| RYAN K. COCHRAN, | ) | |
| | ) | |
| Defendants. | ) | |

## SECOND REPORT AND RECOMMENDATION

The case comes before the court on the various motions to dismiss (docs. 27, 30, 31) filed by defendants BankTrust, W. Bibb Lamar, Jr., Edward T. Livingston, Elam P. Holley, Jr., Mac Martin, Elaine Dellinger, Anderson & Weidner, David Anderson, Deanna L. Weidner, and Ryan K. Cochran. All of the motions are brought pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. The motion filed by defendants Anderson, Weidner, and Anderson Weidner, LLC, also moves in the alternative for summary judgment. However, the court has not reviewed documents outside the pleadings and treats all of the motions as merely motions to dismiss. No motions to dismiss have been fled by defendants Sexton, Star Properties, LLC, or Cummings. The court *sua sponte* reviews the plaintiff's claims as they apply to these three defendants.

A report and recommendation was entered on September 23, 2011. (Doc. 46.) Relying on the doctrine of *res judicata*, it was recommended that all claims be dismissed. However, the dismissal that was the basis of the *res judicata* finding turned out to be a dismissal without prejudice. Therefore, the motions for a Rule 12(b)(6) dismissal or for summary judgment are back before this court. On March 12, 2012 the court entered an order, requiring the parties to brief the issue of whether the *Rooker-Feldman* doctrine bars this case. (Doc. 56.) The parties responded to that order by generally agreeing that it does not. (Doc. 59, 60, 61.)

I.  ISSUES

The following are the issues in this case and they will be discussed separately.

A.  Whether the *Rooker–Feldman* Doctrine bars review of the foreclosure proceeding;

B.  Whether representations in the August 8, 2007 bankruptcy court trial brief filed by defendants Weidner, Anderson, and BankTrust create a cause of action for fraud on the court;

C.  Whether the plaintiff's RICO claims are timely filed;

D.  Whether the plaintiff has pled a RICO "Enterprise";

E.  Whether the plaintiff has pled a "pattern" of racketeering activity;

F.  Whether the individual allegations of "racketeering activity" state a claim;

G.  Whether the plaintiff has alleged a conspiracy to violate RICO;

H.  Whether res judicata bars certain claims in this case;

2

I.      Whether the plaintiff's injury — the foreclosure — was caused by the
        defendants' conduct;

J.      Whether the plaintiff has alleged a breach of contract;

K.      Whether any of the defendants' conduct amounts to extrinsic fraud;

L.      Whether any defendant can be liable for trespass; and

M.      Whether the conduct of any defendant amounts to the intentional infliction of
        emotional distress.


II.     ALLEGATIONS

        A.      <u>General Allegations In the Complaint</u>

        On August 30, 2002, the plaintiff took out a mortgage on her home from defendant

BankTrust.[1]  On April 27, 2004, the plaintiff filed for Chapter 7 bankruptcy.  The BankTrust

debt was listed as a secured debt on the bankruptcy schedule, but was always paid outside the

schedule. The plaintiff's property taxes were also included as unsecured priority claims.

        On May 24, 2004 the Jefferson County tax collector, in violation of the automatic stay

in bankruptcy, sold the property to pay unpaid taxes.  On August 3, 2004,  the plaintiff was

discharged in Chapter 7 bankruptcy. On October 26, 2004, defendant Sexton filed a Chapter

13 case in bankruptcy on behalf of the plaintiff.  Again, the residence was a scheduled asset.

(Doc. 1, p. 41.)[2]  The plaintiff's BankTrust mortgage was also scheduled. (Doc. 1, p. 41.) The

---

        [1]The mortgage was with People's Bank & Trust Company, which has since become
BankTrust.  For ease of reference, the court will refer to this defendant only as BankTrust, the
name it is known by now.

        [2]"On a motion to dismiss, the Court may consider documents attached to the Complaint
or directly referred to in the Complaint.  Exhibits attached to a Complaint are properly

primary purpose of this filing was to schedule outstanding payments for the unsecured priority claims for IRS and property taxes owed by the plaintiff. Mortgage payments owed to BankTrust were never paid through the bankruptcy court. On December 13, 2005, Dysart's Chapter 13 plan was confirmed. (Doc. 1, p. 41.) However, the debt to BankTrust was not addressed in the plan. (Doc. 1, p. 42.) The plaintiff elected to continue to make payments on that debt directly to BankTrust. (Doc. 1, p. 42.)

The complaint also states that a court order, entered some time before March 1, 2006, prevented the plaintiff from redeeming the property. Attached to the complaint as Exhibit 9 is a receipt, dated March 1, 2006, which shows the plaintiff's name and address, her parcel, the tax due, and the statement "DO NOT ALLOW REDEMPTION!!" (Doc. 1, p. 75)(caps in original).

On May 23, 2006, the Jefferson County Tax Collector, in violation of the stay, again sold the plaintiff's home in payment of unpaid taxes.

The plaintiff was supposed to refinance her home in order to completely pay all of her debts as part of her Chapter 13 plan. The refinancing was supposed to be closed by defendant Sexton on April 6, 2007, but "clear to close" documents never arrived for the closing and it did not take place. The refinancing would have included the BankTrust balance, the taxes, and "the first overbid due to investors." (Doc. 1, p. 10.)

---

considered part of the pleadings for all purposes, including a Rule 12(b)(6) motion. *Solis-Ramirez v. United States Dep't of Justice,* 758 F.2d 1426, 1430 (11th Cir.1985). Attachments to a Complaint are to be considered in the same manner as the Complaint itself. *Rhodes v. Omega Research, Inc.,* 38 F.Supp.2d 1353, 1357-58 (S.D.Fla.1999)." *Jordan v. Miami-Dade County*, 439 F. Supp. 2d 1237, 1240 (S.D. Fla. 2006).

4

On August 8, 2007 defendant Weidner, one of the attorneys for BankTrust, filed a trial brief in the bankruptcy court stating that "[d]efendants would perform an accounting for monies that were delinquent and owed by [the plaintiff]." (Doc. 1, p. 10.) Also, the brief stated that BankTrust "intends to examine witnesses and present evidence to establish the amounts due by [the plaintiff] after the tax sales are set aside." *Id.* The complaint alleges that the defendants never intended to follow through on these statements.  The plaintiff states that she relied on these representations, and that the defendants never made her aware of any amounts that she owed.

At some point BankTrust moved the bankruptcy court for relief from the automatic stay in order to foreclose upon the property.  The plaintiff did not oppose the motion.  (Doc. 1, p. 67.)  On September 4, 2007, the bankruptcy court ordered that "the automatic stay in this Bankruptcy Case shall be and hereby is terminated with respect to the secured claim of [BankTrust] and [BankTrust] is hereby authorized to foreclose its mortgage against the Debtor's residence."  (Doc. 1, p. 67.)

Also on September 4, 2007,  the bankruptcy court set aside the two tax sales and held that title to the property was "vested in Nell Dysart." (Doc. 1, p. 70.)  The complaint states that the defendants violated the September 4, 2007 order by advertising the property for foreclosure sale in the Alabama Messenger on September 22, September 29, and October 6, 2007.  The home was foreclosed upon on October 15, 2007, before 11:00 a.m., the advertised time of the sale.   The plaintiff claims that this sale was therefore illegal.

The Jefferson County tax collector's letter stating the amount that the plaintiff owed in taxes was not entered in the tax collector's computer system until November 28, 2007.

5

The total amount due was $12,903.97.  The plaintiff's taxes were paid on December 27, 2007, with the bankruptcy court paying $6,100.00, Star Properties paying $5,800.00, and BankTrust paying $950.00.  The complaint alleges that "[i]n order to take care of her tax default, [the plaintiff] only needed to pay a balance of $6,803.97."  *Id.* at 11.  This amount apparently represents an approximation of the amounts paid by BankTrust and Star Properties.  The plaintiff was not informed of that amount.

On September 8, 2009 the plaintiff, through attorneys John Watts and Stan Herring, not parties to this action, filed a lawsuit against BankTrust.  In response, defendants Anderson and Weidner "email[ed] a tortuous and threatening letter and draft to [the plaintiff's] attorneys.  The [d]efendants threatened to file a frivolous lawsuit action against her attorneys if they did not withdraw her lawsuit.  They also threatened to file a Motion that was filled with falsities, if her lawsuit was not withdrawn."  *Id.* at 12.

    B.    <u>Alleged Facts Regarding the "Pattern of Racketeering"</u>

        1.    *The Alleged Enterprise – TPBE*

BankTrust, formerly known as The Peoples Bank & Trust Company of Selma, Alabama, formed an alleged association-in-fact enterprise with W. Bibb Lamar, Jr,  Edward T. Livingston, Mac Martin, Elam P. Holley, Jr,  Elaine Dellinger, Anderson & Associates, LLC.,  Anderson & Weidner, David B. Anderson, Deanna D. Weidner, Ryan C. Cochran, K. Edward Sexton, Star Properties, LLC., and Stephen Cummings, III. The complaint refers to this enterprise as "The Peoples BankTrust Enterprise" or "TPBE."  The plaintiff claims that TPBE is "an enterprise associated-in-fact and operated together for the common purpose of conspiring to divest Dysart of her home and equity therein."  (Doc. 1, p. 12.)

6

It is alleged that BankTrust and its employees conducted, oversaw, and directed the conduct of the affairs of the enterprise.  The complaint states that Anderson & Associates, LLC, Anderson & Weidner, and David Anderson's role in TBPE "was to actively participate in, manage, conduct, oversee and direct the conduct of the affairs of the enterprise."  (Doc. 1, p. 12.)  The complaint continues:

> Deanna Weidner and Ryan Cochran's role in TPBE was to actively participate in the conduct of the affairs of the enterprise by carrying out orders of BankTrust and David Anderson. Eddie Sexton's role in TPBE was to actively participate in the conduct of the affairs of the enterprise, directly or indirectly by conspiring with David Anderson and Deanna Weidner to intentionally conceal or suppress vital information that Dysart relied on. Such was information that Sexton had a fiduciary duty to disclose to Dysart. But that he failed to do, causing Dysart to be injured by his suppression of information. Star Properties, LLC. and Stephen Cummings, III's role in TPBE was to conspire with David Anderson and Deanna Weidner to actively participate in the conduct of its affairs indirectly by fraudulently purchasing Dysart's home.

(Doc. 1, p. 13.)

The plaintiff alleges that the defendants played "significant roles in the predicate acts used for the facilitation of the unauthorized and unlawful foreclosure of Dysart's home by among other things, failing to disclose pertinent information to Dysart, and failing to give Dysart the required notice due to her under clause #22 of her mortgage. The defendant's conduct was also in violation of the Fannie Mae/Freddie Mac uniform mortgage instrument and in violation of the Code of Alabama 1975 § 35-10-8."  (Doc. 1, p. 13.)  The complaint states that the predicate acts continue to this date as there is a cloud on the title of the residence.  (Doc. 1, p. 13.)

       2.     *18 U.S.C. § 1341 (Mail Fraud)*

On or about December 6, 2007, Star Properties and Trey Cummings placed an

advertisement for the sale of the plaintiff's home in the Birmingham News.  The complaint

calls the advertisement a part of the furtherance of "a scheme or artifice to defraud."  (Doc.

1, p. 14.)

> On or about October 18, 2007, Anderson, in an email
>
> tried to "lull" Dysart into a "false sense of security" or acceptance that she/Dysart was
> aware of Defendants' actions to foreclose; that the foreclosure was valid; that
> Defendants' actions were justified; that Defendant Sexton was a willing participant in
> the discussions relating to the foreclosure.

(Doc. 1, p. 14.)  Anderson also sent this same correspondence via first class mail.  (Doc. 1,

p. 15.)  The plaintiff calls this "an essential part of the scheme to dispose of Dysart's home."

(Doc. 1, p. 15.)

On or about September 22, September 29, and October 6, 2007, BankTrust, Weidner,

and Anderson advertised Dysart's home for sale in the Alabama Messenger.  The plaintiff calls

this "an essential part the scheme to dispose of Dysart's home for obtaining money.  (Doc.

1, p. 15.)

On or about July 31, August 7, and August 14, 2004, BankTrust and Cochran

advertised the plaintiff's home for sale in the Alabama Messenger.  The complaint calls this

"an essential part the scheme to dispose of Dysart's home for obtaining money."  (Doc. 1, p.

15.)

### 3.    18 U.S.C. § 1343 (Wire Fraud)

On or about July 6, 2004 and on or about July 19, 2004, Cochran "threaten[ed]

Dysart to secure — with her home — an unrelated business debt approximating $114,000.00,

for the purpose of 'furthering a scheme to defraud,' as defined in 18 U.S.C. § 1343."  The

8

complaint states that Cochran threatened to foreclose on Dysart's home if sufficient collateral

was not offered for the existing unsecured business debt, which was included in Dysart's

Chapter 7 proceeding. When Dysart did not offer the collateral, BankTrust foreclosed.

> On October 15, 2007, Weidner and Cummings
>
> devised a scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmitted or caused to be transmitted by means of wire/telephone, communications in interstate or foreign commerce, a telephone conversation "for the purpose of executing the fraudulent scheme" to divest Dysart of her home and profit from such scheme, as defined in 18 U.S.C. § 1343. Star Properties/Cummings purchased Dysart's foreclosed home.

(Doc. 1, p 16.)

> On or about October 18, 2007, Anderson, in an email,
>
> tried to convince Dysart into a "false sense of security" or acceptance that she/Dysart was aware of Defendants' actions to foreclose; that the foreclosure was valid; that Defendants' actions were justified; that Defendant Sexton was a willing participant in the discussions relating to the foreclosure.

(Doc. 1, pp. 16-17.)

> From on or about December 6, 2007, and continuing through until or about August

19, 2008, Star Properties and Trey Cummings

> devised a scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmitted or caused to be transmitted by means of wire/internet, communication in interstate or foreign commerce, a writing for the purpose of illegally advertising for sale and profiting from the sale of Dysart's home, as defined in 18 U.S.C. § 1343. Star Properties fraudulently acquired title to Dysart's home on October 15, 2007 as a party to an illegal foreclosure of her home by Defendant, BankTrust. As a Realtor for Keller Williams Hoover, AL, Cummings advertised on Keller Williams Realty's internet website.

(Doc. 1, p. 17.)

> On or about October 27, 2009, BankTrust, Weidner, and Anderson
>
> devised a scheme or artifice to defraud, or for obtaining money or property by means

of false or fraudulent pretenses, representations, or promises, transmitted or caused
to be transmitted by means of wire/email, communication in interstate or foreign
commerce, a writing for the purposes of "avoidance of detection, prevention of
recovery of money, and to conceal an otherwise completed fraud" that divested Dysart
of her home, as defined in 18 U.S.C. § 1343.

(Doc. 10, p. 18.)

On October 27, 2009, the complaint alleges that the defendants sent "a threatening
and malicious email, with defaming content to Dysart's attorneys." (Doc. 1, p. 18.)   The
email demanded that Dysart withdraw her lawsuit against BankTrust or Dysart's attorneys
would face a legal malpractice lawsuit. Dysart withdrew her lawsuit.

> 4.    *18 U.S.C. § 1344 (Bank Fraud)*

On or about December 26, 2007, Dellinger issued an "excess funds" check to Dysart
in the amount of $3,606.13, which was an overage from the foreclosure sale of Dysart's
home.

On October 15, 2007, Star Properties and Cummings illegally and fraudulently
purchased Dysart's home from defendant BankTrust before the legal hour for sale.

On October 15,2007, BankTrust, Weidner, and Anderson, foreclosed on Dysart's
home, "violat[ing] the terms and conditions of the contract regarding proper procedure for
foreclosure." (Doc. 1, p. 18.)

On or about August 19, 2008, Star Properties and Cummings, with a false deed and
fraudulent title to Dysart's home, sold the home.

> 5.    *18 U.S.C. § 1509 (Obstruction of Court Orders)*

On or about September 22, 2007, and other later times, BankTrust, Weidner, and
Anderson

10

> willfully prevented, obstructed, impeded, or interfered with, or willfully attempted to
> prevent, obstruct, impede, or interfere with, the due exercise of rights or the
> performance of duties under an order, judgment, or decree of a court of the United
> States, for the purpose of intentionally violating an Agreed Order entered on
> September 4, 2007, in The United States Bankruptcy Court For The Northern District
> Of [sic] Alabama Southern Division; such order imposed a duty on Defendants to
> perform an accounting of delinquent monies owed by Dysart; Order also gave Dysart
> an opportunity to cure a property tax default by voiding the 2004 and the 2006 tax
> sales at issue; Order restored Dysart's legal right to her residence by vesting property
> in her name; Defendants withheld material facts, and intentionally and fraudulently
> denied Dysart the due exercise of rights as defined in 18 U.S.C. § 1509.

(Doc. 1, p. 20.)


III.   ANALYSIS


   A.   The *Rooker–Feldman* Doctrine Does Not Bar Review of the Foreclosure
        Proceeding


"The *Rooker–Feldman* doctrine bars collateral review of state court judgments by a

federal court." *In re Clarke*, 373 B.R. 769, 771 (Bankr. S.D. Fla. 2006) (citing *Rooker v. Fid.

Trust Co.*, 263 U.S. 413, 44 S.Ct. 149, 68 L.Ed. 362 (1923); *D.C. Ct.App. v. Feldman,* 460

U.S. 462, 103 S.Ct. 1303, 75 L.Ed.2d 206 (1983)).   The Eleventh Circuit has stated:

> The Court has an independent duty to ensure that a case or controversy exists
> and that it has subject matter jurisdiction over the claims presented before ruling on
> the merits of a claim. *See Harris v. United States,* 149 F.3d 1304, 1308 (11th
> Cir.1998). In certain circumstances, a federal *948 court must decline or postpone the
> exercise of its jurisdiction by deferring to the courts of the several states. *See, e.g.,
> D.C. Court of Appeals v. Feldman,* 460 U.S. 462, 103 S.Ct. 1303, 75 L.Ed.2d 206
> (1983) ( "*Feldman* "); *Colo. River Water Conservation Dist. v. United States,* 424 U.S.
> 800, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976); *Younger v. Harris,* 401 U.S. 37, 91 S.Ct.
> 746, 27 L.Ed.2d 669 (1971); *Burford v. Sun Oil Co.,* 319 U.S. 315, 63 S.Ct. 1098, 87
> L.Ed. 1424 (1943); *R.R. Comm'n of Tex. v. Pullman Co.,* 312 U.S. 496, 61 S.Ct. 643,
> 85 L.Ed. 971 (1941); *Rooker v. Fid. Trust Co.,* 263 U.S. 413, 44 S.Ct. 149, 68 L.Ed.
> 362 (1923) ("*Rooker* ").   The doctrine established by the *Rooker* and *Feldman* cases
> essentially holds that federal courts-other than the Supreme Court-do not have subject
> matter jurisdiction over "cases brought by state-court losers [ (1) ] complaining of
> injuries caused by state court judgments rendered before the [federal] district court

11

proceedings commenced and [ (2) ] inviting district court review and rejection of those judgments." *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.,* 544 U.S. 280, 284, 125 S.Ct. 1517, 161 L.Ed.2d 454 (2005). In its reading of the doctrine, the Eleventh Circuit has held that a federal district court "lacks jurisdiction to review, reverse, or invalidate a final state court decision." *Dale v. Moore,* 121 F.3d 624, 626 (11th Cir.1997).  The doctrine applies when

> (1) the party in federal court is the same as the party in state court; (2) the prior state court ruling was a final or conclusive judgment on the merits; (3) the party seeking relief in federal court had a reasonable opportunity to raise its federal claims in the state court proceeding; and (4) the issue before the federal court was either adjudicated by the state court *or* was inextricably intertwined with the state court's judgment.

> *Storck v. City of Coral Springs,* 354 F.3d 1307, 1310 n. 1 (11th Cir.2003) (emphasis added) (quotation marks & citation omitted). "A federal claim is inextricably intertwined with a state court judgment if the federal claim succeeds only to the extent that the state court wrongly decided the issues before it." *Siegel v. LePore,* 234 F.3d 1163, 1172 (11th Cir.2000) (quotation marks & citation omitted).

*Parker v. Potter*, 368 F. App'x 945, 947-48 (11th Cir. 2010) *cert. denied,* 131 S. Ct. 899, 178 L. Ed. 2d 758 (2011) (foreclosure).

Judge Johnson noted in the prior case involving these parties that the *Rooker–Feldman* doctrine prevents this court from reviewing the foreclosure action.  *Dysart v. BankTrust, et al.,* CV-10-J-3521-S, doc. 10, p. 3.  Still, the nature of the foreclosure, whether it was judicial or through the power of sale set out in the mortgage, was unclear.  Accordingly, after the matter was returned  to the undersigned, the parties were asked to brief this issue.  The defendants did, and they stated that

> the 2007 foreclosure sale that is the basis for Dysart's claims was a non-judicial foreclosure sale conducted pursuant to the power of sale clause contained in BankTrust's mortgage and Alabama Code Section 35-10-1, et. seq. As a result there is no state-court judgment. Thus, the statutory foreclosure sale does not implicate the *Rooker-Feldman* doctrine.

(Doc. 59, p. 2.)    Based upon this new information, and for the reasons stated in the

12

defendants' brief, the court finds that the *Rooker-Feldman* doctrine is not applicable.

     B.     <u>Count One — Fraud on the Court</u>

Count One alleges that on August 8, 2007, defendants Weidner, Anderson, and BankTrust filed a trial brief in the bankruptcy court where they stipulated that the tax sales of the plaintiff's property were void, and that an accounting was necessary "to establish the amount due by Dysart after the tax sales are set aside." (Doc. 1, p. 22.)  Dysart claims that these representations were willfully made by these defendants in order to deceive her into believing that she would be told the amounts she needed to pay in order to cure her default. The complaint refers to this as "Fraud on the Court."  (Doc. 1, p. 21-23.)  She cites the following authority in her complaint:

> The Attorney Defendants' egregious misconduct and fabrication of evidence to which they were a party to, constitute a fraud on the court. *Hazel-Atlas Glass Co. v. HartfOrd-Empire Co.*, 322 U.S. 238, 64 S.Ct. 997,88 L.Ed. 1250 (1944). *See Rozier v. Ford Motor Company*, 573 F.2d 1332. A saving clause in Rule 60(b) provides: "This rule does not limit the power of a court to entertain an independent action ... for fraud upon the court." *Dausuel v. Dausuel*, 90 U.S.App.D.C. 275, 195 F.2d 774 (1952). *See Rozier v. Ford Motor Company*, 573 F.2d 1332.

> 71.    Dysart had no way of knowing the intention of the Defendants was to deceive. Under the *Throckmorton* Doctrine, for fraud to lay a foundation for an independent action, it must be such that it was not in issue in the former action; nor could it have been put in issue by the reasonable diligence of the opposing party. *Toledo Scale Co. v. Computing Scale Co.*, 261 U.S. 399,425,43 S.Ct. 458, 465, 67 L.Ed. 719 (1923). *See Hall v. Hall*, 587 So.2d 1198.

> 72.    As a direct and proximate result of Defendant's fraud on the court, Dysart was injured.

(Doc. 1, pp. 22-23.)[3]

"The inherent power of a federal court to investigate whether *a judgment* was obtained

---

    [3]The plaintiff provides no additional authority in her opposition filing, her brief, or in her objections to the first recommendation.  (Docs. 38, 39, 47.)

by fraud, is beyond question. *Universal Oil Products Co. v. Root Ref. Co.*, 328 U.S. 575, 580, 66 S. Ct. 1176, 1179, 90 L. Ed. 1447 (1946) (emphasis added) citing *Hazel-Atlas Co. v. Hartford Empire Co.*, 322 U.S. 238, 64 S.Ct. 997, 88 L.Ed. 1250.  The Eleventh Circuit has stated that

> Generally, "only the most egregious misconduct, such as bribery of a judge or members of a jury, or the fabrication of evidence by a party in which an attorney is implicated, will constitute a fraud on the court."

*Patterson v. Lew*, 265 F. App'x 767, 768-69 (11th Cir. 2008) (unreported) quoting *Rozier v. Ford Motor Co.,* 573 F.2d 1332, 1338 (5th Cir.1978).

As noted above, the plaintiff cites *Hazel-Atlas Glass Co. v. HartfOrd-Empire Co.*, 322 U.S. 238, 64 S.Ct. 997, 88 L.Ed. 1250 (1944). "Almost all of the principles that govern a claim of fraud on the court are derivable from the *Hazel-Atlas* case." Fraud on the Court, 11 Fed. Prac. & Proc. Civ. § 2870 (2d ed.).  In that case, Justice Black was clear that the case "involves the power of a Circuit Court of Appeals, upon proof that fraud was perpetrated on it by a successful litigant, *to vacate its own judgment* entered at a prior term and direct *vacation of a District Court's decree* entered pursuant to the Circuit Court of Appeals' mandate." *Hazel-Atlas*, 322 U.S. at 239 (emphasis added).  The case does not stand for the proposition that a private litigant can sue another litigant for damages that allegedly grow out of a fraud upon the court.  Indeed, the Eleventh Circuit states that "[w]e have consistently held that a fraud between parties is not a fraud on the court."  *Patterson*, 265 F. App'x at 769, and cases cited therein.

The remainder of the citations in the complaint also stand for the proposition that the doctrine of fraud on the court is used only to vacate a judgment entered because of fraud.

*See, Toledo Scale Co. v. Computing Scale Co.*, 261 U.S. 399, 421, 43 S. Ct. 458, 464, 67 L. Ed. 719 (1923) ("*to justify setting aside a decree* for fraud whether extrinsic or intrinsic, it must appear that the fraud charged really prevented the party complaining from making a full and fair defense.") (emphasis added); *Rozier v. Ford Motor Co.*, 573 F.2d 1332, 1338 (5th Cir. 1978) ("Alternately stated, '(in) order *to set aside a judgment or order* because of fraud upon the court under Rule 60(b) . . . it is necessary to show an unconscionable plan or scheme which is designed to improperly influence the court in its decision.'") (emphasis added) (quoting *England v. Doyle*, 281 F.2d 304, 309 (9th Cir. 1960)); *Dausuel v. Dausuel*, 195 F.2d 774, 775 (D.C. Cir. 1952) ("A court may at any time *set aside a judgment* for after-discovered fraud upon the court.") (emphasis added); *Hall v. Hall*, 587 So. 2d 1198, 1200 (Ala. 1991) ("In addition to the six enumerated grounds, Rule 60(b) also provides, 'This rule does not limit the power of a court to entertain an independent action within a reasonable time and not to exceed three years after the entry of the judgment ... to relieve a party from a judgment, order, or proceeding, or *to set aside a judgment for fraud upon the court*.'") (emphasis added).

The plaintiff also cites Rule 60(b) of the Federal Rules of Civil Procedure as a further ground for relief.  Rule 60(b) is the modern day statement of the *Hazel-Atlas* rule.

> (b) Grounds for Relief from a Final Judgment, Order, or Proceeding. On motion and just terms, the court may relieve a party or its legal representative from a final judgment, order, or proceeding for the following reasons: . . . (3) fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party, . . . or . . . (6) any other reason that justifies relief.

Fed. R. Civ. P. 60(b)(3), (6) (emphasis added).  This rule provides support that the doctrine is used only to set aside a *judgment* rendered on the basis of fraud.  Further, the rule makes

15

it clear that the proper method to assert the doctrine is by "motion" in the court where the original judgment or decree was entered, not in a separate action.  Fed. R. Civ. P. Rule 60(b) (stating that the claim should be made "[o]n motion and just terms.").

Further, even if the motion could be made in this action it is untimely, as "[a] motion under Rule 60(b) must be made within a reasonable time — and, for reasons (1), (2), and (3), no more than a year after the entry of the judgment or order or the date of the proceeding." Fed. R. Civ. P. 60(c).  The representations by the defendant occurred on August 8, 2007. (Doc. 1, p. 10.)  The Bankruptcy Court's order was entered on September 4, 2007.  (Doc. 1, p. 10.)  If the motion were brought under subsection three, it is clearly late.  If it is brought pursuant to the savings clause of subsection six, the nearly four-year delay in filing does not constitute "a reasonable time."

Last, if somehow this count could be construed as a "run of the mill" fraud claim, it is untimely.  "Under Alabama law, the statute of limitations applicable to [a] fraud claims is two years. Ala. Code 1975 § 6-2-38(1)." *Waldrup v. Hartford Life Ins. Co.*, 598 F. Supp. 2d 1219, 1226 (N.D. Ala. 2008).  "Under [Ala. Code § 6-2-3] the two-year statute of limitations does not begin to run in a fraud case until 'the discovery by the aggrieved party of the fact constituting the fraud.' Ala.Code § 6-2-3." *Waldrup*, 598 F. Supp. 2d at 1226.  The plaintiff admits that by October of 2007 she was put on notice of evidence suggesting the possibility of fraud.  (Doc. 47, p. 5.)  As noted in the original recommendation, her statute of limitations regarding any fraud claim has long since run.

C.    Counts Two and Three  — Violation and Conspiracy to Violate RICO, 18 U.S.C. § 1962(c)

16

1.    *The RICO Claims Are Timely*

As noted in the original report and recommendation, this is the third time the plaintiff has filed a lawsuit concerning the events surrounding her foreclosure.  The first was filed in Jefferson County Circuit Court on September 8, 2009.  The plaintiff's attorneys at that time voluntarily dismissed that action.  (Doc. 1, pp. 3, 12.)  Her second suit was filed in this district last year.  *See Dysart v. BankTrust, et al.*, CV-10-J-3521-S.  In that second case the plaintiff sued the exact same defendants as she has in the instant case.  Further, she attempted to set out various RICO and state law claims.

Judge Johnson noted that the RICO counts were untimely.  In the original report and recommendation this court agreed.  Upon reconsideration, however, the RICO claims are considered timely filed.

The statute of limitations for federal RICO claims is four years. *Rotella v. Wood*, 528 U.S. 549, 553, 120 S.Ct. 1075, 145 L.Ed.2d 1047 (2000).  Unless it is tolled, the statute begins to run from the date the plaintiff knew he was injured. *Pac. Harbor Capital, Inc. v. Barnett Bank, N.A.*, 252 F.3d 1246, 1251 (11th Cir.2001).  Judge Johnson held

> The vast majority of the acts about which plaintiff complains occurred between three and seven years prior to the filing of this lawsuit. . . . In her complaint, the plaintiff alleges her troubles first arose in 2003 or 2004.  She states that in March 2004, defendant Peoples knew plaintiff was delinquent in her 2003 property taxes. Complaint, ¶ 47. She also asserts that her March 2004 mortgage payment was not accepted. Plaintiff exhibit 6. In the RICO context, "inquiry notice" controls. *Prudential Ins. Co. of America v. United States Gypsum Co.*, 359 F.3d 226, 236-37 (3rd Cir.2004) (rejecting the argument that the statute of limitations for civil RICO claims is triggered only when the injury becomes "actual"); *Takeuchi v. Sakhai*, 227 Fed.Appx. 106, 107 (2nd Cir.2007) (rejecting plaintiffs' "actual injury" argument and holding that the statute of limitations ran from the time plaintiffs were on inquiry notice as to their injuries).

> Given the allegations of the plaintiff's complaint, the court finds the

17

foreclosure itself was not the point at which the plaintiff should have learned of the
alleged fraudulent scheme, but rather before then, such as March 2004 when plaintiff
had the bank refuse a mortgage payment, or March 2006 when plaintiff learned she
was not allowed to redeem her property. See plaintiff exhibit 22.

*Dysart v. BankTrust, et al.*, CV-10-J-3521-S, doc., 10, pp. 6-7 (N.D. Ala.).

Having apparently learned from Judge Johnson's dismissal of her action, the plaintiff

does not allege in this action that her back mortgage payment was refused in March of 2004.

In her objections she admits that it was. (Doc. 47, p. 6.) Her complaint in this matter still

alleges that a March 2006 court order prevented her from redeeming her property, but it

does not go so far as to say that she *knew* about the order at that time. The complaint does

have an attachment — a receipt — dated March 1, 2006, which reflects that she was not

allowed to redeem. The defendants contend that these and other facts show that the plaintiff

knew enough that she should have inquired well before she was foreclosed upon.

The complaint alleges that "[t]he common purpose of this pattern of racketeering

activity had been to fraudulently divest [p]laintiff of her primary residence." (Doc. 1, p. 24,

¶ 78.) Also it states:

> As a direct and proximate result of Defendant's violation of 18 U.S.C. §
> 1962©, Dysart was injured physically, economically, and emotionally *because she was*
> *forced out her home*, a home where she was also primary caregiver for her elderly
> mother. She was forced to accept a financial loss associated with the equity that she
> accumulated in her home; she lost all the payments that she had made on her home;
> she lost the equity that she had accrued; she lost the possibility of any profits that she
> would have made from a sale of her home.
>
> 83.    As a direct and proximate result of Defendant's violation of 18 U .S.C. §
> 1962(c), Dysart was injured. The extreme mental anguish, and tremendous emotional
> distress that Dysart was/is under caused her illnesses of Graves disease/
> hyperthyroidism, high blood pressure, and related conditions that she attributes to the
> egregious conduct of the Defendants.

(Doc. 1, pp. 24-25) (emphasis added).

Defendants conspired to violate 18 U.S.C. § 1962© in violation of 18 U.S.C. § 1962(d), in order to conceal the truth from Dysart, as it related to *the foreclosure of her mortgage*.

87.   As a direct and proximate result of Defendants' violation of 18 U.S.C. § 1962(d), Dysart was injured because the Defendants withheld information that Dysart should have been made aware of.

(Doc. 1, p. 25) (emphasis added).  She refers to allegations of mail fraud, wire fraud, and bank fraud only as "predicate acts."  (Doc. 1, p. 24, ¶77.)  Based on these allegations, the RICO counts state the plaintiff's *injury* as being the foreclosure.[4]

Dysart insists that  because the foreclosure did not occur until October of 2007, the statute did not begin to run until that time.  (Doc. 47, p. 6.)  The Supreme Court has pointed out that

RICO's private right of action is contained in 18 U.S.C. § 1964(c), which provides in relevant part that "[a]ny person *injured* in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee." Section 1962 contains RICO's criminal prohibitions. Pertinent here is § 1962(c), which makes it "unlawful for any person employed by or associated with" an enterprise engaged in or affecting interstate or foreign commerce "to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." The term "racketeering activity" is defined to include a host of so-called predicate acts.

*Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 647, 128 S. Ct. 2131, 2137-38, 170 L. Ed. 2d 1012 (2008) (emphasis added).

_____

[4]And damages flowing therefrom.  Strangely, the plaintiff now states that she "is not asserting a wrongful foreclosure action in this lawsuit."  (Doc. 47, p. 2.)  If that is true, the court cannot discern <u>any</u> actionable damages in this matter.  Certainly if she is not complaining about the foreclosure, but something else that occurred before that time, the claim may very well not be timely.  Later in the same document she states "Dysart was directly injured by the scheme of mail fraud, which caused Dysart to lose her property, along with the equity that she had in it." (Doc.47, p. 5.)  Based on this language, and the language quoted from the complaint, the court will continue to treat the alleged injury as the foreclosure.

The Eleventh Circuit has held that the language of the statute mandates that "until a person suffers an injury due to a RICO violation, he has no right to sue for damages, and thus a civil RICO cause of action cannot accrue until the person suffers injury." *Bivens Gardens Office Bldg., Inc. v. Barnett Bank of Florida, Inc.*, 906 F.2d 1546, 1552 (11th Cir. 1990) *abrogated by Rotella v. Wood*, 528 U.S. 549, 120 S. Ct. 1075, 145 L. Ed. 2d 1047 (2000).[5] This conclusion is buttressed by the Supreme Court's discussion, in *Rotella v. Wood*, 528 U.S. 549, 553, 120 S. Ct. 1075, 1080, 145 L. Ed. 2d 1047 (2000), of the various rules used by the circuits to determine when a RICO cause of action begins to accrue. The court noted that

> [t]hree distinct approaches emerged. Some Circuits . . . applied an injury discovery accrual rule starting the clock when a plaintiff knew or should have known of his <u>injury</u>. Some applied the injury and pattern discovery rule . . . under which a civil RICO claim accrues only when the claimant discovers, or should discover, both an <u>injury</u> and a pattern of RICO activity. [Lastly, some] applied a "last predicate act" rule. Under this rule, the period began to run as soon as the plaintiff knew or should have known of the <u>injury</u> and the pattern of racketeering activity, but began to run anew upon each predicate act forming part of the same pattern.

*Rotella*, 528 U.S. at 553-54 (emphasis added). The Court ultimately eliminated the second and third options. The court also noted that there existed at least one other option, the injury rule, cited by Justice Scalia in *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 198, 117 S. Ct. 1984, 1995, 138 L. Ed. 2d 373 (1997), where the cause of action accrues and the statute begins to run when a defendant commits an act that *injures* a plaintiff's business. Under this last rule discovery is irrelevant. The court simply would look to when the act which injured the plaintiff occurred. Regardless of the rule used, all of the rules require that there be some

---

[5]In abrogating *Bivens*, the Supreme Court held only that accrual of a RICO action was not delayed until he discovered alleged pattern of racketeering activity. It does not overrule the statement for which *Bivens* is quoted herein.

sort of injury before the statute begins to accrue.  More recently, the Eleventh Circuit has

written:

> We assume, without needing to decide, that the statute of limitations period starts
> from the date of discovery of the *injury*. Under the injury discovery rule, unless tolled,
> the statute of limitations under RICO is four years from the date the plaintiff knew
> it was *injured*.

*Pac. Harbor Capital, Inc. v. Barnett Bank, N.A.*, 252 F.3d 1246, 1251 (11th Cir. 2001) citing

*Rotella,* 528 U.S. at 552-53 (emphasis added).

The defendants cite *Prudential Ins. Co. of Am. v. U.S. Gypsum Co.*, 359 F.3d 226, 236

(3d Cir. 2004) and *Takeuchi v. Sakhai*, 227 F. App'x 106, 107 (2d Cir. 2007), for the

proposition that the statute of limitations can begin to run before the injury becomes "actual."

(Doc. 30, p. 32.)  They cite no Eleventh Circuit or Supreme Court precedent on this issue.

In *Prudential*, the plaintiff had purchased a number of properties in the 1970s and

1980s which contained asbestos containing materials ("ACMs").  The plaintiff brought a

RICO action against the makers of the materials, and the court noted the complaint "seeks

recovery for both past and future injuries caused by the presence of ACMs in [the plaintiff's]

properties."  *Prudential*, 359 F.3d at 234.  The plaintiff asserted

> that it suffered no injuries either from its knowledge of the existence of in-place
> ACMs in its properties or from the risk of injuries stemming from those ACMs. [The
> plaintiff] asserts that ACMs only cause injury when they deteriorate and begin
> releasing hazardous levels of asbestos fibers that contaminate buildings, and therefore
> it suffered injury only when actual contamination required it to address or remedy the
> hazards such contaminations posed.

*Id.* at 236.  In other words, the plaintiff in *Prudential* argued that its cause of action could not

begin to accrue until it had actually been injured.  The *Prudential* court rejected that argument

citing the fact that the plaintiff sought damages for past *and future* injuries.  It then held:

21

> Consequently, [the plaintiff] cannot also argue that the statute of limitations for its RICO claims should not have begun to run until those injuries became "actual" injuries and it needed to take remedial measures and incurred expenses for remediation.  Such a legal rule would place too much discretion in the plaintiff's hands, and would be antithetical to the "basic policies of all limitations provisions: repose, elimination of stale claims, and certainty about a plaintiff's opportunity for recovery and a defendant's potential liabilities."

*Id. quoting Rotella,* 528 U.S. at 550.

Even if the *Prudential* case were controlling, the court did not reject the need for there to be an injury before the statute begins to run.  In *Prudential*, the plaintiff knew it had been injured when it realized that there were ACMs in its properties.  The only question was when it would have to pay to clean up the ACMs.  In the instant case, the plaintiff may have known that something was afoot before she was foreclosed upon, but she was not injured until the foreclosure occurred.

*Takeuchi* is a summary order issued by the Second Circuit without setting out the facts of the case.  The court held that the District Court was correct when it held that "no reasonable juror could find that plaintiffs did not have knowledge of the fraud in 1997, and thus, plaintiffs were on inquiry notice at that time as to any possible injury resulting from that fraud." *Takeuchi*, 227 F. App'x at 107.  The opinion is silent as to whether there *was* actual injury before the statute expired.  Accordingly, the court does not find this case persuasive.

In this case plaintiff may have been aware of the facts of the alleged pattern of racketeering, but she had not yet been injured until her home was foreclosed upon on October 15, 2007.  No claim for a RICO violation could begin to accrue *until it existed*.  It did not exist until the plaintiff was injured.  According to her complaint she was not injured until her home was foreclosed upon on October 15, 2007.  She filed this action within four

years of that date.  The RICO counts are timely filed.[6]

2.    *Even Though They Are Timely Filed, the RICO Claims Still Fail*

Counts Two and Three allege RICO claims.  The private right of action for such claims is contained in 18 U.S.C. § 1964(c), which provides, in relevant part, "Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee." 18 U.S.C.A. § 1964(c).  "Section 1962 contains RICO's criminal prohibitions." *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 647 (2008).  Count Two alleges a violation of 18 U.S.C. § 1962(c), which states:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

18 U.S.C.A. § 1962(c).  Count Three alleges a violation of 18 U.S.C. § 1962(d) which states: "It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."

The Eleventh Circuit has explained:

[I]n order to establish a federal civil RICO violation under § 1962©, the plaintiffs "must satisfy four elements of proof: '(1) conduct (2) of an enterprise (3) through a

---

[6]Count Two also states that "[t]wo years after the illegal scheme to divest Dysart of her home, Dysart filed a lawsuit to recover damages for the egregious acts of the [d]efendants. Defendants Anderson and Weidner tortuously interfered with the proceeding in order to conceal the [d]efendants' fraud." (Doc. 1, p. 24.)  It is not clear what damages, if any, flowed from this conduct as the plaintiff's home had already been foreclosed upon by this time.  However, since this conduct occurred *after* the foreclosure, and the court finds that the RICO count based upon the foreclosure is timely, this claim is also timely filed.

23

pattern (4) of racketeering activity.' " *Jones v. Childers,* 18 F.3d 899, 910 (11th
Cir.1994) (quoting *Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 496, 105 S.Ct. 3275,
3285, 87 L.Ed.2d 346 (1985)). These requirements apply whether the RICO claim is
civil or criminal in nature.

      In civil cases, however, RICO plaintiffs must also satisfy the requirements of
18 U.S.C. § 1964(c). Section 1964(c) states that "[a]ny person injured in his business
or property by reason of" RICO's substantive provisions has the right to "recover
threefold the damages he sustains...." 18 U.S.C. § 1964(c). Thus, under § 1964(c),
civil RICO claimants, such as the plaintiffs here, must show (1) the requisite injury to
"business or property," and (2) that such injury was "by reason of" the substantive
RICO violation.

*Williams v. Mohawk Indus., Inc.*, 465 F.3d 1277, 1282-83 (11th Cir. 2006).

         a.      There is No "Enterprise" In This Case

The Eleventh Circuit has held that

[a]n enterprise "includes any individual, partnership, corporation, association, or
other legal entity, and any union or group of individuals associated in fact although
not a legal entity." 18 U.S.C. § 1961(4). As stated in *United States v. Goldin
Industries, Inc.,* 219 F.3d 1271, 1275 (11th Cir.2000), "the existence of an enterprise
is proved by evidence of an ongoing organization, formal or informal, and by evidence
that the various associates function as a continuing unit." (internal quotation marks
and citation omitted). Furthermore, "the definitive factor in determining the existence
of a RICO enterprise is the existence of an association of individual entities, however
loose or informal, that furnishes a vehicle for the commission of two or more
predicate crimes, that is, the pattern of racketeering activity requisite to the RICO
violation." *Id.*

*Williams v. Mohawk Indus., Inc.*, 465 F.3d 1277, 1284 (11th Cir. 2006).

      The complaint alleges that the defendants "operated together for the common purpose

of conspiring to divest Dysart of her home and equity therein." (Doc. 1, p. 12) (emphasis

added). This is not an allegation of an "ongoing" organization. All of the allegations in the

complaint relate to Dysart and *her* home alone. As noted by a Southern District of Florida

Court,

all RICO enterprises [must] have a structure and some mechanism for "controlling and
directing the affairs of the enterprise on an on-going, rather than *ad hoc* basis." *United*

*States v. Riccobene*, 709 F.2d 214, 222-23 (3d Cir.1983); *Bachman v. Bear Stearns & Co.*, 178 F.3d 930, 932 (7th Cir.1999) (stating that a RICO enterprise requires "continuity of structure and personality," the ability "to hold [itself] together through time," and "hierarchal or consensual decision-making").

. . .

A RICO enterprise "require[s] a certain amount of organizational structure which eliminates simple conspiracies from the Act's reach. That is, simply conspiring to commit a fraud is not enough to trigger the Act if the parties are not organized in a fashion that would enable them to function as racketeering organization <u>for other purposes</u>." *VanDenBroeck v. CommonPoint Mortgage Co.*, 210 F.3d 696, 699 (6th Cir.2000); *Fitzgerald v. Chrysler Corp.*, 116 F.3d 225, 228 (7th Cir.1997). Since "diverse parties . . . customarily act for their own gain or benefit in commercial relationships," a complaint founded on commercial relationships between the alleged components of the enterprise should plead facts "dispel[ling] the notion that the different parties entered into [the alleged] agreements . . . for their own gain or benefit." *Stachon v. United Consumers Club, Inc.*, 229 F.3d 673, 677 n. 4 (7th Cir.2000).

*In re Managed Care Litig.*, 298 F. Supp. 2d 1259, 1273-74 (S.D. Fla. 2003) (emphasis added).

There is no allegation that the "enterprise" existed for any reason other than to take Dysart's home and her home alone. The RICO claims fail for lack of an enterprise.

Further, even if there were an enterprise in this case, "one is not liable under that provision unless one has participated in the operation or management of the enterprise itself." *Reves v. Ernst & Young*, 507 U.S. 170, 183, 113 S. Ct. 1163, 1172, 122 L. Ed. 2d 525 (1993). The court disregards the conclusory statement that defendants collectively managed the affairs of the enterprise. The complaint alleges that Weidner and Cochran's role in the enterprise was to carry out the orders of BankTrust and Anderson. (Doc. 1, p. 13.) Similarly, the complaint alleges that "Sexton's role . . . was to . . . intentionally conceal or suppress vital information that Dysart relied on." (Doc. 1, p. 13.) Star Properties, LLC and Cummings job was to fraudulently purchase Dysart's home. (Doc. 1, p. 13.) These allegations establish that

25

these defendants were not managing or operating the enterprise.[7]  The RICO counts against

them are therefore due to be dismissed.

The plaintiff does not argue that these defendants participated in the management or

operation of the alleged enterprise.  Instead, she argues that such is not a requirement, citing

the  Seventh Circuit case of *Brouwer v. Raffensperger, Hughes & Co.*, 199 F.3d 961, 966-67

(7th Cir. 2000).  (Doc. 39, p. 9.)  This case does not aid the plaintiff. Even if the case were

binding  upon  this  court,  the  Seventh  Circuit  was  determining  the  proper  standard  for  a

<u>conspiracy</u> claim under section 1964(d).  That court held that a person does not need to agree

to be an operator or a manager <u>to be a conspirator</u>.   In the same opinion the Seventh Circuit

stated, "after *Reves* subsection (c) applies only to those with some degree of management or

control  over  the  RICO  enterprise."  *Brouwer*, 199 F.3d at 965.

> b.     The Complaint Has Not Pleaded a "Pattern" of Racketeering
>        Activity

As noted above, the complaint alleges only one injury, the foreclosure of the plaintiff's

home.[8]   The defendants insist that the plaintiff cannot succeed because "[n]o RICO claim

exists where the alleged fraudulent scheme inflicts or threatens only a single injury."  (Doc.

28, p. 7.)  The plaintiff does not respond to this argument in her brief. (Doc. 39.)

The  defendant's  argument  attacks  whether  the  plaintiff  has  sufficiently  alleged  a

"pattern of racketeering activity."  The Eleventh Circuit has said:

---

[7]The complaint alleges only that BankTrust, Anderson and Weidner, and David Anderson
did that.  (Doc. 1, pp. 12-13.)

[8]The complaint actually speaks to various other damages which grow out of the
foreclosure such as the plaintiff's illnesses and mental anguish. (Doc. 1, p. 21.) There is only one
legal "injury," the foreclosure.

26

To successfully allege a pattern of racketeering activity, plaintiffs must charge that: (1) the defendants committed two or more predicate acts within a ten-year time span; (2) the predicate acts were related to one another; and (3) the predicate acts demonstrated criminal conduct of a *continuing* nature. *See* 18 U.S.C. § 1961(5); *H.J. Inc. v. Northwestern Bell Tel. Co.,* 492 U.S. 229, 239-43, 109 S.Ct. 2893, 2900-2903, 106 L.Ed.2d 195 (1989); *Childers,* 18 F.3d at 910-13; *see also State v. Lucas,* 600 So.2d 1093, 1094 (Fla.1992) (adopting the criteria set forth in *H.J. Inc.*).

It is by now well established that in order to prove a "pattern of racketeering activity" it is not sufficient to simply establish two isolated predicate acts. RICO targets *ongoing* criminal activity, rather than sporadic, isolated criminal acts, a principle that was stressed in an American Bar Association study which explained that "[t]he 'pattern' element of the [RICO] statute was designed to limit its application to planned, ongoing, continuing crime as opposed to sporadic, unrelated, isolated criminal episodes." Report of the Ad Hoc Civil RICO Task Force of the ABA Section of Corporation, Banking and Business Law 72 (1985). As the Supreme Court has explained,

> while two acts are necessary, they may not be sufficient. Indeed, in common parlance, two of anything do not generally form a "pattern." The legislative history supports the view that two isolated acts of racketeering activity do not constitute a pattern. As the Senate Report explained: "The target of [RICO] is thus not sporadic activity. The infiltration of legitimate business normally requires more than one 'racketeering activity' and the threat of continuing activity to be effective. It is this factor of *continuity plus relationship* which combines to produce a pattern." S.Rep. No. 91-617, p. 158 (1969) (emphasis added).... Significantly, in defining "pattern" in a later provision of the same bill, Congress was more enlightening: "[C]riminal conduct forms a pattern if it embraces criminal acts that have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." 18 U.S.C. § 3575(e).

*Sedima, S.P.R.L. v. Imrex Co., Inc.,* 473 U.S. 479, 497 n. 14, 105 S.Ct. 3275, 3285 n. 14, 87 L.Ed.2d 346 (1985).

Four years after it had decided *Sedima,* the Supreme Court further explicated the concept of "continuity plus relationship" it outlined in *Sedima.* In *H.J. Inc.,* the Court observed that "RICO's legislative history reveals Congress' intent that to prove a pattern of racketeering activity a plaintiff or prosecutor must show that the racketeering predicates are related, *and* that they amount to or pose a threat of *continued criminal activity.*" 492 U.S. at 239, 109 S.Ct. at 2900 (second emphasis added). This Circuit has held that " 'a "pattern of racketeering" activity requires proof of something beyond the two predicate acts themselves.' That something is the threat

27

of *continuing* racketeering activity." *Childers*, 18 F.3d at 912 (emphasis added) (quoting *United States v. Gonzalez*, 921 F.2d 1530, 1545 (11th Cir.1991)). The continuity element of a pattern of racketeering activity is crucial to a valid RICO claim in order to ensure that the crime alleged is the sort of offense that RICO is designed to address-one that is part of a pattern of ongoing, continuing criminality or that involves criminality that promises to continue into the future.

*Jackson v. BellSouth Telecommunications*, 372 F.3d 1250, 1264-65 (11th Cir. 2004)

(emphasis in original) (footnotes omitted).

Explaining continuity, the Eleventh Circuit has stated:

"Continuity" is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition.... A party alleging a RICO violation may demonstrate continuity over a closed period by proving a series of related predicates extending over a substantial period of time.... Often a RICO action will be brought before continuity can be established in this way. In such cases, liability depends on whether the *threat* of continuity is demonstrated.

*H.J. Inc.*, 492 U.S. at 241-42, 109 S.Ct. at 2902 (emphasis in original). In "open-ended" cases that rely on alleging the *threat* of continuity, plaintiffs can meet their burden by establishing either that "the racketeering acts themselves include a specific threat of repetition extending indefinitely into the future," or that "the predicate acts or offenses are part of an ongoing entity's regular way of doing business." *Id.* at 242, 109 S.Ct. at 2902.

*Jackson*, 372 F.3d at 1265 (11th Cir. 2004).

In analyzing the specific facts before it, the *Jackson* court held that because of the short period of time over which the alleged predicate acts occurred, and that the alleged racketeering activity was related to a single goal, there was no closed ended continuity. Specifically the court wrote that "in cases like this one, where the RICO allegations concern only a single scheme with a discrete goal, the courts have refused to find a closed-ended pattern of racketeering even when the scheme took place over longer periods of time." *Id.* at 1267. While this latter sentence is dicta, other circuits agree with this approach. *See*

28

*Edmondson & Gallagher v. Alban Towers Tenants Ass'n*, 48 F.3d 1260, 1265 (D.C. Cir. 1995) (no violation where plaintiffs alleged only a single scheme which entails but a single discrete injury, suffered by a small number of victims); *Efron v. Embassy Suites (Puerto Rico)*, *Inc.*, 223 F.3d 12, 19 (1st Cir. 2000) (no violation where "the alleged racketeering acts . . . 'taken together . . . comprise a single effort' to facilitate a single financial endeavor"); *Marshall–Silver Constr. Co. v. Mendel*, 894 F.2d 593 (3d Cir.1990) (seven month single-victim, single-injury scheme does not satisfy continuity requirement); *Menasco, Inc.* *v. Wasserman*, 886 F.2d 681, 684 (4th Cir. 1989) (no violation where defendants' actions were narrowly directed towards a single fraudulent goal); *Thompson v. Paasche*, 950 F.2d 306, 311 (6th Cir. 1991) (no violation where fraudulent scheme included nineteen lots to sell and once all the lots were sold the scheme was over); *Terry A. Lamber Plumbing, Inc. V. Western Security Bank*, 934 F.2d 976, 982 (8th Cir. 1991) ("Foreclosing on problem loans is not a criminal act and having had problem loans in the past does not make one a racketeer. Mere allegations cannot raise a single transaction to the level of RICO."); *SIL-FLO, Inc. v. SFHC, Inc.*, 917 F.2d 1507, 1516 (10th Cir. 1990) (no violation where plaintiff alleged a single scheme to accomplish "one discrete goal," directed at one individual with no potential to extend to other persons or entities).

Further, at least one district court opinion in this circuit has followed this approach and noted that the *Jackson* court's discussion on this issue is highly relevant. *See Ward v. Nierlich*, 617 F. Supp. 2d 1226, 1238 (S.D. Fla. 2008) ("In *Jackson,* Plaintiffs' RICO claim was dismissed because the scope of the racketeering activity was narrow *and* because the time frame was only nine months. The much smaller timeline at issue in *Jackson* prevents the case

29

from being directly on point, but its discussion of the relevancy of narrowness of a RICO scheme is highly relevant."); *see also Bivens v. Roberts*, No. 208CV026, 2009 WL 891859 at * 9 (S.D. Ga. Mar. 31, 2009) (questioning whether *Jackson* stands for the proposition that a single criminal scheme could not constitute closed-ended continuity but still finding no violation where "[o]nly one distinct harm has been alleged by these plaintiffs, and no additional injury has befallen them from any repeated fraudulent acts by defendants.")

Because the plaintiff has not addressed this argument in her brief, the court does not know whether she means to argue that this is an open-ended or closed-ended continuity case. Clearly, though, this is not the open-ended continuity situation. The court gives no credence to the complaint's conclusory statement that "[i]t is of understanding and belief that Star Properties, LLC's pattern and regular way of doing business has been in the fraudulent acquisition of real property." (Doc. 1, p. 21.) That statement is the classic formulaic recitation of the elements of a cause of action which the Supreme Court has made clear will not suffice. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955, 1965, 167 L. Ed. 2d 929 (2007) ("a formulaic recitation of the elements of a cause of action will not do"). Further, the complaint alleges no facts which demonstrate that the alleged predicate acts themselves include a specific threat of repetition. Also, the complaint does not establish closed-ended continuity. This case involves multiple alleged predicate acts, over a long period of time, with one alleged victim, and one alleged injury. The complaint itself is clear that "the common purpose of the enterprise might have been accomplished when Dysart's home was foreclosed on," and "further profit from the scheme . . . may be over." (Doc. 1, pp. 20.) Therefore the alleged activity has completed its purpose.

30

The complaint states that "monies derived from the predicate acts of the Defendants still affect interstate commerce by virtue of the fraudulent deed and fraudulent title that the Defendants produced."   (Doc. 1, pp. 20.)   This does not establish continuing criminal activity. This is merely a statement of the *effects* of the alleged criminal acts into the future, not whether the criminal acts themselves continue into the future. Such does not establish continuity.  *See Castrillo v. Am. Home Mortg. Servicing, Inc.*, 670 F. Supp. 2d 516, 531 (E.D. La. 2009) (holding that even though long-term *effects* of defendants' alleged criminal activities may extend into the future that does not establish "threat of continued racketeering activity") (emphasis added).   The complaint's allegation that a cover-up of the predicate acts continues (doc. 1, p. 21) does not allege that the predicate acts themselves extend into the future.   The complaint also alleges, "Because of alleged fraud and conversion, i.e. Phillips v [sic] Star Properties, Hovies v. Star Properties, Wallace v. Star Properties; Star Properties, LLC's fraudulent activity is likely to continue."  (Doc. 1, p. 21.)  This last statement makes no sense and so is of no help to the plaintiff.

> c.      The Complaint's Allegations of Racketeering Activity Fail

As shown above, section 1962(c) requires the plaintiff to prove that the defendant's participated in an illegal enterprise through a pattern of "racketeering activity." 18 U.S.C. § 1962(c). "Racketeering activity" is defined by the statute to include several offenses including mail fraud (18 U.S.C. § 1341), wire fraud (18 U.S.C. § 1343), bank fraud (18 U.S.C. § 1344). 18 U.S.C. § 1961(1)(B).   The complaint claims predicate acts based upon each of these sections.  The complaint also claims predicate acts based upon 18 U.S.C. § 1509, a section not listed in 18 U.S.C. § 1961(1).  Any claim of a violation of 18 U.S.C. § 1509 cannot be the

31

basis for a RICO action. *Blackburn v. Calhoun*, No. 207CV166, 2008 WL 850191 (N.D. Ala. Mar. 4, 2008) *aff'd*, 296 F. App'x 788 (11th Cir. 2008) (predicate acts must be violations of criminal statutes listed in 18 U.S.C. § 1961).[9]

> The remaining alleged predicate acts are all based on fraud. When this is the case,

> [the] substantive RICO allegations must comply not only with the plausibility criteria articulated in *Twombly* and *Iqbal* but also with Fed.R.Civ.P. 9(b)'s heightened pleading standard, which requires that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." *See also Ambrosia Coal & Constr. Co. v. Pages Morales*, 482 F.3d 1309, 1316 (11th Cir.2007) (holding that civil RICO claims, which are "essentially a certain breed of fraud claims, must be pled with an increased level of specificity" under Rule 9(b)). We have held that pursuant to Rule 9(b), a plaintiff must allege: "(1) the precise statements, documents, or misrepresentations made; (2) the time, place, and person responsible for the statement; (3) the content and manner in which these statements misled the Plaintiffs; and (4) what the defendants gained by the alleged fraud." *Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1380–81 (11th Cir.1997) (applying the requirements to a RICO fraud complaint). The plaintiff must allege facts with respect to each defendant's participation in the fraud. *Id.* at 1381.

*Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1291 (11th Cir. 2010).

### (1)     Mail Fraud

First, the alleged mail fraud's predicate acts specifically mention only defendants Star Properties, Cummings, Anderson, BankTrust, Weidner, and Cochran. Based on the above cited case law, and because no specific allegation of mail fraud is made against them, the RICO counts against the remaining defendants based upon mail fraud are due to be dismissed. *See McAllister Towing & Transp. Co., Inc. v. Thorn's Diesel Serv., Inc.*, 131 F. Supp. 2d 1296, 1302 (M.D. Ala. 2001) ("Federal Rule of Civil Procedure 9(b) requires a plaintiff in pleading fraud to distinguish among defendants and specify their respective role in the alleged fraud.").

---

[9]Even if it could be, to the extent the claim is based upon fraud, it is also due to be dismissed for the reasons stated in this section.

32

As to Star Properties and Cummings, the entirety of the allegations of mail fraud are these:

> On or about December 6, 2007, in the Birmingham News, in the Northern District of Alabama and e1sewhere, Star Properties and Trey Cummings, Defendants herein, devised a scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute ... for the purpose of executing such scheme or artifice or attempting so to do, placed in a post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service ... those being illegal advertisements of Dysart's home for sale, for the purpose of "furthering the scheme to defraud", as an essential part the scheme to sell Dysart's home for obtaining money, as defined in 18 U .S.C. § 1341.

(Doc. 1, p. 14.) This conclusory statement merely restates language from the statue and states that the advertisements were "illegal," whatever that means. It does not state that the advertisements were false or fraudulent. "Illegal" advertisements which are not relied upon to the plaintiff's detriment are not fraudulent. Even if they were, the allegations are not specific enough under Rule 9(b). They do not state how the advertisements misled the plaintiff or what the defendant gained as a result of the advertisements.

As to defendant Anderson, the complaint states that on October 18, 2007 Anderson sent a letter to the plaintiff where "he tried to 'lull' Dysart into a 'false sense of security' or acceptance that she/Dysart was aware of Defendants' actions to foreclose; that the foreclosure was valid; that Defendants' actions were justified; that Defendant Sexton was a willing participant in the discussions relating to the foreclosure." (Doc. 1, p. 14.) As this letter came after the plaintiff's injury, which was the foreclosure on October 15, 2007, the letter could not be a <u>predicate</u> act. Even if it were a predicate act, the complaint does not allege that the statements in the letter were false or fraudulent, how they misled the plaintiff, or what the defendant gained from the statements.

33

The complaint states that BankTrust, Weidner, and Anderson, on September 22, September 29, and October 6, 2007, placed "illegal advertisements of Dysart's home for sale." (Doc. 1, p. 15.)  Again, it does not state that the advertisements were false or fraudulent, how they misled the plaintiff, or what the plaintiff gained from the advertisements.  Indeed, the complaint states that the plaintiff did not even know about these ads until October 15, 2007, when Weidner told her about them.  (Doc. 1, p. 3.)  The plaintiff states that she "had no knowledge of the ads."  *Id.*

The plaintiff cannot claim to be misled about something of which she had no knowledge.  Further, these statements are not particular enough under Rule 9(b), as they do not state what the defendants gained from the ads. The same is also true for the plaintiff's allegation that BankTrust and Cochran illegally advertised the plaintiff's home for sale on July 31, August 7, and August 14, 2004.  (Doc. 1, p. 15.)

(2)     Wire Fraud

Predicate acts of wire fraud are alleged only against defendant Cochran, Weidner, Cummings, Anderson, Star Properties, and BankTrust.  Based on the above-cited case law, and because no specific allegation of wire fraud is made against them, the RICO counts based upon wire fraud brought against the remaining defendants are due to be dismissed.

The complaint alleges that Cochran sent

a facsimile, threatening Dysart to secure -with her home -an unrelated business debt approximating $114,000.00, for the purpose of "furthering a scheme to defraud", as defined in 18 U.S.C. § 1343. Defendant Cochran threatened to foreclose on Dysart's home if sufficient collateral was not offered for the existing unsecured business debt, which was included in Dysart's Chapter 7 proceeding. Collateral was not offered. BankTrust did foreclose.

34

(Doc. 1, p. 16.)

This "threat," allegedly made by Cochran, does not allege a false statement, relied upon by the plaintiff to her detriment. It actually alleges a <u>true</u> statement. Cochran threatened to foreclose if the collateral was not offered. It was not offered, and the mortgage was foreclosed. Whatever this statement is, it is not fraud.

As to Weidner and Cummings, the complaint alleges only:

> On October 15, 2007, in the Northern District of Alabama, Weidner and Cummings, Defendants herein, devised a scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmitted or caused to be transmitted by means of wire/telephone, communications in interstate or foreign commerce, a telephone conversation "for the purpose of executing the fraudulent scheme" to divest Dysart of her home and profit from such scheme, as defined in 18 U.S.C. § 1343. Star Properties/Cummings purchased Dysart's foreclosed home.

(Doc. 1, p. 16.) This paragraph alleges no facts. It merely restates language from the statute, and then states that Star Properties and Cummings purchased the home <u>after</u> foreclosure. If the claim is based upon the purchase after the plaintiff's alleged injury, it is not a predicate act. If the plaintiff's claim is based on something else, it is not specific enough to make out a claim of fraud.

The remaining allegations in the "wire fraud" section of the complaint all discuss events which occurred <u>after</u> foreclosure, and thus cannot be predicate acts.

(3)      Bank Fraud

Predicate acts of bank fraud are alleged against defendants Dellinger, Weidner, Cummings, Anderson, Star Properties, and BankTrust. Based on the above cited case law, and because no specific allegation of wire fraud is made against them, the RICO counts

35

against the remaining defendants based upon bank fraud are due to be dismissed.

The only allegations in this section of the complaint which could possibly be <u>predicate</u> acts concern the alleged "illegal foreclosure" on October 15, 2007. The complaint alleges that BankTrust had "no legal authority to sell" the home, and that it sold the home "before the legal hour of the sale." (Doc. 1, p. 19.) The complaint also states, in a conclusory manner, that defendants BankTrust, Weidner and Anderson "illegally and improperly foreclosed on Dysart's home; by violating terms and conditions of the contract regarding proper procedure for foreclosure; and by holding state statutory law in disregard." (Doc. 1, p. 19.)

In order to establish bank fraud as a predicate act under 18 U.S.C. § 1344, the plaintiff must show the execution of "a scheme or artifice to defraud a financial institution; or to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises." 18 U.S.C.A. § 1344. The plaintiff is alleging that the defendants tried to defraud a third party, a bank. Assuming the plaintiff even has standing to allege such a predicate act, her complaint alleges no facts suggesting a fraud upon any bank or any reliance on any misrepresentations by any bank. There is no bank fraud claim here.


3.    The Conspiracy Claim Fails

Since the underlying RICO claim fails, and the conspiracy claim contains no new allegations, it also fails. *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1296 (11th Cir. 2010) (("'where a plaintiff fails to state a RICO claim **and the conspiracy count does not**

36

**contain additional allegations**, the conspiracy claim necessarily fails.'") *quoting Rogers v. Nacchio*, 241 Fed.Appx. 602, 609 (11th Cir.2007), *in turn citing Jackson*, 372 F.3d at 1269) (emphasis in original)).   Even if the claim did not fail for that reason, it would fail because it does not set out any facts establishing a conspiracy, much less facts which make a conspiracy "plausible."  *See Twombly*, 550 U.S. at 567-70.

        4.    *Res Judicata*

        The defendants contend that res judicata bars this action, not because of the decision in Judge Johnson's case, but because the bankruptcy court allowed them to foreclose.   The plaintiff admits that she "never opposed the Bankruptcy Court's ruling on the issue of BankTrust foreclosing."   (Doc. 39, p. 5.)   Further, she states that "[i]t is true that the defendants were entitled to foreclose, but in a legal manner.   Defendants foreclosed in an unlawful and deceitful manner."   (Doc. 39, p. 6.)   She then seems to argue that she did not receive proper notice of the foreclosure.

        The Eleventh Circuit has held:

> The doctrine of claim preclusion (or *res judicata*) bars the parties to an action from relitigating matters that were or could have been litigated in an earlier suit. The doctrine facilitates "the conclusive resolution of disputes" by reducing "the expense and vexation attending multiple lawsuits, conserv[ing] judicial resources, and foster[ing] reliance on judicial action by minimizing the possibility of inconsistent decisions." *Montana v. United States,* 440 U.S. 147, 153-54, 99 S.Ct. 970, 59 L.Ed.2d 210 (1979). In accordance with those values, the doctrine bars a claim whenever (1) a court of competent jurisdiction has (2) rendered a final judgment on the merits in another case involving (3) the same parties and (4) the same cause of action. *Rubbermaid,* 193 F.3d at 1238.

*Shurick v. Boeing Co.*, 623 F.3d 1114, 1116-17 (11th Cir. 2010).   "[R]es judicata applies not only to claims which were actually brought before the previous court, but also to those claims

'which could have been raised in that action.'" *In re Atlanta Retail, Inc.*, 456 F.3d 1277, 1288 (11th Cir. 2006) quoting *In re Piper Aircraft Corp.*, 244 F.3d 1289, 1296 (11th Cir. 2001)).

The bankruptcy court, a court of competent jurisdiction, issued a final judgment on the issue of whether the BankTrust could foreclose. The plaintiff agrees that they could. At least as to BankTrust and Dysart, the parties are identical in both cases. Res judicata bars the plaintiff's claims to the extent they concern <u>whether</u> BankTrust could foreclose. Any claims that arise out of what occurred after the bankruptcy court granted BankTrust the right to foreclose, whatever those may be, are not barred by res judicata.

5.    The Plaintiff's Injury, the Foreclosure, Was Not Caused By the Defendant's Conduct

"[U]nder § 1964(c), civil RICO claimants, such as the plaintiffs here, must show (1) the requisite injury to "business or property," and (2) that such injury was "by reason of" the substantive RICO violation. *Williams v. Mohawk Indus., Inc.*, 465 F.3d 1277, 1282-83 (11th Cir. 2006). The plaintiff agrees that the defendants were entitled to foreclose on her home. Therefore, none of the alleged predicate acts caused that injury. The plaintiff cannot show that her damage flowed from the alleged RICO violations.[10]

---

[10]To the extent that the complaint could be read to claim personal injuries those claims are not available under RICO. See *Major League Baseball Properties, Inc. v. Price*, 105 F. Supp. 2d 46, 49 (E.D. N.Y. 2000) ("Congress enacted RICO 'to combat organized crime, not to provide a federal cause of action and treble damages' for personal injuries") quoting *Oscar v. University Students Co-operative Assoc.*, 965 F.2d 783, 785 (9th Cir.1992). Even if personal injuries could be recovered, they, like the plaintiff's other alleged damages, flow from the foreclosure itself, which was approved by the plaintiff and authorized by the bankruptcy court.

38

D.      Count Four — Breach of Contract

This count is brought only against BankTrust.  "The elements of a breach of contract claim under Alabama law are (1) a valid contract binding the parties; (2) the plaintiff's performance under the contract; (3) the defendant's nonperformance; and (4) resulting damages."  *Reynolds Metals Co. v. Hill*, 825 So. 2d 100, 105 (Ala. 2002).  It is undisputed that the parties entered into a valid contract, the mortgage agreement.  (Doc. 1, p. 26.)

The agreement contained the following clause:

> 22.   Acceleration; Remedies.   Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument . . ..   The notice shall specify: (a) the default; (b) the action required to cure the default; © a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and the sale of the Property.  The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale.

(Doc. 1, p. 59.)

The complaint alleges that this notice was never sent to the plaintiff by BankTrust.  It claims that, as a result of the failure to provide this notice, her home was illegally sold. BankTrust does not argue that it gave *this* notice, rather it argues that Alabama law requires it to comply only with statutory notice requirements, regardless of the terms of the mortgage contract. It contends that because the complaint does not allege a failure to comply with statutory notice requirements, the claim must fail.  This is a defense to the plaintiff's prima facie case.  *See Redman v. Fed. Home Mortgage Corp.*, 765 So. 2d 630, 637 (Ala. 1999) Lyons, Justice, concurring specially ("constructive notice, coupled with compliance with

39

statutory provisions, constituted a defense to this action alleging wrongful foreclosure"). The plaintiff is not required to affirmatively allege the absence of a defense in her complaint.

Even if the plaintiff were required to plead the absence of this defense, it is not applicable here. The defendant is arguing a defense to a different notice requirement in the mortgage. A careful reading of the contract shows that the mortgage seems to contemplate a second, separate notice form the one noted above. Following the above quoted language, the mortgage continues:

> If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law.
>
> . . .
>
> If Lender invokes the power of sale, Lender shall give a copy of a notice to Borrower. Lender shall publish the notice of sale once a week for three consecutive weeks in a newspaper published in Jefferson County, Alabama, and thereupon shall sell the Property to the highest bidder at public auction at the front door of the County Courthouse of this County.

(Doc. 1, p. 59.)

Based on this additional language, in addition to the notice of her default and rights to the plaintiff, the mortgage requires BankTrust to give a separate notice of the sale to the world. This is important because the mortgage provides that the power of sale can be invoked only "[i]f the default is not cured on or before the date specified in the [first] notice." If BankTrust did not give the first notice, in theory it could not invoke the power of sale. Since it did invoke, the plaintiff's argument goes, it breached the contract, resulting in the loss of the plaintiff's home and equity.

The plaintiff's case fails because the bankruptcy court settled the issue of whether the

mortgage could be foreclosed.  The plaintiff did not contest the sale, rather she agrees that "the [d]efendants were entitled to foreclose."  (Doc. 39, p. 6.)  She simply has no damages as a result of the first notice not being given, regardless of whether the defendant had a duty to give said notice.

E.      Count Five – Extrinsic Fraud

The complaint, in Count Five, alleges so-called "Extrinsic Fraud" against defendants Anderson, Weidner, and BankTrust.  While BankTrust is named in the title of the count, the body of the count itself contains no allegations that BankTrust did anything.  It is due to be dismissed.

As to Anderson and Weidner, the count alleges that, on October 27, 2009, they

> email[ed] a tortuous and threatening letter and draft to [the plaintiff's] attorneys. The [d]efendants threatened to file a frivolous lawsuit action against her attorneys, if they did not withdraw her lawsuit.  They also threatened to file a Motion that was filled with falsities, if her lawsuit was not withdrawn.

(Doc. 1, pp. 12, 75.)  The plaintiff attached the letter to the complaint.  (Doc. 1, p. 75.)

A review of the letter shows that it was written by Anderson.[11]  It tells the plaintiff's attorneys that he believes that they are "misinformed about several material facts and the law," and then sets out what he sees as the facts of the case.  (Doc. 1, pp. 75-76.)  It provides notice, as is required under the Alabama Attorney Liability Act, that they will pursue plaintiff's lawyers for the cost of defense of the plaintiff's case if they continue to pursue the case.  *Id.* at 76. It also attached a motion to dismiss or for summary judgment that Anderson

---

[11]The document is a letter that was sent to the plaintiff's attorneys via email only. Accordingly, it is sometimes referred to by the plaintiff as a letter and an email.

stated he was "almost ready to file." *Id.*

The complaint claims that false representations were contained in both the letter and the motion.  (Doc. 1, pp. 28-29.)  After the defendants sent this letter, the complaint claims that the plaintiff met with her attorneys and "[i]t was decided . . . that Dysart would withdraw her lawsuit." (Doc. 1, p. 29.) The complaint claims that the plaintiff dismissed her case "in reliance on the false representations."

The plaintiff's argument seems to fall under Rule 60(b)(3) which allows a court to "relieve a party or its legal representative from a final judgment, order, or proceeding for . . . fraud (whether previously called intrinsic or <u>extrinsic</u>), misrepresentation, or misconduct by an opposing party." (Emphasis added).  As noted in this court's discussion of Count One, the proper way for this contention to be raised is by motion, <u>in the original court from which the plaintiff seeks relief from judgment</u>, not here in a new action.  Further, relief under Rule 60(b)(3) must be requested no later than one year after the entry of the judgment or order.

If the plaintiff is seeking to make another run of the mill fraud claim, she has not cited, and the court is not aware of any authority, that holds that a plaintiff, who is represented by counsel, and who dismisses her suit voluntarily, can have a new action against former opposing counsel for fraud based on representations in the opposing counsel's letters and pleadings.  Even if she could, the plaintiff does not set out what representations in either the letter or the motion were false.  She does not state specifically how she relied upon them.  Such allegations are not particular enough under Rule 9(b) of the Federal Rules of Civil Procedure. Lastly, the plaintiff states that her damages were that she was "deprived . . . of an opportunity to be heard."  (Doc. 1, p. 29.)  She has since filed this suit two more times.

Clearly, that is not the case.

F.      Count Seven – Trespass

The defendants move to dismiss Count Seven.  The plaintiff does not respond to their argument in her brief.

The plaintiff claims that all defendants trespassed on her property when her mortgage was foreclosed. As noted above, the Bankruptcy Court allowed the foreclosure, and the plaintiff agrees that the defendants could foreclose on the property.  "'Trespass' has been defined as "[a]ny entry on the land of another without express or implied authority.' *Foust v. Kinney*, 202 Ala. 392, 393, 80 So. 474, 475 (1918)."  *Cent. Parking Sys. of Alabama, Inc. v. Steen*, 707 So. 2d 226, 228 (Ala. 1997).  First, the plaintiff has not cited any authority defining "foreclosure" as "trespass."   If the trespass is based upon some other act, the complaint does not specify it.  In any case, once the bankruptcy court allowed the foreclosure, and when it occurred, the defendants had the authority to enter upon the property.

G.      Count Six – Intentional Infliction of Emotional Distress

The defendants assert that this count is due to be dismissed.  The plaintiff has not responded to this argument in her brief.

"The statutory period of limitations for the tort of outrage is two years."  *Cont'l Cas. Ins. Co. v. McDonald*, 567 So. 2d 1208, 1215 (Ala. 1990). The Alabama Supreme Court has "used the term 'continuous tort' to describe a defendant's repeated tortious conduct which has repeatedly and continuously injured a plaintiff."  *Cont'l Cas. Ins. Co.*, 567 So. 2d  at

43

1215. This action was filed on June 6, 2011.  The only act alleged in the complaint which falls within two years prior to that date are the alleged misrepresentations of Anderson and Weidner in the letter and attached motion of October 27, 2009.  These acts are not part of the same repeated conduct as other acts that are outside the statute. Further, none of the acts alleged in the complaint amounts to the tort of outrage.  *See Baker v. State Farm Gen. Ins. Co.*, 585 So. 2d 804, 807 (Ala. 1991) ("'By extreme we refer to conduct so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society'") *quoting American Road Service Co. v. Inmon*, 394 So.2d 361, 365 (Ala.1981).


RECOMMENDATION

Based on the foregoing it is RECOMMENDED that the motions to dismiss be GRANTED, and this action DISMISSED as to all movants and all claims. It is further recommended that the action be DISMISSED *sua sponte* against those defendants who did not file a motion to dismiss.

Any party may file specific written objections to this report and recommendation within fourteen (14) days from the date it is filed in the office of the Clerk. Failure to file written objections to the proposed findings and recommendations contained in this report and recommendation within fourteen (14) days from the date it is filed shall bar an aggrieved party from attacking the factual findings on appeal. Written objections shall specifically identify the portions of the proposed findings and recommendation to which objection is made and the specific basis for objection. A copy of the objections must be served upon all

44

other parties to the action.

DONE this 12th day of April, 2012.

Robert R. Armstrong, Jr.
United States Magistrate Judge

IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| NELL C. DYSART, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | 2:11-cv-01917-LSC |
| | ) | |
| BANKTRUST, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OF OPINION

The magistrate judge filed a Second Report and Recommendation (Doc. 63) on April 12, 2012, recommending that motions to dismiss filed by Defendants BankTrust, W. Bibb Lamar, Jr., Edward T. Livingston, Elam P. Holley, Jr., Mac Martin, Elaine Dellinger, Anderson & Weidner, David Anderson, Deanna L. Weidner, and Ryan K. Cochran (Docs. 27, 30, 31) be granted in all respects. The magistrate judge also recommended that Plaintiff's claims against the remaining Defendants be dismissed *sua sponte*. The parties were allowed fourteen (14) days in which to file written objections to the magistrate judge's recommendation. Plaintiff filed objections on April 26, 2011. (Doc. 64.) Most Defendants filed responses to Plaintiff's objections.

(Docs. 65, 66, 67.)[1]

Plaintiff sued all Defendants for violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, *et seq.*, trespass, and intentional infliction of emotional distress.  Plaintiff also sued Defendants David Anderson, Deanna L. Weidner, and BankTrust for extrinsic fraud; Defendants David Anderson, Deanna L. Weidner, and "BankTrust/Officers / Employees" for "fraud on the court"; and Defendant BankTrust, only, for breach of contract.  (Doc. 1.)

Having carefully reviewed and considered *de novo* all the materials in the court file, including the report and recommendation, the Court finds that the magistrate judge's report and recommendation are due to be ACCEPTED and ADOPTED with regard to Plaintiff's RICO claim.  With respect to Plaintiff's remaining state law claims, the Court REJECTS the magistrate judge's report and recommendation for dismissal based on failure to state a claim and instead chooses to decline to exercise jurisdiction over these claims.  A district court may decline to exercise jurisdiction over state law causes of action if "the district court has dismissed all claims over which it had original jurisdiction."  28 U.S.C. § 1367(c)(3); *see also United Mine*

---

[1] Plaintiff filed a "Motion to Strike Anderson Weidner's Response" for being filed one day late. (Doc. 68.)  Anderson & Weidner, David Anderson, and Deanna Weidner filed their response to Plaintiff's Objections at 3:53 a.m. on May 16, 2012.  The deadline for filing was May 15, 2012.  The Court construes the late filing as a motion for leave to file out of time, which is GRANTED.  Plaintiff's Motion to Strike is DENIED.

*Workers v. Gibbs*, 383 U.S. 715, 726 (1966).  In the Complaint, Plaintiff alleges that the

Court has jurisdiction of this action under 28 U.S.C. § 1331 (federal question).  It is

apparent the Court does not have diversity jurisdiction over the state law claims.

Because the Court is dismissing Plaintiff's RICO action, it declines to exercise

jurisdiction over Plaintiff's state law claims.

For these reasons, Defendants' motions to dismiss (Docs. 27, 30, 31) will be

granted, and Plaintiff's claims against those defendants who did not file motions will

also be dismissed *sua sponte*.  A separate order will be entered.

Done this 3rd day of July 2012.

L. SCOTT COOGLER
UNITED STATES DISTRICT JUDGE
139297

FILED

2012 Jul-03 PM 02:08
U.S. DISTRICT COURT
N.D. OF ALABAMA

Case: 2:11-cv-01917-LSC   Document: 70   Filed: 07/03/12   Page: 62 of 65

Case: 12-13653     Date Filed: 07/03/2012     Page: 1 of 1

IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| NELL C. DYSART, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | 2:11-cv-01917-LSC |
| | ) | |
| BANKTRUST, et al., | ) | |
| | ) | |
| Defendants. | ) | |

ORDER

In accordance with the Memorandum of Opinion entered contemporaneously herewith, it is hereby ORDERED, ADJUDGED, and DECREED that Defendants' Motions to Dismiss (Docs. 27, 30, 31) are granted. Moreover, the remaining Defendants are dismissed from this action *sua sponte*. Plaintiff's claim under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, *et seq.*, is hereby DISMISSED, without prejudice, for failure to state a claim. Fed. R. Civ. P. 12(b)(6). Plaintiff's remaining state law claims are DISMISSED in their entirety, without prejudice, under 28 U.S.C. § 1367(c)(3). This matter is closed. Costs are taxed to the Plaintiff.

Done this 3rd day of July 2012.

_____
L. SCOTT COOGLER
UNITED STATES DISTRICT JUDGE
139297

# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

ELBERT PARR TUTTLE COURT OF APPEALS BUILDING
56 Forsyth Street, N.W.
Atlanta, Georgia 30303

John Ley
Clerk of Court

For rules and forms visit
www.ca11.uscourts.gov

July 16, 2012

Nell C. Dysart
PO BOX 10042
BIRMINGHAM, AL 35202

Appeal Number: 12-13653-E
Case Style: Nell Dysart v. Banktrust, et al
District Court Docket No: 2:11-cv-01917-LSC

**CIVIL APPEALS ARE GOVERNED BY <u>STRINGENT</u> PROCEDURES FOR REQUESTING EXTENSIONS OF TIME TO FILE BRIEFS AND RECORD EXCERPTS. RULES PROVIDE FOR <u>DISMISSAL WITHOUT FURTHER NOTICE</u> WHEN A BRIEF OR RECORD EXCERPTS IS NOT FILED OR CORRECTED WITHIN THE TIME PERMITTED. PLEASE SEE THE CIRCUIT RULES AT WWW.CA11.USCOURTS.GOV**

The referenced case has been docketed in this court. Please use the appellate docket number noted above when making inquiries. Motions for extensions of time to file a brief are frowned upon by the court.

Pursuant to 11th Cir. R. 12-1, the record in this appeal was deemed completed and filed on the date the appeal was docketed in this court.

Eleventh Circuit Rule 31-1 requires that APPELLANT'S BRIEF AND RECORD EXCERPTS BE SERVED AND FILED ON OR BEFORE <u>August 21, 2012</u>.

This is the only notice you will receive concerning the due date for filing briefs and record excerpts. (In cross-appeals pursuant to Fed.R.App.P. 28(h), the party who first files a notice of appeal is the appellant unless the parties otherwise agree.) <u>See</u> Fed.R.App.P. 28, 30, 31 and 32, and the corresponding circuit rules, for further information on preparing briefs and record excerpts.

Attorneys registered to use ECF must file briefs electronically using the ECF system. Use of ECF does not modify the requirements of the circuit rules that counsel must also provide seven (7) paper copies of a brief to the court, nor does it modify the requirements of the circuit rules

for the filing of record excerpts or expanded record excerpts in a particular case.

Attorneys not registered to use ECF must, in addition to providing seven (7) paper copies of a brief, upload the brief electronically using the EDF system. (Pro se parties may not use the EDF system, but must provide the required number of paper copies.) The EDF system is described in 11th Cir. R. 31-5, and instructions are available on the court's Web site. An EDF ID number is needed to upload your brief. If you do not remember your EDF ID number, you may look it up on the court's Web site. When uploading a brief for the first time, you will be prompted to register and create a password known only by you for all future uploads.

Attorneys and pro se parties in districts not participating in the Electronic Records on Appeal Program must file record excerpts in conformance with 11th Cir. R. 30-1 and 30-2. Attorneys and pro se parties in districts that are participating in the Electronic Records on Appeal Program, and whose cases are included in the program, must file expanded record excerpts in conformance with the Electronic Records on Appeal Program Components and Instructions for Preparing Expanded Record Excerpts, available on the court's Web site. Pro se parties who are incarcerated are not required to file record excerpts.

We have not yet received the Certificate of Interested Persons and Corporate Disclosure Statement (CIP) required by FRAP 26.1 and the accompanying circuit rules. The rules provide that the certificate must be filed by every appellant [and cross-appellant] with this court within 14 days after the date the appeal is docketed in this court, or along with the filing in this court by any party of any motion, petition, or pleading, whichever occurs first. The rules further provide that on the same day a paper certificate is served, the party filing it must also complete the court's web-based certificate at the "Electronic Filing" link of the court's website, www.ca11.uscourts.gov , by electronically providing the information required for that form. Only the ticker symbols for publicly traded corporations that are listed on the paper CIP must be entered in the web-based system. If your CIP does not include any publicly traded corporations, you are required to go to the website and simply click the button indicating that you have no publicly traded corporations to report. Pro se parties are **not required or authorized** to complete the web-based certificate.

You are hereby notified that the clerk is not authorized to submit to the court any brief (except for the reply brief of an appellant or cross-appellant), petition, answer, motion or response that does not contain the certificate, but may receive and retain the papers pending supplementation of the papers with the required certificate. You are also hereby notified that failure to submit the required certificate will result in your document(s) being returned unfiled which may ultimately result in dismissal of your appeal.

Attorneys who wish to participate in this appeal must be properly admitted either to the bar of this court or for this particular proceeding pursuant to 11th Cir. R. 46-1. An attorney not yet properly admitted must file an appropriate application for admission within fourteen (14) days from this date. In addition, all attorneys (except court-appointed counsel) who wish to participate in this appeal must complete and return an appearance form within fourteen (14) days. Application for Admission to the Bar and Appearance of Counsel Form are available on

the Internet at www.ca11.uscourts.gov . The clerk may not accept motions or other filings from an attorney until that attorney files an appearance form. See 11th Cir. R. 46-5.

Sincerely,

JOHN LEY, Clerk of Court

Reply to: Gloria M. Powell, E/dro
Phone #: (404) 335-6184


DKT-7CIV Civil-ND Crim Early Briefing